APPEAL,TYPE−E

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:26−cv−02185−BAH

CALIFORNIA v. UNITED STATES ENVIRONMENTAL PROTECTION AGENCY et al
Assigned to: Judge Beryl A. Howell
Cause: 05:702 Administrative Procedure Act

Date Filed: 06/22/2026
Jury Demand: None
Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**STATE OF CALIFORNIA** represented by

**Natalie Collins**
OFFICE OF THE ATTORNEY GENERAL
600 West Broadway Ste. 1800
San Diego, CA 95814
619−738−9140
Email: natalie.collins@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine Gaumond**
OFFICE OF THE ATTORNEY GENERAL
455 Golden Gate Ave
Suite 11000
San Francisco, CA 94102
415−510−4439
Email: katherine.gaumond@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Margaret Elaine Meckenstock**
OFFICE OF THE ATTORNEY GENERAL/CALIFORNIA
Natural Resources Law Section
1515 Clay Street
20th Floor
Oakland, CA 94612
(510) 879−0299
Email: Elaine.Meckenstock@doj.ca.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**U.S. ENVIRONMENTAL PROTECTION AGENCY** represented by

**Martha Mann**
DOJ−ENRD

Poc Daniels, Lisa
601 D Street, Nw
Room 2434
Washington, DC 20047−7754
202−616−2627
Email: martha.mann@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 305−8576
Fax: (202) 616−8470
Email: stephen.pezzi@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Hughes**
U.S. DEPARTMENT OF JUSTICE
150 M Street NE
150 M Street NE
Washington, DC 20002
202−305−4598
Email: jeffrey.hughes@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Robert Nolan Stander**
DOJ−Enrd
950 Pennsylvania Avenue, NW
Washington, DC 20530
202−717−7067
Email: robert.stander@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**LEE M. ZELDIN**
*in his official capacity as Administrator of the United States Environmental Protection Agency*

represented by

**Martha Mann**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Hughes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert Nolan Stander**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Movant**

**AMERICAN PETROLEUM INSTITUTE**

represented by **Michael B. Schon**
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW
Washington, DC 20001
202−436−4811
Email: mike@lehotskycohn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine Yarger**
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW
Washington, DC 20001
303−717−4749
Email: katie@lehotskycohn.com
*ATTORNEY TO BE NOTICED*

**Movant**

**AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS**

represented by **Michael B. Schon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine Yarger**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/22/2026 | 1 | COMPLAINT against All Defendants (Fee Status:Filing Fee Waived) filed by CALIFORNIA. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to United States Environmental Protection Agency, # 3 Summons to EPA Administrator Zeldin)(Meckenstock, Margaret) (Attachment 1 replaced on 6/22/2026) (zmtm). (Entered: 06/22/2026) |
| 06/22/2026 | | Case Assigned to Judge Beryl A. Howell. (zmtm) (Entered: 06/22/2026) |
| 06/22/2026 | 2 | SUMMONS (2) Issued Electronically as to U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 06/22/2026) |
| 06/22/2026 | | NOTICE OF NEW CASE ERROR The following error(s) need correction: Missing summonses− U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (zmtm) (Entered: 06/22/2026) |

| | | |
|---|---|---|
| 06/22/2026 | 3 | ENTERED IN ERROR.....REQUEST FOR SUMMONS TO ISSUE *as to U.S. Attorney and U.S. Attorney General* filed by STATE OF CALIFORNIA. Related document: 1 Complaint, filed by STATE OF CALIFORNIA. (Attachments: # 1 Summons)(Meckenstock, Margaret) Modified on 6/24/2026, Counsel refiled at docket entry 4 (mg). (Entered: 06/22/2026) |
| 06/23/2026 | 4 | REQUEST FOR SUMMONS TO ISSUE *as to U.S. Environmental Protection Agency; Lee Zeldin, Administrator of the U.S. Environmental Protection Agency; U.S. Attorney; and U.S. Attorney General* filed by STATE OF CALIFORNIA. Related document: 1 Complaint, filed by STATE OF CALIFORNIA.(Meckenstock, Margaret) (Entered: 06/23/2026) |
| 06/23/2026 | 5 | NOTICE of Appearance by Katherine Gaumond on behalf of STATE OF CALIFORNIA (Gaumond, Katherine) (Entered: 06/23/2026) |
| 06/23/2026 | 6 | STANDING ORDER. Signed by Judge Beryl A. Howell on June 23, 2026. (lcbah4) (Entered: 06/23/2026) |
| 06/23/2026 | 7 | ENTERED IN ERROR.....**REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Plaintiff's Proof of Service. Reason(s): Case is closed. (zmtm) Modified on 6/24/2026 (zmtm). (Entered: 06/24/2026) |
| 06/24/2026 | 8 | SUMMONS (4) Issued Electronically as to U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(mg) (Entered: 06/24/2026) |
| 06/24/2026 | 9 | AFFIDAVIT of Mailing by STATE OF CALIFORNIA re 1 Complaint, *upon U.S. Environmental Protection Agency*. (Meckenstock, Margaret) Modified event on 6/25/2026 (mg). (Entered: 06/24/2026) |
| 06/24/2026 | 10 | AFFIDAVIT of Mailing by STATE OF CALIFORNIA re 1 Complaint, *upon Lee Zeldin, Administrator, U.S. Environmental Protection Agency*. (Meckenstock, Margaret) Modified event on 6/25/2026 (mg). (Entered: 06/24/2026) |
| 06/24/2026 | 11 | AFFIDAVIT of Mailing by STATE OF CALIFORNIA re 1 Complaint, *upon Todd Blanche, Acting Attorney General*. (Meckenstock, Margaret) Modified event on 6/25/2026 (mg). (Entered: 06/24/2026) |
| 06/25/2026 | 12 | AFFIDAVIT of Mailing by STATE OF CALIFORNIA re 1 Complaint, *upon U.S. Attorney's Office for the District of Columbia*. (Meckenstock, Margaret) Modified event on 6/25/2026 (mg). (Entered: 06/25/2026) |
| 06/25/2026 | 13 | MOTION for Preliminary Injunction by STATE OF CALIFORNIA. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Austin Hicks, # 3 Declaration of M. Elaine Meckenstock, # 4 Appendix Exhibit List, # 5 Exhibit 1, # 6 Exhibit 2, # 7 Exhibit 3, # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6, # 11 Exhibit 7, # 12 Exhibit 8, # 13 Exhibit 9, # 14 Exhibit 10, # 15 Exhibit 11, # 16 Exhibit 12, # 17 Exhibit 13, # 18 Exhibit 14, # 19 Exhibit 15, # 20 Exhibit 16, # 21 Exhibit 17, # 22 Exhibit 18, # 23 Exhibit 19, # 24 Exhibit 20, # 25 Exhibit 21, # 26 Exhibit 22, # 27 Exhibit 23, # 28 Exhibit 24, # 29 Exhibit 25, # 30 Text of Proposed Order)(Meckenstock, Margaret) (Entered: 06/25/2026) |
| 06/25/2026 | 14 | MOTION to Take Judicial Notice by STATE OF CALIFORNIA. (Meckenstock, Margaret) (Entered: 06/25/2026) |
| 06/25/2026 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER (paperless) ORDERING the parties to meet and confer and to submit by June 26, 2026, at noon, a proposed briefing schedule on plaintiff's 13 Motion for a Preliminary Injunction or Stay Under 5 U.S.C. &sect 705 and 14 Request for Judicial Notice in Support of Plaintiff's Motion for Preliminary Injunction or Stay Under 5 U.S.C. &sect 705. Signed by Judge Beryl A. Howell on June 25, 2026. (lcbah4) (Entered: 06/25/2026) |
| 06/26/2026 | 15 | PROPOSED BRIEFING SCHEDULE re 13 MOTION for Preliminary Injunction , 14 MOTION to Take Judicial Notice by STATE OF CALIFORNIA. (Meckenstock, Margaret) (Entered: 06/26/2026) |
| 06/26/2026 | | MINUTE ORDER (paperless) ISSUING, upon consideration of the parties' 15 Joint Proposed Briefing Schedule, the following SCHEDULING ORDER to control proceedings for plaintiff's 13 Motion for a Preliminary Injunction or Stay Under 5 U.S.C. &sect 705 and 14 Request for Judicial Notice in Support of Plaintiff's Motion for Preliminary Injunction or Stay Under 5 U.S.C. &sect 705:<br><br>   (1) By July 10, 2026, defendants shall file in a single brief any opposition to plaintiff's pending motions;<br><br>   (2) By July 17, 2026, plaintiff shall file in a single brief any reply in support of its pending motions.<br><br>As necessary, any hearing will be set following completion of briefing on the pending motions.<br><br>Signed by Judge Beryl A. Howell on June 26, 2026. (lcbah4) (Entered: 06/26/2026) |
| 06/29/2026 | | Set/Reset Deadlines: Defendants Opposition To Plaintiff's Pending Motions due by 7/10/2026. Plaintiff Reply In Support Of Its Pending Motions due by 7/17/2026. (mac) (Entered: 06/29/2026) |
| 07/08/2026 | 16 | NOTICE of Appearance by Martha Mann on behalf of U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN (Mann, Martha) (Entered: 07/08/2026) |
| 07/09/2026 | 17 | NOTICE of Appearance by Stephen M. Pezzi on behalf of All Defendants (Pezzi, Stephen) (Entered: 07/09/2026) |
| 07/10/2026 | 18 | NOTICE of Appearance by Robert Nolan Stander on behalf of All Defendants (Stander, Robert) (Entered: 07/10/2026) |
| 07/10/2026 | 19 | NOTICE of Appearance by Natalie Collins on behalf of STATE OF CALIFORNIA (Collins, Natalie) (Entered: 07/10/2026) |
| 07/10/2026 | 20 | MOTION to Dismiss by U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order)(Mann, Martha) (Entered: 07/10/2026) |
| 07/10/2026 | 21 | Memorandum in opposition to re 13 MOTION for Preliminary Injunction filed by U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Mann, Martha) (Entered: 07/10/2026) |
| 07/10/2026 | 22 | MOTION to Intervene by AMERICAN PETROLEUM INSTITUTE, AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS. (Attachments: # 1 Memorandum in Support of Motion to Intervene, # 2 Declaration of Geoff Moody, # 3 Declaration of |

| | | |
|---|---|---|
| | | Will Hupman, # 4 Text of Proposed Order Granting Motion to Intervene, # 5 Exhibit Response in Opposition to Plaintiff's Motion for Preliminary Injunction, # 6 Text of Proposed Order Denying Plaintiff's Motion for Preliminary Injunction, # 7 Exhibit LCvR 26.1 Disclosure Statement)(Schon, Michael) (Entered: 07/10/2026) |
| 07/11/2026 | | MINUTE ORDER (paperless) ORDERING the parties to meet and confer and to submit by July 13, 2026, at 5 P.M., a proposed briefing schedule on defendants' 20 Motion to Dismiss; and DIRECTING the parties to submit, by July 13, 2026, at 5 P.M., their respective positions on the American Fuel &amp Petrochemical Manufacturers and American Petroleum Institute's 22 Motion to Intervene. Signed by Judge Beryl A. Howell on July 11, 2026. (lcbah4) (Entered: 07/11/2026) |
| 07/13/2026 | | Set/Reset Deadlines: Parties Proposed Briefing Schedule And Respective Positions On The American Fuel & Petrochemical Manufacturers And American Petroleum Institute's 22 Motion To Intervene due no later than 5:00PM on 7/13/2026. (mac) (Entered: 07/13/2026) |
| 07/13/2026 | 23 | PROPOSED BRIEFING SCHEDULE *and Notice of Position* by STATE OF CALIFORNIA. (Gaumond, Katherine) (Entered: 07/13/2026) |
| 07/13/2026 | | MINUTE ORDER (paperless) ISSUING, upon consideration of the parties' 23 Joint Schedule Proposal and Notice of Position, the following SCHEDULING ORDER to control proceedings for defendants' 20 Motion to Dismiss and American Fuel &amp Petrochemical Manufacturers and American Petroleum Institute's 22 Motion to Intervene:<br><br>   (1) By July 17, 2026, plaintiff shall file in a single brief any reply in support of its motion for a preliminary injunction or stay and any opposition to defendants' motion to dismiss;<br><br>   (2) By July 24, 2026, plaintiff shall file any opposition to American Fuel &amp Petrochemical Manufacturers and American Petroleum Institute's motion to intervene;<br><br>   (3) By July 28, 2026, defendants shall file any reply in support of their motion to dismiss; and<br><br>   (4) By July 31, 2026, the American Fuel &amp Petrochemical Manufacturers and the American Petroleum Institute shall file any reply in support of their motion to intervene.<br><br>As necessary, any hearing will be set following completion of briefing on the pending motions.<br><br>Signed by Judge Beryl A. Howell on July 13, 2026. (lcbah4) (Entered: 07/13/2026) |
| 07/14/2026 | | Set/Reset Deadlines: Plaintiff Reply In Support Of ITs Motion For A Preliminary Injunction Or Stay And Any Opposition To Defendant's Motion To Dismiss due by 7/17/2026. Plaintiff Opposition To American Fuel And Petrochemical Manufacturers And American Petroleum Institute's Motion To Intervene due by 7/24/2026. Defendants Reply In Support Of Their Moton To Dismiss due by 7/28/2026. American Fuel And Petrochemical Manufacturers And The American Petroleum Institute Reply In Support Of Their Motion To Intervene due by 7/31/2026. (mac) (Entered: |

| | | |
|---|---|---|
| | | 07/14/2026) |
| 07/14/2026 | 24 | NOTICE of Appearance by Jeffrey Hughes on behalf of U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN (Hughes, Jeffrey) (Entered: 07/14/2026) |
| 07/16/2026 | 25 | MOTION to Treat Response in Opposition to Plaintiff's Motion for Preliminary Injunction as Both a Response in Opposition and a Motion to Dismiss by AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE. (Attachments: # 1 Text of Proposed Order)(Schon, Michael) (Entered: 07/16/2026) |
| 07/17/2026 | 26 | REPLY to opposition to motion re 13 Motion for Preliminary Injunction,, filed by STATE OF CALIFORNIA. (Meckenstock, Margaret) (Entered: 07/17/2026) |
| 07/17/2026 | 27 | Memorandum in opposition to re 20 MOTION to Dismiss filed by STATE OF CALIFORNIA. (Meckenstock, Margaret) (Entered: 07/17/2026) |
| 07/17/2026 | 28 | NOTICE by STATE OF CALIFORNIA re 25 Motion for Miscellaneous Relief, (Meckenstock, Margaret) (Entered: 07/17/2026) |
| 07/22/2026 | 29 | RESPONSE re 28 Notice (Other) filed by AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE. (Schon, Michael) (Entered: 07/22/2026) |
| 07/23/2026 | 30 | NOTICE OF SUPPLEMENTAL AUTHORITY by STATE OF CALIFORNIA (Attachments: # 1 Exhibit A)(Gaumond, Katherine) (Entered: 07/23/2026) |
| 07/24/2026 | 31 | Memorandum in opposition to re 22 MOTION to Intervene filed by STATE OF CALIFORNIA. (Collins, Natalie) (Entered: 07/24/2026) |
| 07/28/2026 | 32 | REPLY to opposition to motion re 20 Motion to Dismiss filed by U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Hughes, Jeffrey) (Entered: 07/28/2026) |
| 07/31/2026 | 33 | REPLY to opposition to motion re 22 Motion to Intervene,, filed by AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE. (Schon, Michael) (Entered: 07/31/2026) |
| 08/04/2026 | | MINUTE ORDER (paperless) GRANTING plaintiff California's 14 Request for Judicial Notice in Support of Plaintiff's Motion for Preliminary Injunction or Stay Under 5 U.S.C. &sect 705. California did not comply with D.D.C. Local Rule 7(m) and include a statement in this "nondispositive motion in a civil action . . . . whether the motion is opposed" by opposing counsel, *id.*, but neither defendant nor proposed intervenors have expressed any opposition. Moreover, as the D.C. Circuit has explained, "[a] court may also consider 'matters of which it may take judicial notice' because that information 'is not subject to reasonable dispute,'" *Page v. Comey*, 137 F.4th 806, 814 (D.C. Cir. 2025) (quoting *Stewart v. Nat'l Educ. Dep't*, 471 F.3d 169, 173 (D.C. Cir. 2006), and Fed. R. Evid. 201(b)), and such materials include court−docketed filings, government−generated records and newspaper articles for which judicial notice is requested. Accordingly, the motion is GRANTED. Signed by Judge Beryl A. Howell on August 4, 2026. (lcbah4) (Entered: 08/04/2026) |
| 08/04/2026 | | MINUTE ORDER (paperless), upon consideration of the proposed−intervenors American Petroleum Institute and American Fuel &amp Petrochemical Manufacturers' (collectively, "API") 22 Motion to Intervene ("API's Mot. to Intervene"), California's |

| | | |
|---|---|---|
| | | 31 Opposition to Motion to Intervene ("Cal.'s Opp'n"), and API's 29 Reply in Support of Motion to Intervene ("API's Reply"), GRANTING API's motion to intervene.<br><br>Parties may intervene as a right "in an action if they meet four requirements: (1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of the applicant's interests." *United Mexican States v. Lion Mexico Consol. L.P.*, 172 F.4th 1, 11 (D.C. Cir. 2026) (quoting *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 156 (D.C. Cir. 1998)). The fourth of these requirements is not burdensome, and "is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *see also Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) ("This burden, however, is not onerous.").<br><br>API have established each of these elements. First, API argues, and California does not deny, *see* Cal.'s Opp'n at 5, that its "motion is timely" because its "motion came just a few weeks after the complaint was filed, at an early stage of the case, and no party will be prejudiced," API's Mot., Att. 1, API's Mem. in Supp. of Mot. to Intervene ("API's Mem.") at 5, which is enough to satisfy the first element. Second, API has identified a legally protected interest in the litigation, emphasizing that "[t]he outcome of this lawsuit may directly affect API's members, who manufacture fuels, operate refineries, and distribute and sell fuel nationwide" because "EPA has transmitted to Congress waivers that authorize California regulatory programs with substantial nationwide market consequences for liquid fuels." API's Mem. at 6. Indeed, as API argues, *see id.*, the Supreme Court's recent decision in *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025), is dispositive on this issue, since the Court reasoned that "the fuel producers persuasively contend that invalidating California's regulations would likely mean more gasoline−powered automobiles, which would in turn likely mean more sales of gasoline and other liquid fuels by the fuel producers," *id.* at 117. As to the third element, that the action must threaten to impair the legally protected interest, API has demonstrated that its members' economic interests may be affected by this suit because "California alleges that submission of the waivers threatens their continued effectiveness and seeks relief specifically designed to prevent that result." API's Reply at 5. California's theory of the case suggests that "EPA's reclassification and submission of these four waivers is a new attempt to overturn additional waivers and prevent California from enforcing its laws," Cal.'s Opp'n at 4, and, to the extent that California's relief would preserve these waivers, API's economic interests would be impaired. Fourth, API contends that "the Government must represent the broad public interest, including institutional interests, while Proposed Intervenors represent the more narrow, parochial economic and legal interests of their members," API's Mem. at 8. This is sufficient to demonstrate that EPA's representation "'may be' inadequate" to protect API's economic interests. *Trbovich*, 404 U.S. at 538 n.10. Therefore, API has satisfied all four prerequisites for intervention and its motion to intervene is GRANTED.<br><br>Signed by Judge Beryl A. Howell on August 4, 2026. (lcbah4) (Entered: 08/04/2026) |
| 08/04/2026 | | MINUTE ORDER (paperless), upon consideration of the proposed−intervenors American Petroleum Institute and American Fuel &amp Petrochemical Manufacturers' (collectively, "API") 25 Motion to Treat Their Response in Opposition to Plaintiff's Motion for Preliminary Injunction As Both a Response in Opposition and a Motion to |

| | | |
|---|---|---|
| | | Dismiss ("API's Mot. to Convert"), plaintiff California's 28 Notice ("Cal.'s Notice"), API's 29 Notice in Response to Notice ("API's Notice"), California's 31 Opposition to Motion to Intervene ("Cal.'s Opp'n"), and API's 33 Reply in Support of Motion to Intervene ("API's Reply"), which motion became ripe for resolution last Friday, July 31, 2026, GRANTING API's motion to convert their opposition.<br><br>API explains that its motion is designed to further judicial economy and avoid duplicative briefing. *See* API's Notice at 1 ("Rather than burden the Court with a second brief repeating the same jurisdictional and merits arguments, the Motion asks the Court to treat the arguments already set forth in their proposed opposition as also supporting dismissal of the Complaint."). Despite having failed to comply with Local Rule 7(m) for its own motion for judicial notice, California criticizes API's "failure to comply" with the same local rule. Cal.'s Notice at 2. California also contends that granting the motion would create prejudice by delaying the briefing schedule while "adding nothing to the case." Cal.'s Reply at 10. To avoid any such delay, and also promote efficiency and conserve judicial resources, as API promises, API's Reply at 10, API's motion to convert is ***GRANTED***, and the following ***EXPEDITED BRIEFING SCHEDULE*** is ***ISSUED***: (1) by August 7, 2026 at noon, California shall file any opposition to API's 22 −5 converted Motion to Dismiss addressing any arguments not already addressed in California's 13 Motion for a Preliminary Injunction or Stay Under 5 U.S.C. &sect 705, California's 31 Opposition to Motion to Intervene; and California's 26 Reply In Supp. of Preliminary Injunction and Opposition to Def.'s Mot. to Dismiss; and (2) by August 10, 2026, at noon, API shall file any reply.<br><br>Signed by Judge Beryl A. Howell on August 4, 2026. (lcbah4) (Entered: 08/04/2026) |
| 08/04/2026 | | MINUTE ORDER (paperless) DIRECTING the parties to appear for a hearing on California's 13 Motion for a Preliminary Injunction or Stay Under 5 U.S.C. &sect 705, defendant U.S. Environmental Protection Agency ("EPA") and Lee M. Zeldin's 20 Motion to Dismiss, and American Petroleum Institute and American Fuel &amp Petrochemical Manufacturers' 22 −5 Motion to Dismiss, on August 12, 2026, at 10 A.M. in Courtroom 26A. Signed by Judge Beryl A. Howell on August 4, 2026. (lcbah4) (Entered: 08/04/2026) |
| 08/05/2026 | | Set/Reset Deadlines/Hearings: Preliminary Injunction Hearing set for 8/12/2026 at 10:00 AM in Courtroom 26A− In Person before Judge Beryl A. Howell. California Opposition To API's 22 −5 Converted Motion to Dismiss due no later than 12:00PM on 8/7/2026. API Reply due no later than 12:00PM on 8/10/2026. (mac) (Entered: 08/05/2026) |
| 08/05/2026 | 34 | Unopposed MOTION for Extension of Time to *Hear Motions* by STATE OF CALIFORNIA. (Attachments: # 1 Text of Proposed Order)(Meckenstock, Margaret) (Entered: 08/05/2026) |
| 08/05/2026 | | MINUTE ORDER (paperless) GRANTING plaintiff's 34 Unopposed Motion to Reschedule the Hearing; DIRECTING the parties to appear for a hearing on California's 13 Motion for a Preliminary Injunction or Stay Under 5 U.S.C. &sect 705, defendant U.S. Environmental Protection Agency ("EPA") and Lee M. Zeldin's 20 Motion to Dismiss, and American Petroleum Institute and American Fuel & Petrochemical Manufacturers' 22 −5 Motion to Dismiss, on August 19, 2026, at 10 A.M. in Courtroom 26A; and, given that defendants have filed a 20 Motion to Dismiss, ORDERING defendants to file, by August 7, 2026, at 3 PM, a certified list of the contents of the administrative record, *see* D.D.C. Local Rule 7(n) ("In cases involving |

| | | |
|---|---|---|
| | | the judicial review of administrative agency actions, unless otherwise ordered by the Court, the agency must file a certified list of the contents of the administrative record with the Court .  . . simultaneously with the filing of a dispositive motion . . . ."). Signed by Judge Beryl A. Howell on August 5, 2026. (lcbah4) (Entered: 08/05/2026) |
| 08/06/2026 | | Set/Reset Deadlines/Hearings: Preliminary Injunction Hearing set for 8/19/2026 at 10:00 AM in Courtroom 26A− In Person before Judge Beryl A. Howell. Certified List Of The Contents Of The Administrative Record due no later than 3:00PM on 8/7/2026. (mac) (Entered: 08/06/2026) |
| 08/06/2026 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for August 19, 2026 at 10:00AM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833−990−9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB), **Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court.** (mac) (Entered: 08/06/2026) |
| 08/06/2026 | 35 | MOTION for Waiver *of Local Rule 7(n)(1)* by U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Attachments: # 1 Text of Proposed Order)(Hughes, Jeffrey) (Entered: 08/06/2026) |
| 08/07/2026 | | MINUTE ORDER (paperless) GRANTING defendants' consent 35 Motion for Waiver of Local Rule 7(n); and DIRECTING defendants to produce a certified list of the contents of the administrative record within 14 days of resolution of the pending motions, unless this case is dismissed. Signed by Judge Beryl A. Howell on August 7, 2026. (lcbah4) (Entered: 08/07/2026) |
| 08/07/2026 | 36 | Memorandum in opposition to re 25 MOTION to Treat Response in Opposition to Plaintiff's Motion for Preliminary Injunction as Both a Response in Opposition and a Motion to Dismiss *and AFPM's Converted Motion to Dismiss* filed by STATE OF CALIFORNIA. (Meckenstock, Margaret) (Entered: 08/07/2026) |
| 08/07/2026 | 37 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Katherine C. Yarger, Filing fee $ 100, receipt number ADCDC−12599478. Fee Status: Fee Paid. by AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE. (Attachments: # 1 Declaration of Katherine C. Yarger, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Schon, Michael) (Entered: 08/07/2026) |
| 08/10/2026 | 38 | REPLY to opposition to motion re 25 Motion for Miscellaneous Relief, filed by AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE. (Schon, Michael) (Entered: 08/10/2026) |
| 08/10/2026 | | MINUTE ORDER (paperless) GRANTING intervenor−defendants' 37 Motion for Leave to Appear Pro Hac Vice. Ms. Katherine C. Yarger may enter an appearance *pro hac vice* for the purpose of representing intervenor−defendants in this action. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on August 10, 2026. (lcbah4) (Entered: 08/10/2026) |

| | | |
|---|---|---|
| 08/12/2026 | 39 | NOTICE OF RELATED CASE by STATE OF CALIFORNIA. Case related to Case No. D.C. Cir. 26−1218. (Gaumond, Katherine) (Entered: 08/12/2026) |
| 08/12/2026 | 40 | NOTICE OF RELATED CASE by STATE OF CALIFORNIA. Case related to Case No. 9th Cir. 26−5143. (Gaumond, Katherine) (Entered: 08/12/2026) |
| 08/13/2026 | 41 | NOTICE of Appearance by Katherine Yarger on behalf of AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE (Yarger, Katherine) (Entered: 08/13/2026) |
| 08/19/2026 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 8/19/2026 re 13 Motion for Preliminary Injunction 20 Motion to Dismiss and [22−5] Motion To Intervene Exhibit Response in Opposition to Plaintiff's Motion for Preliminary Injunction. The Court Heard Oral Arguments From The Parties. The Court Will Reserve Judgment. (Court Reporter REBECCA MONROE.) (mac) (Entered: 08/19/2026) |
| 08/20/2026 | | MINUTE ORDER (paperless), in light of the issues not addressed in briefing and requiring clarification after the August 19, 2026, hearing regarding plaintiff California's 13 Motion for a Preliminary Injunction or Stay Under 5 U.S.C. &sect 705, defendant U.S. Environmental Protection Agency ("EPA") and Lee M. Zeldin's 20 Motion to Dismiss, and defendant−intervenors American Petroleum Institute and American Fuel &amp Petrochemical Manufacturers' 22 −5 Motion to Dismiss, DIRECTING, by August 21, 2026, at 5 P.M., that:<br><br>   (1) plaintiff and defendants jointly submit a fulsome explanation as to why either 42 U.S.C. &sect 7604 or 42 U.S.C. &sect 7607 does not deprive this Court of jurisdiction;<br><br>   (2) defendants submit a fulsome explanation as to why 42 U.S.C. &sect 7543(b) controls the process for withdrawal of a Clean Air Act Section 209(b) waiver, as EPA's counsel represented at the hearing, rather than an Administrative Procedure Act procedure, e.g., 5 U.S.C. &sect&sect 553, 558(c); and<br><br>   (3) defendant−intervenors (i) state whether either American Petroleum Institute or American Fuel &amp Petrochemical Manufacturers, or both, submitted comments to EPA during the administrative process resulting in the grant of any of the four Section 209(b) waivers at issue, and (ii) attach any comments or statements submitted by the intervenors during those administrative processes.<br><br>Signed by Judge Beryl A. Howell on August 20, 2026. (lcbah4) (Entered: 08/20/2026) |
| 08/21/2026 | | Set/Reset Deadlines: Parties Submission To The Court due no later than 5:00PM on 8/21/2026. (mac) (Entered: 08/21/2026) |
| 08/21/2026 | 42 | RESPONSE TO ORDER OF THE COURT re Order,,,,,, *concerning 42 U.S.C. 7604, 7607* filed by STATE OF CALIFORNIA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Meckenstock, Margaret) (Entered: 08/21/2026) |
| 08/21/2026 | 43 | RESPONSE TO ORDER OF THE COURT re Order,,,,,, filed by AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Schon, Michael) (Entered: 08/21/2026) |
| 08/21/2026 | 44 | |

| | | |
|---|---|---|
| | | RESPONSE TO ORDER OF THE COURT re Order,,,,,, filed by U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Mann, Martha) (Entered: 08/21/2026) |
| 09/02/2026 | 45 | ORDER GRANTING California's 13 Motion for a Preliminary Injunction or Stay Under 5 U.S.C. &sect 705; DENYING defendants U.S. Environmental Protection Agency and Lee M. Zeldin's 20 Motion to Dismiss; and DENYING defendant−intervenors American Petroleum Institute and American Fuel &amp Petrochemical Manufacturers's 22 −5 Motion to Dismiss. See Memorandum Opinion for further details. Signed by Judge Beryl A. Howell on September 2, 2026. (lcbah4) (Entered: 09/02/2026) |
| 09/02/2026 | 46 | MEMORANDUM OPINION regarding California's 13 Motion for a Preliminary Injunction or Stay Under 5 U.S.C. &sect 705; defendants U.S. Environmental Protection Agency and Lee M. Zeldin's 20 Motion to Dismiss; and DENYING defendant−intervenors American Petroleum Institute and American Fuel &amp Petrochemical Manufacturers's 22 −5 Motion to Dismiss. Signed by Judge Beryl A. Howell on September 2, 2026. (lcbah4) (Entered: 09/02/2026) |
| 09/03/2026 | | Set/Reset Deadlines: EPA Status Report due by 9/21/2026 (mac) (Entered: 09/03/2026) |
| 09/04/2026 | 47 | Unopposed MOTION for Leave to File *Supplemental Complaint* by STATE OF CALIFORNIA. (Attachments: # 1 Memorandum in Support with exhibit list, # 2 Exhibit A − Proposed Supplemental Complaint, # 3 Exhibit B − Redline, # 4 Exhibit C − Proposed Memo I S O PI Motion, # 5 Exhibit D − EPA At−Berth Submission, # 6 Exhibit E − EPA CHC Submission, # 7 Text of Proposed Order)(Meckenstock, Margaret) (Entered: 09/04/2026) |
| 09/04/2026 | | MINUTE ORDER (paperless) GRANTING plaintiff California's 47 unopposed Motion for Leave to Supplement the Complaint; and DIRECTING California to file, by September 8, 2026, at 5 P.M., any supplemental complaint. Signed by Judge Beryl A. Howell on September 4, 2026. (lcbah4) (Entered: 09/04/2026) |
| 09/04/2026 | 48 | AMENDED COMPLAINT *(Supplemental Complaint)* against All Defendants filed by STATE OF CALIFORNIA.(Meckenstock, Margaret) (Entered: 09/04/2026) |
| 09/09/2026 | 49 | Second MOTION for Preliminary Injunction by STATE OF CALIFORNIA. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Meckenstock, Margaret) (Entered: 09/09/2026) |
| 09/11/2026 | 50 | TRANSCRIPT OF PROCEEDINGS before Judge Beryl A. Howell held on 8/19/2026; Page Numbers: 1−88. Date of Issuance:9/11/2026. Court Reporter Rebecca Monroe, email: rebecca_monroe@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which |

| | | |
|---|---|---|
| | | includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/2/2026. Redacted Transcript Deadline set for 10/12/2026. Release of Transcript Restriction set for 12/10/2026.(Monroe, Rebecca) (Entered: 09/11/2026) |
| 09/11/2026 | 51 | Unopposed MOTION for Extension of Time to File Answer by AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE. (Schon, Michael) (Entered: 09/11/2026) |
| 09/11/2026 | 52 | Unopposed MOTION for Extension of Time to File Answer by U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE M. ZELDIN. (Hughes, Jeffrey) (Entered: 09/11/2026) |
| 09/11/2026 | | MINUTE ORDER (paperless), upon consideration of plaintiff California's 49 Second Motion for Preliminary Injunction, DIRECTING the parties to meet and confer and to submit by September 14, 2026, at 2 P.M., a proposed briefing schedule on plaintiff's second motion for preliminary injunction; GRANTING defendant−intervenors American Petroleum Institute and American Fuel &amp Petrochemical Manufacturers' 51 Unopposed Motion for Extension of Time to File Answer; DIRECTING defendant−intervenors to submit any response to the 48 Amended Complaint by September 30, 2026; GRANTING defendant U.S. Environmental Protection Agency ("EPA") and Lee M. Zeldin's 52 Unopposed Motion for Extension of Time to File Answer; and DIRECTING defendant to submit any response to the 48 Amended Complaint by September 30, 2026. Signed by Judge Beryl A. Howell on September 11, 2026. (lcbah4) (Entered: 09/11/2026) |
| 09/11/2026 | 53 | MOTION to Expedite re 49 Second MOTION for Preliminary Injunction by STATE OF CALIFORNIA. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Meckenstock, Margaret) (Entered: 09/11/2026) |
| 09/12/2026 | | MINUTE ORDER (paperless), upon consideration of plaintiff California's 53 Motion for Expedited Ruling on Its Second Preliminary Injunction Motion, in which the position of defendants the U.S. Environmental Protection Agency (and its Administrator, in his official capacity) is quoted in full, *see id.*, Att. 1, Cal.'s Mem. of P. &amp A. in Supp. of Pl.'s Mot. for Expedited Ruling at 2 n.2, but no position is provided for defendant−intervenors American Petroleum Institute and American Fuel & Petrochemical Manufacturers because during repeated conferrals they have chosen to remain elusive, declining to agree that no additional briefing is necessary, while providing no reasoning nor "identif[ying] any distinction between the June and July reclassifications that would warrant additional briefing," *id.* at 2−3, DIRECTING defendant−intervenors to submit, by today, September 12, 2026, at 4 P.M., a notice as to whether their position differs in any way from that of EPA. Signed by Judge Beryl A. Howell on September 12, 2026. (lcbah4) (Entered: 09/12/2026) |
| 09/12/2026 | 54 | RESPONSE TO ORDER OF THE COURT re Order,,,, filed by AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE. (Schon, Michael) (Entered: 09/12/2026) |
| 09/12/2026 | 55 | MEMORANDUM AND ORDER GRANTING plaintiff California's 49 Second Motion for Preliminary Injunction; and GRANTING California's 53 Motion for Expedited Ruling on Its Second Preliminary Injunction Motion. See Memorandum &amp Order for further details. Signed by Judge Beryl A. Howell on September 12, 2026. (lcbah4) |

| | | |
|---|---|---|
| | | (Entered: 09/12/2026) |
| 09/13/2026 | | MINUTE ORDER (paperless) VACATING AS MOOT the direction issued September 11, 2026, that "the parties [] meet and confer and [] submit by September 14, 2026, at 2 P.M., a proposed briefing schedule on plaintiff's second motion for preliminary injunction." Signed by Judge Beryl A. Howell on September 13, 2026. (lcbah4) (Entered: 09/13/2026) |
| 09/14/2026 | | Set/Reset Deadlines: EPA Status Report due by 9/30/2026 (mac) (Entered: 09/14/2026) |
| 09/14/2026 | | Set/Reset Deadlines: Defendant−Intervenors And Defendan U.S. Environmental Protection Agency ("EPA") and Lee M. Zeldin's Response To Amended Complaint due by 9/30/2026. (mac) (Entered: 09/14/2026) |
| 09/14/2026 | 56 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 55 Order on Motion for Preliminary Injunction,, Order on Motion to Expedite, 46 Memorandum & Opinion, 45 Order on Motion for Preliminary Injunction,, Order on Motion to Dismiss, by LEE M. ZELDIN, U.S. ENVIRONMENTAL PROTECTION AGENCY. Fee Status: No Fee Paid. (Hughes, Jeffrey) (Entered: 09/14/2026) |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF CALIFORNIA,<br>*Plaintiff,*<br>v.<br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency,<br>*Defendants,*<br>and<br>AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AND AMERICAN PETROLEUM INSTUTITE,<br>*Defendant-Intervenors.* | Case No. 1:26-cv-02185-BAH |

**NOTICE OF APPEAL**

Pursuant to Federal Rules of Appellate Procedure 3 and 4 and 28 U.S.C. § 1292(a)(1), the United States Environmental Protection Agency and Lee Zeldin (together, "EPA") appeal to the United States Court of Appeals for the District of Columbia Circuit from the District Court's orders (1) granting California's motion for a preliminary injunction and denying EPA's motion to dismiss entered on September 2, 2026, Dkt. 45, 46, and (2) granting California's second motion for a preliminary injunction entered on September 12, 2026, Dkt. 55.

Dated: September 14, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

STEPHEN M. PEZZI
(DC Bar #995500)
Chief Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
stephen.pezzi@usdoj.gov
(202) 305-8576

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
(DC Bar #1028454)
*Deputy Assistant Attorney General*

*/s/ Jeffrey Hughes*
MARTHA C. MANN
(FL Bar #155950)
JEFFREY HUGHES
(NY Bar #5367214)
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 717-7067 (Stander)
(202) 353-5900 (Mann)
(202) 532-3080 (Hughes)
robert.stander@usdoj.gov
martha.mann@usdoj.gov
jeffrey.hughes@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CALIFORNIA,<br>Plaintiff,<br>v.<br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br>Defendants. | Civil Action No. 26-cv-2185 (BAH)<br><br>Judge Beryl A. Howell |

**ORDER**

Upon consideration of plaintiff California's Motion for a Preliminary Injunction, ECF No. 13; defendants the U.S. Environmental Protection Agency's (and its Administrator, in his official capacity) (collectively, "EPA") Motion to Dismiss, ECF No. 20; defendant-intervenors American Petroleum Institute and American Fuel & Petrochemical Manufacturers' Motion to Dismiss, ECF No. 22-5; the memoranda and exhibits submitted in support and opposition; and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby:

**ORDERED** that defendants' Motion to Dismiss, ECF No. 20, is **DENIED**; it is further

**ORDERED** that defendant-intervenors' Motion to Dismiss, ECF No. 22-5, is **DENIED**; it is further

**ORDERED** that plaintiff's Motion for a Preliminary Injunction, ECF No. 13, is **GRANTED**; it is further

**ORDERED** that defendant EPA take all necessary steps within the agency's control to restore the *status quo*, as it existed before EPA's June 12, 2026 press release, as to the four Clean Air Act preemption waiver orders referenced in the press release and titled "Motor Vehicle Evaporative Emissions and Greenhouse Gas ('Advanced Clean Cars I' (ACCI))," "Reinstatement of ACC I," "Small Offroad Engine (SORE) Amendments," and "Greenhouse Gas Emission Standards – 2009 and Subsequent Model Years"; it is further

**ORDERED** that defendant EPA withdraw or correct EPA's reclassifications of these four Clean Air Act Section 209(b) waiver orders, and other such reclassifications, from orders to rules in all public statements, including the June 12, 2026 press release; it is further

**ORDERED** that defendant EPA is **ENJOINED** and **STAYED**, pursuant to 5 U.S.C. § 705, from giving effect to the reclassification of these four Clean Air Act Section 209(b) waiver orders, and other such reclassifications, from orders to rules; it is further

**ORDERED** that defendant EPA submit, by September 21, 2026, a status report summarizing the steps taken to comply with this order; and it is further

**ORDERED** that this Order shall remain in effect until further order of this Court.

**SO ORDERED.**

*This is an appealable order.*

Date: September 2, 2026

**BERYL A. HOWELL**
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br><br>Defendants. | Civil Action No. 26-cv-2185 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

This is no run-of-the-mill challenge to agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* At stake in this case is purposeful agency action to tell Congress one thing while operating differently elsewhere, with the purpose of invoking a legal mechanism that could halt future efforts by the agency itself, as well as California and other States, to control emissions of air pollutants and ensure cleaner air. Despite these potential long-term effects, the U.S. Environmental Protection Agency ("EPA"), aligned with intervenors American Fuel & Petrochemical Manufacturers ("AFPM") and American Petroleum Institute ("API"), contend this action is off-limits to judicial review—and they are partially right.

Since 1967, the Clean Air Act (or "CAA"), 42 U.S.C. § 7401 *et seq.*, has allowed California to seek waivers from EPA to be permitted to set more stringent vehicle emission standards than those imposed by the federal government. Compl. ¶¶ 1-3, ECF No. 1. Then, as now, California was seen as an innovator in pollution control, having begun statewide efforts to control air pollution a decade earlier than such efforts at the federal level. *See Motor & Equip. Mfrs. Ass'n v. EPA* (*MEMA I*), 627 F.2d 1095, 1109 n.26 (D.C. Cir. 1979). Indeed, the rationale underlying Congress's choice of this scheme is encapsulated in the only comment made during congressional

consideration directed at the waiver provision in what is now part of the Clean Air Act: "I am firmly convinced that the United States as a whole will benefit by allowing California to continue setting its own more advanced standards for control of motor vehicle emissions. In a sense, our State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research. . . . Our State intends to continue its efforts to eliminate air pollution without letup and asks only that no roadblocks be put in its path." 113 Cong. Rec. 32478 (1967) (remarks of Sen. George Murphy), *quoted in MEMA I*, 627 F.2d at 1110 n.31. This congressional encouragement of limited State experimentation was expanded in 1977, with an amendment to the CAA allowing States to choose to adopt the standards issued by either California or the EPA, 42 U.S.C. § 7507, with seventeen additional States and the District of Columbia opting to follow many California standards, s*ee* Benjamin M. Barczewski, Kathryn G. Kynett & Emily N. Peterson, Cong. Rsch. Serv., R48168, *California and the Clean Air Act (CAA) Waiver: Frequently Asked Questions* 7 (2025) ("2025 CRS Report").

In the intervening half century since Congress created a preemption waiver process for California in the CAA, EPA has denied California a waiver in full only once, and California has continued its efforts to eliminate various types of air pollution without federal roadblocks. *See* Cal.'s Mot. for Prelim. Inj., Mem. in Supp. ("Cal.'s Mem.") at 4, ECF No. 13-1. This historical practice was disrupted in February 2025, when EPA reclassified three of California's waiver orders, granted between 2023 and 2024 and already in effect, as "rules" subject to submission to Congress for review under the Congressional Review Act (or "CRA"), 5 U.S.C. § 801 *et seq.* Compl. ¶ 13. Utilizing the CRA's expedited procedures, Congress enacted disapproval resolutions subsequently signed by the President in June 2025, repealing the three waiver orders. *Id.* ¶¶ 69-70. One year later, on June 12, 2026, EPA again reclassified as "rules" and submitted to Congress

four additional California preemption waiver orders, originally granted between 2009 and 2024, prompting California to file this lawsuit. *Id.* ¶¶ 7, 9. Not finished, on July 22, 2026, during the pendency of this litigation, EPA reclassified another two California waiver orders as "rules" and submitted them to Congress. *See* Cal.'s Notice of Suppl. Auth. at 1, ECF No. 30.

California's preemption waivers have been resisted at every turn by the two intervenors in this action—AFPM and API (collectively, "defendant-intervenors"), which are trade associations representing "fuel producers, refiners, distributors, and retailers that operate throughout the United States" and have a commercial interest in opposing these "regulations designed to reduce demand for liquid fuels." Def.-Intervenors' Mot. to Intervene, Mem. in Supp. at 1-2, ECF No. 22-1.[1] The objections raised by those two trade associations during EPA's consideration of some of the preemption waivers at issue in this lawsuit, were heard but overruled, and the waivers went into effect. The bullseye on the CAA's long-standing preemption waivers to California has nevertheless persisted, and the torch carried by trade associations for the petroleum industry is now being lifted by EPA, in remarkable lock-step with the political planning document, referred to as "Project 2025" or "2025 Presidential Transition Project," issued in April 2023 by the Heritage Foundation, which document outlined the precise legal steps now being employed by the EPA, namely, to bypass normal administrative and legislative processes to invalidate even long-standing

[1] "AFPM is the leading trade association representing the makers of [] fuels," and AFPM members Cenovus, Chevron U.S.A. Inc., Flint Hills Resources, HF Sinclair, Marathon Petroleum, and Valero sell gasoline and diesel" in states that follow California's emissions standards. *Id.*, Att. 2, Decl. of AFPM's Senior Vice President of Gov't Rels. & Pol'y, Geoff Moody ("Moody Decl.") ¶¶ 3, 5, ECF No. 22-2. Similarly, "API is a national, not-for-profit trade association representing all segments of America's oil and natural gas industry," and its "membership includes approximately 600 companies engaged in producing, refining, transporting, and marketing petroleum and natural gas products," such as "Chevron Corporation and Marathon Petroleum Corporation" and other "large integrated energy companies, independent producers, refiners, pipeline operators, marketers, and marine transporters." *Id.*, Att. 3, Decl. of API's Vice President of Downstream Pol'y, Will Hupman ("Hupman Decl.") ¶¶ 3-4, ECF No. 22-3. Members of both petroleum trade associations are concerned that their "sales will be reduced, causing monetary injury, if California's waivers remain effective." Moody Decl. ¶ 6; Hupman Decl. ¶ 10.

federal regulatory actions by using the CRA's expedited congressional procedure applicable to a limited subset of agency rules. *See infra* n.2.

The central problem for EPA is that the waivers themselves explicitly state that they are not rules, while the CRA limits invocation of this statute only to agency rules of general applicability, which EPA, in its own words, has emphatically stated Clean Air Act waiver orders are not. This forces on EPA the dilemma of admitting either that "agency action" within the meaning of the APA occurred when EPA reclassified the waivers as rules of general applicability subject to the CRA, or that the agency simply labeled the waivers as rules in reports to Congress, despite EPA consistently expressing the view that these waivers, in fact, did not meet the prerequisite under the CRA of a rule of general applicability—with the latter choice raising the obvious specter of the current EPA Administrator having submitted misleading reports to Congress. Faced with this dilemma, EPA and its petroleum trade association intervenor-defendants invite this Court to engage in Orwellian doublethink, offering two explanations simultaneously for what the agency has done: first, EPA just determined, despite its prior determinations to the contrary, that the four waivers should be reclassified and treated as "rules" and so were submitted to Congress, pursuant to the CRA, but also, second, EPA merely sent a report to Congress, and no reclassification of the waivers as "rules" occurred at all and thus no rights have been effected of California and other States, which have adopted regulatory programs in reliance on the waiver orders. Given that the CRA requires agencies' submission to Congress of only certain types of "rules," these two explanations are irreconcilable.

In other words, EPA urges that the Court pay no attention to the language of the waiver decisions themselves or to the statutory definitions provided under the APA and CRA, and certainly pay no attention to what the agency tells Congress—since no matter the actions EPA

takes to send these waivers to Congress, the CRA precludes judicial review. Whether EPA may successfully cloak its actions from judicial review with the CRA's judicial review bar "does not turn upon its say-so," however, and such an assertion was described in analogous circumstances by the D.C. Circuit "as a 'preposterous position' because a 'bald assertion of power by an agency cannot legitimize it.'" *Ardelyx, Inc. v. Kennedy*, 179 F.4th 947, 955 (D.C. Cir. 2026) (quoting *COMSAT Corp. v. FCC*, 114 F.3d 223, 227 (D.C. Cir. 1997)). "Otherwise, agencies could characterize reviewable or unauthorized action as falling within the scope of no-review provisions whose application to such action Congress did not intend." *Id.* (quoting *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004)). Outside of Oceania, such an unreviewable power grab by a federal agency is not permitted. To avoid the conclusion that EPA may have purposely submitted a misleading report to Congress, the only remaining conclusion is that EPA has reclassified its prior waiver orders as "rules." EPA's reclassification is an action subject to judicial review under the APA.

California is able to overcome the various grounds presented by EPA and defendant-intervenors for dismissal of this lawsuit: the judicial review bar created by the Congressional Review Act does not preclude judicial review, and California has established Article III standing and also demonstrated that EPA's decisions to reclassify the waivers constitute final agency action. Further, California has satisfied all four factors requisite for emergency injunctive relief. Accordingly, for the reasons explained more fully below, California's motion for a preliminary injunction is granted, *see* ECF No. 13, and EPA's and intervenor-defendants' motions to dismiss are denied, *see* ECF Nos. 20, 22-5.

## I. BACKGROUND

Set out below is an overview of the relevant statutory framework of the Clean Air Act and the Congressional Review Act for resolving California's pending motion for a preliminary injunction and EPA's and intervenor-defendants' pending motions to dismiss, followed by the factual and procedural background for this case.

### A. Statutory Framework

Before the twentieth century, responsibility for the regulation of pollution rested primarily with the States, giving each State, in Justice Holmes' words, "an interest independent of and behind the titles of its citizens, in all the earth and air within its domain" and "the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air." *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). This paradigm changed by the middle of the twentieth century, as control over pollution became entwined with our system of federalism through increasing congressional action and executive branch involvement. The significant air pollution-control statute, the Clean Air Act, enacted in 1963, preserved the ability for California to retain and improve its already robust regulation over air pollution, subject to EPA's approval, reflecting the continuing congressional nod to individual State sovereignty. As noted, this law was subsequently amended, in 1977, to authorize other States to choose to follow California's rules.

Nearly twenty years later, the Congressional Review Act was enacted, in 1996, as part of the Contract with America Advancement Act, Pub. L. No. 104-121, 110 Stat. 847 (1996), "to strengthen congressional oversight of agency rulemaking, requir[ing] federal agencies to submit a report on each new rule to both houses of Congress and to the Comptroller General for review before a rule can take effect," Cal.'s Mot., Ex. 4, U.S. Gov't Accountability Off., B-334309, *In re Environmental Protection Agency—Applicability of the Congressional Review Act to Notice of*

*Decision on Clean Air Act Waiver of Preemption* 4 ("2023 GAO Decision") (Nov. 30, 2023), ECF No. 13-8.

The statutory backgrounds for California's waivers under the Clean Air Act and the Congressional Review Act are described in more detail below.

### 1. *The Clean Air Act*

The Clean Air Act, 42 U.S.C. § 7401 *et seq.*, "authorized federal authorities to expand their research efforts, to make grants to state air pollution control agencies, and also to intervene directly to abate interstate pollution in limited circumstances." *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 63-64 (1975). "No federal statute purported to regulate emissions from motor vehicles until 1965, when Congress enacted the Motor Vehicle Pollution Control Act," Pub. L. No. 89-272, 79 Stat. 992 (1965) (codified as amended 42 U.S.C. § 7401 *et seq.*), but "the statute contained no express preemption provision." *MEMA I*, 627 F.2d at 1108. "Congress' entry into the field and the heightened state activity after 1965 raised the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers." *Id.* at 1109. Thus, "[a]cting on this concern, Congress in 1967 expressed its intent to occupy the regulatory role over emissions control to the exclusion of all the states," except for California, which had a decade head-start in developing "[c]omprehensive statewide efforts" for "pollution control from motor vehicles" starting in 1957. *Id.* & n.26; *see also Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1078 (9th Cir. 2013) ("California has long been in the vanguard of efforts to protect the environment, with a particular concern for emissions from the transportation sector.").

To receive a waiver from the otherwise applicable federal preemption over emissions control regulations, *see* 42 U.S.C. § 7543(a), California must "determine[] that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal

standards," *id.* § 7543(b)(1). If such a determination is made, California will only be denied a waiver if the EPA Administrator finds that "the determination of the State is arbitrary and capricious," that "such State does not need such State standards to meet compelling and extraordinary conditions," or that "such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title." *Id.* § 7543(b)(1)(A)-(C). "Congress intended the State to continue and expand its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program; in short, to act as a kind of laboratory for innovation." *MEMA I*, 627 F.2d at 1111; *accord New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

"Since the inception of the federal government's emissions control program it has drawn heavily on the California experience to fashion and to improve the national efforts at emissions control," so, for example, "[t]he first federal emission standards were largely borrowed from California." *MEMA I*, 627 F.2d at 1110 & n.34; *see also Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 454 (D.C. Cir. 1998) ("California first required automobile manufacturers to install OBDs [on-board emissions diagnostic devices] in new cars sold in the state in 1988—two years before Congress mandated the installation of OBDs in cars sold nationwide."). In 1977, "Congress amended the CAA to permit other states to adopt and enforce standards 'identical to the California standards for which a waiver has been granted,' without obtaining a separate waiver, provided that both California and the other state have given manufacturers a two-year lead time." *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 196 (D.C. Cir. 2011) (quoting 42 U.S.C. § 7507); *Ford Motor*

*Co. v. EPA*, 606 F.2d 1293, 1297 (D.C. Cir. 1979) ("In short, Congress consciously chose to permit California to blaze its own trail with a minimum of federal oversight."); *see also N.Y. Auto. Dealers Ass'n v. N.Y. Dep't of Env't Conservation*, 827 F. Supp. 895, 902 (N.D.N.Y. 1993) ("By permitting states like New York to adopt California's new vehicle emission standards, Congress implicitly accepted the consequences of that action which were that automobile dealers in such adopting states would be limited to selling California certified vehicles and consumers in such states would be limited to registering only those vehicles. . . . Congress effectively sacrificed that interest in favor of the legitimate police powers of states.").

"[P]ollution and climate change have particularly harmful impacts on California due to its large agriculture and ocean-based economies, dependence on an over-stressed water supply, long coastlines, and susceptibility to wildfires." *Ohio v. EPA*, 98 F.4th 288, 297 (D.C. Cir. 2024) (per curiam), *rev'd on other grounds, remanded sub nom. Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025). Indeed, California "contains seven of the ten worst areas for ozone pollution in the country and six of the ten worst areas for small particulate matter" and "faces increasing risks from record-setting fires, heat waves, storm surges, sea-level rise, water supply shortages and extreme heat." *Id.* (citation and internal quotations omitted). Consequently, while "[i]n the 1960s and 1970s, California's emissions standards focused on ozone-generating pollutants, like nitrogen oxides," more recently, "California expanded its regulatory program to restrict a variety of other emissions, such as methane and other greenhouse gases." *Id.* at 296.

"EPA has granted California more than 100 waivers across multiple administrations for various mobile source emissions standards." 2025 CRS Report at 14. As of May 9, 2025, "17 states and the District of Columbia have adopted some subset of California's motor vehicle air pollutant and GHG emissions standards," *id.* at 7, and the California Air Resources Board (or

"CARB") estimates that states following California's standards "accounted for 39.7% of new light-duty vehicle registrations and 25.4% of new heavy-duty vehicle registrations," *id.*

**2. *The Congressional Review Act***

"Enacted as part of the Contract with America Advancement Act of 1996, Pub. L. No. 104-121, 110 Stat. 847, the Congressional Review Act[ ("CRA"), 5 U.S.C. § 801 *et seq.*,] was designed to give Congress an expedited procedure to review and disapprove federal regulations." *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 556 (9th Cir. 2019). The CRA requires that "[b]efore a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing . . . (i) a copy of the rule; (ii) a concise general statement relating to the rule, including whether it is a major rule; and (iii) the proposed effective date of the rule." 5 U.S.C. § 801(a)(1)(A). "Upon receipt of a report submitted . . . , each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued." 5 U.S.C. § 801(a)(1)(C).

The CRA generally adopts the APA's definition of the word "rule," *see id.* § 804(3), as "mean[ing] the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing," *id.* § 551(4) (APA definition of "rule"). Three express exclusions from the APA's definition of "rule" are made in the CRA, which more narrowly defines a "rule" to exclude: (1) "any rule of particular applicability," (2) "any rule relating

to agency management or personnel," and (3) "any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties." *Id.* § 804(3).

The CRA provides an expedited congressional disapproval process for considering a submitted federal agency report, including provisions that outline the procedural steps for submission of the report, the timeframe for congressional action in the form of a "joint resolution," and the treatment by the House and the Senate of a joint resolution received from the other House. *See id.* §§ 801-802. Importantly, to avoid disapproval and concomitant invalidation of a rule on which regulated entities had already relied, only new agency rules are contemplated for submission to Congress for review. Specifically, the CRA provides that "[b]efore a rule can take effect, the Federal agency promulgating such rule shall submit . . . a report" with information about the rule, including "the proposed effective date of the rule." *Id.* § 801(a)(1)(A). As to the timing for consideration of such a report, Congress generally has sixty days after receipt of an agency report to take action. *See id.* § 802(a). A fast-track procedure is available under the CRA for the Senate to take action: if the committee to which the Senate assigns the joint resolution has not reported that resolution after twenty calendar days, a petition supported by thirty Senators can discharge consideration of the joint resolution by the committee and place the resolution on the calendar. *Id.* § 802(c). Additionally, "[i]n the Senate, debate on the joint resolution, and on all debatable motions and appeals in connection therewith, shall be limited to not more than 10 hours, which shall be divided equally between those favoring and those opposing the joint resolution." *Id.* § 802(d)(2). This limitation appears to eliminate the possibility of a filibuster. *See also id.* ("An amendment to, or a motion to postpone, or a motion to proceed to the consideration of other business, or a motion to recommit the joint resolution is not in order."). Finally, any CRA

resolution that has been passed by the House of Representatives "shall not be referred to a committee" but instead will receive a full vote in the Senate. *Id.* § 802(f)(1).

These procedures provided in Section 802 are deemed to be "an exercise of the rulemaking power of the Senate and House of Representatives, respectively." *Id.* § 802(g) (1). Thus, each House has the right "to change the rules (so far as relating to the procedure of that House) at any time, in the same manner, and to the same extent as in the case of any other rule of that House." *Id.* § 802(g)(2).

Passage by the House of Representatives and Senate of a "joint resolution of disapproval," which is then signed by the President, has immediate and potentially long-lasting consequences. *Id.* § 801(b)(1). As an immediate matter, any agency rule disapproved in a presidentially executed disapproval joint resolution "shall not take effect (or continue)." *Id.* "[I]f the Congress passes a joint resolution of disapproval . . . , and the President signs a veto of such resolution," the rule will take effect on the earlier date "on which either House of Congress votes and fails to override the veto of the President" or "occurring 30 session days after the date on which the Congress received the veto and objections of the President." *Id.* § 801(a)(3)(B). As to future consequences, not only does the rule "not take effect" but also the rule "may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule." *Id.* § 801(b)(2).

Finally, and relevant here, the CRA provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." *Id.* § 805.

### B. Factual Background

The factual background relating to Congress's joint disapproval resolutions eliminating three of California's Clean Air Act waivers in 2025 is discussed first, followed by descriptions of

the four waivers at issue in this lawsuit that EPA also reclassified as "rules" and submitted to Congress under the CRA, as announced in a press release on June 12, 2026.

### 1. *June 2025 Revocation of Three California CAA Preemption Waivers*

Since the enactment of the CRA thirty years ago, "EPA [has] consistently maintained its position that Clean Air Act waiver decisions are not rules." Compl. ¶ 42. Similarly, "[t]he Government Accountability Office (GAO)—the non-partisan entity on which Congress relies for CRA applicability determinations—has agreed that waivers are not rules under that statute (or the APA)." *Id.* ¶ 43 (citing 2023 GAO Decision). Notwithstanding this historical consensus and practice, in February 2025, EPA "Administrator Lee Zeldin announced in the Oval Office, alongside President Donald Trump . . . that the EPA will be transmitting to Congress the Biden Administration's rules granting waivers that allowed California to preempt federal car and truck standards." Cal.'s Mot., Ex. 7, Press Release, EPA, *Trump EPA to Transmit California Waivers to Congress in Accordance with Statutory Reporting Requirements* ("EPA Feb. 2025 Press Release") (Feb. 14, 2025), ECF No. 13-11.[2] Targeted in this EPA action were three Clean Air Act preemption waivers previously granted to California in 2023, 2025, and 2025, respectively.[3]

---

[2] The use of the CRA to target California's waivers was a tactic outlined before the 2024 presidential election in the Heritage Foundation's Project 2025 policy guide, titled *Mandate for Leadership: The Conservative Promise*, chapter 13 of which focuses on the EPA and advocates that "Congress should prioritize several EPA science activity reforms," and promotes "Use of the Congressional Review Act for Congress to disapprove of EPA regulations and other quasi-regulatory actions and prohibit 'substantially similar' actions in the future." Heritage Found., *Mandate for Leadership: The Conservative Promise* 439 (2023). Two policy-specific actions from the same chapter recommend that leadership should "Restore the position that California's waiver applies only to California-specific issues like ground-level ozone, not global climate issues," and should "Ensure that other states can adopt California's standards only for traditional/criteria pollutants, not greenhouse gases." *Id.* at 426.

[3] These three waivers were California's "Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus $NO_X$ rules." EPA Feb. 2025 Press Release. The Advanced Clean Cars II regulation "would establish criteria and [greenhouse gas] pollutant emissions standards for new [model year] 2026 and subsequent model year California on-road light- and medium-duty vehicles." 2025 CRS Report at 12. The Advanced Clean Trucks regulation "requires that manufacturers produce and sell increasing quantities of medium- and heavy-duty zero-emission vehicles and near-zero-emission vehicles in California, starting with the 2024 model year through 2035, by which point zero-emission vehicle sales must make up 40% to 75% of new truck sales, depending on the vehicle class." *Id.* at 13. Finally, the Omnibus $NO_X$ rules "would establish criteria pollutant exhaust emissions standards for new MY2024 and subsequent

Shortly after this Oval Office announcement, in March 2025, the GAO released a decision, which relied in part on its reasoning in an earlier decision from 2023 about the 2022 Advanced Clean Cars waiver at issue in this case, *see infra* Part I.B.2(c), concluding that EPA's decision to authorize a CAA preemption waiver "was not a rule for purposes of CRA because it was an order under APA." Cal.'s Mot., Ex. 10, U.S. Gov't Accountability Off., B-337179, *Observations Regarding the Environmental Protection Agency's Submission of Notices of Decision on Clean Air Act Preemption Waivers as Rules Under the Congressional Review Act* 9 (2025) ("2025 GAO Decision") (Mar. 6, 2025), ECF No. 13-14. The GAO "explained that an adjudicatory order is a case-specific, individual determination of a particular set of facts that has immediate effect on the individual(s) involved," and "[i]n contrast, a rule is a broad application of general principles that is prospective in nature." *Id.* at 7 (citations omitted). California preemption waivers issued under 42 U.S.C. § 7543(b), often referred to as Section 209(b) waivers, therefore "met the APA definition of an order because the notice determined that California was not preempted from enforcing its Advanced Clean Car Program and therefore made a 'final disposition' granting California a 'form of permission' as described in the APA definition." *Id.* (citations omitted). Furthermore, "the notice was particular to California's [program], involved consideration of particular facts, as opposed to general policy, and had immediate effect on California." *Id.* Alternatively, GAO reasoned, that even if the California waiver "met the APA definition of a rule, it would still not be subject to CRA because of CRA's exclusion of rules of particular applicability." *Id.* "A rule of particular applicability," GAO explained, "is addressed to an identified entity and also addresses actions that entity may or may not take, taking into account facts and circumstances specific to that entity." *Id.* Therefore, California's waiver would be a rule

model year on-road medium- and heavy- duty engines and vehicles" as well as "portions of the Omnibus Low $NO_X$ program that pertain to off-road engines." *Id.* at 10.

of particular applicability because "the notice concerned a specific entity—California—and addressed a statutory waiver specific to California's Advanced Clean Car Program." *Id.*[4]

"The question of the CRA's applicability was then presented to the Senate Parliamentarian," who "[a]fter hearing arguments on both sides, . . . agreed with the GAO that the waiver decisions are not subject to the CRA." Compl. ¶¶ 63-64. "The House nonetheless proceeded, voting to approve resolutions of disapproval on April 30 and May 1 of 2025." *Id.* ¶ 65. To overcome the objection of "several" Senators who "did not want to override the Senate Parliamentarian," *id.* ¶ 66 (citations omitted), Senate leadership proffered, and the Chamber adopted, a "point of order that joint resolutions that meet all the requirements of section 802 of the Congressional Review Act or are disapproving of Agency actions which have been determined to be rules subject to the CRA by a legal decision from GAO are entitled to expedited procedures under the Congressional Review Act." 171 Cong. Rec. S3051 (May 21, 2025) (Sen. John Thune). Utilizing this point of order, "the Senate voted, by slim majorities, to enact three resolutions of disapproval—one for each of the three waivers EPA had purported to reclassify and submit." Compl. ¶ 69. "The President signed the three resolutions on June 12, 2025." *Id.* ¶ 70.[5]

---

[4] The GAO also recounted that when EPA was asked "for clarification on the submission of the Notices of Decision at issue here because the notices themselves stated that CRA did not apply," "the agency still did not address the statements in the notices regarding the inapplicability of the CRA, and, to date, EPA has not further responded to [GAO's] letter." 2025 GAO Decision at 2 (footnote omitted). Likewise, EPA never provided "any explanation of this discrepancy" between its previous longstanding position that CAA waivers are orders and its new claim that CAA waivers are rules. *Id.*

[5] That same day, EPA issued a press release touting that "[t]he President campaigned on this, the American people voted for it, and this Administration is proudly delivering on this mandate." Cal.'s Mot., Ex. 21, Press Release, EPA, *EPA Administrator Zeldin Celebrates President Trump Officially Ending California's Vehicle Waivers, Delivering Another Major Blow to the EV Mandate* (June 12, 2025), ECF No. 13-25. The press release emphasized that "Congressional disapproval of California's electric vehicle (EV) mandates is another step toward ending the EV mandate on all Americans pursuant to President Trump's 'Unleashing American Energy' Executive Order." *Id.* This referenced Executive Order expressed "the policy of the United States: . . . to eliminate the 'electric vehicle (EV) mandate' and promote true consumer choice, which is essential for economic growth and innovation, . . . by terminating, where appropriate, state emissions waivers that function to limit sales of gasoline-powered automobiles." Exec. Order No. 14152, 90 Fed. Reg. 8353, 8353 (Jan. 20, 2025).

These three resolutions of disapproval in 2025 are the subject of ongoing litigation brought by California and ten other States in the Northern District of California, "alleging that the resolutions violate separation of powers and federalism principles and that EPA's reclassifications and submissions of the waivers violated the APA or were ultra vires." *Id.* ¶ 71; *see California v. United States*, No. 4:25-cv-04966 (N.D. Cal. filed June 12, 2025).

**2. *California's Four CAA Preemption Waivers at Issue In this Lawsuit***

At issue in the instant case are an additional four California Clean Air Act preemption waivers that EPA granted to California between 2009 and 2024. Each at-issue waiver is described next.

*a) 2009 New Vehicle GHG Emission Standard Waiver*

The earliest of these at-issue waivers was approved by EPA on July 8, 2009, and authorized California's first greenhouse gas (or "GHG") emission standards for new motor vehicles in model year 2009 and subsequent model years. *See California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles*, 74 Fed. Reg. 32744 (July 8, 2009) ("New Vehicle GHG Emission Standard"). Specifically, the California regulation covers large-volume motor vehicle manufacturers beginning in the 2009 model year, and intermediate and small manufacturers beginning in the 2016 model year" and adds "four new greenhouse gas air contaminants (carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), and hydrofluorocarbons (HFCs)) to California's existing regulations for criteria and criteria-precursor pollutants and air toxic contaminants." *Id.* at 32746.

EPA's waiver decision noted that California's Air Resource Board "found that its greenhouse gas standards will increase the health and welfare benefits from its broader motor vehicle emissions program by directly reducing upstream emissions of criteria pollutants from

decreased fuel consumption." *Id.* at 32750. The EPA Administrator went on to "evaluate[] the comments received and evidence in the record and [] determined that the opponents of the waiver have not met their burden in demonstrating why evidence such as the impacts of climate change on existing ozone conditions in California along with the cumulative impacts identified by proponents of the waiver (e.g., impacts on snow melt and water resources and agricultural water supply, wildfires, coastal habitats, ecosystems, etc.) is not compelling and extraordinary." *Id.* at 32746.[6] The waiver was thus approved.

In response to one comment by the Alliance of Automobile Manufacturers urging that "EPA should not treat the waiver proceeding like an informal rulemaking," the EPA Administrator determined that "EPA's waiver proceedings and actions under section 209(b)(1) are informal adjudications," explaining that when the agency receives a request from a specific regulated party, "EPA applies the pre-existing law, section 209(b), to a specific request covering a specific regulation or regulations, and applies the three statutory criteria to the facts of the waiver request." *Id.* at 32781. Acknowledging that when waivers are granted, "other parties, for example, the manufacturers, are affected by the operation of the state regulation that is no longer preempted," and "other States may then adopt and enforce California's standards," the EPA Administrator reasoned, "the only legal rights and obligations directly determined by EPA in the waiver proceeding are the rights of the State of California to adopt and enforce its state regulations." *Id.* Any "other legal impacts flow from the operation of other laws, once the waiver is granted," and

[6] AFPM's predecessor organization, the National Petrochemical and Refiners Association ("NPRA"), and API submitted comments opposing adoption of the waiver and regulation of greenhouse gasses under the Clean Air Act, arguing, *inter alia*, that the waiver would create an "enormous regulatory burden," that "[c]ompliance costs would be extraordinary," and that "companies [would] relocate U.S. manufacturing operations overseas to avoid these extreme regulatory burdens, [so] new, less efficient—and higher-emitting—plants would be built in other countries." Def.-Intervenors Resp. to the Court's Aug. 20, 2026, Minute Order ("Def.-Intervenors' Resp."), Ex. A., Letter from Kyle B. Isakower, Dir. Of API's Pol'y Analysis Dep't, & David N. Friedman, Dir. Of NPRA's Dep't of Env't Affs., to EPA at 6-7 (Apr. 3, 2009), ECF No. 43-1.

"[t]herefore EPA believes that its waiver proceedings and actions therein should be considered an informal adjudication rather than a rulemaking." *Id.* The EPA Administrator stressed that "EPA has been conducting its waiver proceedings in this manner for decades." *Id.* Thus, the EPA Administrator concluded that "[t]he Congressional Review Act . . . does not apply because this action is not a rule." *Id.* at 32784.

At the time, defendant-intervenors "relied on EPA's position that the waiver was not a rule and argued that the waiver decision was not itself a regulation of green-house gases under the Clean Air Act." Def.-Intervenors Resp. to the Court's Aug. 20, 2026, Minute Order ("Def.-Intervenors' Resp.") at 2 (Apr. 3, 2009), ECF No. 43. By 2021, however, "AFPM took the position that a waiver decision was a 'major rule' under the Congressional Review Act and should be treated as a rule under the Administrative Procedure Act." *Id.*

*b) 2013 Advanced Clean Cars I Program Waiver*

The second waiver at issue was approved by EPA on January 9, 2013, and encompasses a set of California's regulations called the Advanced Clean Cars Program. *See California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years*, 78 Fed. Reg. 2112 (Jan. 9, 2013). The Advanced Clean Cars Program "combines the control of smog and soot causing pollutants and greenhouse gas (GHG) emissions into a single coordinated package of requirements for passenger cars, light-duty trucks and medium-duty passenger vehicles (and limited requirements related to heavy-duty vehicles)." *Id.* at 2112; *see also id.* at 2114 ("This single ACC program combines the control of smog-causing pollutants and GHG emissions into a coordinated package of amendments and requirements . . . in order to address near and long term

smog issues within California and identified GHG emission reduction goals."). To effectuate this pollution control, the "program regulations include revisions to both California's LEV [Low Emission Vehicle] and ZEV [Zero Emission Vehicle] programs." *Id.* at 2112. These amendments were, in part, "designed to respond to California's identified goals of reducing GHG emissions to 80 percent below 1990 levels by 2050 and in the near term to reduce GHG levels to 1990 levels by 2020." *Id.* at 2114. EPA's Administrator noted that California's Air Resources Board "has repeatedly demonstrated the need for its motor vehicle program to address compelling and extraordinary conditions in California"—namely, such "factors that tend to produce higher levels of pollution—geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems." *Id.* at 2129. To achieve the required pollution control, the program makes a number of revisions to vehicle requirements. For instance, changes to the low emission vehicle program required, among other things, "an increase of full useful life durability requirements"—essentially, the vehicle's life expectancy—from 120,000 miles to 150,000 miles, "which guarantees vehicles sustain these extremely low emission levels longer." *Id.* at 2114. Additionally, "more stringent particulate matter (PM) standards" were designed to "reduce the health effects and premature deaths associated with these emissions." *Id.* An overall goal was a 34% reduction in new carbon dioxide emissions from new light-duty vehicles between model year 2016 and model year 2025. *See id.* As with the 2009 waiver, the EPA Administrator concluded that "[t]he Congressional Review Act . . . does not apply because this action is not a rule." *Id.* at 2145.

AFPM opposed this 2013 waiver during the administrative process, asserting that "California does not face extraordinary conditions with respect to climate change compared to the rest of the nation," Def.-Intervenors' Resp., Ex. B., Letter from Richard Moskowitz, AFPM's Gen.

Couns., to EPA at 13 (July 6, 2009), ECF No. 43-2**,** and focusing on the cost of the zero-emissions vehicle mandate contained within the waiver as "substantial . . . , well exceeding $100 million, on all new vehicle purchasers, not just on new vehicle purchasers in California," *id.* at 25. The trade association expressed support for "technology neutral, free market solutions that provide consumer choice for purchasing vehicles, including electric vehicles ('EVs'), but opposes government mandates for EVs and subsidies that create an unlevel playing field and fail to achieve cost-effective emission reductions." *Id.* at 1-2. Presciently raising the issue in 2013 that presents EPA with its current dilemma in this litigation, AFPM opined that classifying the waiver as an order "blocks Congress from taking expedited action to withdraw an unlawfully issued waiver," and further argued, unpersuasively to EPA at the time, that "the issuance of a waiver is also a 'major rule' as defined under the Congressional Review Act." *Id.* at 25.

Five years later, in 2018, during the first Trump Administration, EPA issued a notice "proposing to withdraw the waiver granted to California in 2013 for the GHG and ZEV requirements of its Advanced Clean Cars program." *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks*, 83 Fed. Reg. 42986, 42999 (Aug. 24, 2018). This noticed proposal would have imposed a national standard set by the EPA on passenger cars and light trucks for GHG emissions, by eliminating the preemption waiver granted in 2013 to California and followed by a number of other States. *Id.* After notice and comment, portions of the 2013 waiver decision were withdrawn in September 2019. *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program*, 84 Fed. Reg. 51310 (Sept. 27, 2019). Despite EPA's withdrawal of parts of the 2013 preemption waiver, "automobile manufacturers such as Honda, Ford, Volvo, BMW, and Volkswagen entered into independent agreements with California to continue reducing emissions" such that "the

automakers would continue to meet the LEV and ZEV standards in the California regulations" because they had already made the investments to update their fleets and due to "growing consumer demand for electric vehicles." *Ohio*, 98 F.4th at 298 (citing *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74434, 74458 (Dec. 30, 2021)).

*c) 2022 Reinstatement of 2013 Advanced Clean Car Program Waiver*

The EPA's 2019 withdrawal of parts of the 2013 preemption waiver regarding California's zero emission vehicle mandate and greenhouse gas emission standards for passenger car and light trucks, included in California's Advanced Clean Car program, did not last long in the next presidential administration. Specifically, in 2022, EPA reinstated the preemption waiver for all of California's 2013 Advanced Clean Car Program. *See California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision*, 87 Fed. Reg. 14332 (Mar. 14, 2022). The EPA explained that the reinstatement was due to "significant issues regarding whether [the 2019 withdrawal] was a valid and appropriate exercise of agency authority, including the amount of time that had passed since EPA's 2013 waiver decision . . . and whether EPA took proper account of the environmental conditions in California and the environmental consequences from the waiver withdrawal." *California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Opportunity for Public Hearing and Public Comment*, 86 Fed. Reg. 22421, 22421 (Apr. 28, 2021). EPA's waiver reinstatement decision concluded with the determination that "the Congressional Review Act . . . does not apply because this action is not a rule." *Reconsideration of a Previous Withdrawal; Notice of Decision*, 87 Fed. Reg. at 14379.

This reinstated preemption waiver for California's Advanced Clean Car program is the third at-issue waiver in this litigation and is also the subject of other ongoing litigation. In May 2022, AFPM, one of the intervenor-defendants in this action, petitioned for review of the EPA's 2022 waiver decision in the D.C. Circuit. *See Am. Fuel & Petrochemical Mfrs. v. EPA*, No. 22-1084 (D.C. Cir. May 13, 2022). In 2024, the D.C. Circuit rejected the claim of AFPM and other "entities that produce or sell liquid fuels and the raw materials used to produce those fuels," that "EPA exceeded its statutory authority under the Clean Air Act," because "Fuel Petitioners lack standing to raise their statutory claim." *Ohio*, 98 F.4th at 293-94. In finding a lack of standing, the D.C. Circuit reviewed AFPM's argument that "by requiring vehicle manufacturers to sell vehicles that use less or no liquid fuel, [the waiver] requirements depress the demand for liquid fuels," *id.* at 300, and concluded this was insufficient to show an injury capable of remediation because "automobile manufacturers would . . . require years of lead time to alter their product plans" and "[t]he record evidence provides no basis for us to conclude that manufacturers would, in fact, change course with respect to the relevant model years if this Court were to vacate the waiver," *id.* at 302. The next year, however, the Supreme Court reversed the D.C. Circuit, *see Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025), finding that the petitioners had Article III standing because "invalidating the California regulations would likely redress at least some of the fuel producers' monetary injuries." *Id.* at 114. Upon remand to the D.C. Circuit, the parties have repeatedly and successfully sought to hold the case in abeyance, with EPA explaining that "[g]ood cause thus exists for the requested abeyance" because "[i]t is possible that after its review, EPA could take further action that may obviate the need for judicial resolution of some or all of the disputed issues." Cal.'s Mot., Ex. 25, EPA's Mot. for Abeyance at 3, *Ohio v. EPA*, No. 22-

1081 (D.C. Cir. Mar. 16, 2026), ECF No. 13-29. California views this representation as suggesting a "plan to administratively attack California's waivers." Cal.'s Mem. at 14.

*d) 2025 SORE Regulation Waiver*

The fourth and final at-issue waiver concerns a preemption waiver granted by EPA at the end of 2024 and promulgated in the Federal Register in 2025, as to California's amendments to the state's Small Off-Road Engine (SORE) regulations for certain off-road engines "predominantly used in lawn and garden equipment such as lawn mowers, string trimmers, and leaf blowers, as well as in other small off-road equipment such as portable generators, pressure washers, and air compressors." *California State Nonroad Engine Pollution Control Standards; Small Off-Road Engines; Request for Authorization; Opportunity for Public Hearing and Comment*, 88 Fed. Reg. 33143, 33143 n.1 (May 23, 2023) ("SORE Notice"). The California amendments to its SORE regulations "include improvements to evaporative emissions certification procedures, revise the compliance testing procedure, update the evaporative emissions certification test fuel to represent commercially available gasoline, and align aspects of the SORE requirements with the corresponding federal requirements." *Id.* at 33143-44. Additionally, the SORE regulations "establish exhaust and evaporative emission standards and associated test procedures for 2024 and subsequent model engines and equipment that are significantly more stringent than preexisting exhaust and evaporative emission standards and associated test procedures." *Id.* at 33144. Again, EPA concluded that "[t]he Congressional Review Act . . . does not apply because this action is not a rule." *California State Nonroad Engine Pollution Control Standards; Small Off-Road Engines Regulations; Notice of Decision*, 90 Fed. Reg. 640, 642 (Jan. 6, 2025) ("SORE Waiver").

Again, AFPM petitioned for review of the waiver decision as to California's SORE regulations, this time in the Ninth Circuit. *See Am. Fuel & Petrochemical Mfrs. v. EPA*, No. 25-

1481 (9th Cir. Mar. 7, 2025). The case is currently stayed until October 13, 2026, *see* Order, No. 25-1481 (July 30, 2026), based in part on EPA's representation that the agency "is currently considering taking action that could obviate the need for further litigation here." Cal.'s Mot., Ex. 24, EPA's Mot. for Extension of Time, Decl. of Att'y for U.S. DOJ's Env't & Nat. Res. Div. ¶ 6, *Outdoor Power Equip. Inst. v. EPA*, Nos. 25-881 & 25-1481 (9th Cir. May 14, 2026), ECF No. 13-28.

*e) June 12, 2026 EPA Announcement*

All four of these at-issue waivers were considered orders at the time of EPA's decision to grant preemption waivers. Notwithstanding this prior treatment of the waivers, in a June 12, 2026 press release, EPA announced that the agency had "transmitted four California waiver rules to Congress that have given the state the authority to enact its own emission standards for cars, trucks, lawn mowers, and other equipment used daily by Americans." Cal.'s Mot., Ex. 22, Press Release, EPA, *EPA Fulfills Statutory Obligation by Transmitting Four California Waiver Rules to Congress* ("EPA June 2026 Press Release") at 1 (June 12, 2026), ECF No. 13-26. The press release reported that "EPA has determined that each of these waivers is a rule under the CRA, and because previous Administrations failed to transmit them to Congress, as mandated under the CRA, Congress has not been provided with its statutorily required opportunity to review these rules." *Id.* The release elaborated that "[t]he four rules have prospective, national effects, giving California and the states that adopted the waivers under Clean Air Act section 177 the force of federal law, supplanting EPA authority." *Id.*

California believes that "EPA intends its purported reclassifications to facilitate overturning these waivers and, with them, California's ability to enforce its own laws." Compl. ¶ 78. The reclassification of the waivers, according to California, provides EPA with "two paths

to its ultimate goal of invalidating these waivers," by submitting the waivers to Congress in an "attempt to ease the path to congressional invalidation" and by permitting EPA to "initiate withdrawal proceedings without giving California the notice and opportunity to correct to which it was entitled before those reclassifications." *Id.* ¶¶ 82, 84, 86.

### C. Procedural Background

California filed the instant suit on June 22, 2026, *see* Compl., asserting two claims that the EPA's reclassification of the four waivers violated the APA, or, in the alternative, was *ultra vires* conduct in excess of statutory authority, *see id.* ¶¶ 94-127. California requests, *inter alia*, that "EPA's reclassification and submission actions" be vacated and declared in violation of the APA because the "four waivers are not 'rules' within the meaning of the APA," that "the EPA's submission of these waivers to Congress and the GAO" be declared "not 'report[s]' under 5 U.S.C. § 801(a)(1)(A)," and that EPA be enjoined "from repeating these reclassifications and submission actions with respect to these waivers and other previously granted waivers." *Id.* at pp. 28-29 (Prayer for Relief). Three days later, on June 25, 2026, California moved for a preliminary injunction, *see* Cal.'s Mot., seeking an order directing that defendants: (1) "take all necessary steps to restore the status quo," including to "withdraw or correct EPA's reclassifications of these four Clean Air Act preemption waivers from orders to rules, including the June 12, 2026 press release, and withdraw or correct EPA's submissions to Congress as to any portion of those submissions based on the reclassifications, including any representation that these four waivers are rules," (2) are enjoined "from giving effect to the reclassification of these four Clean Air Act preemption waivers as rules," and (3) are enjoined "from reclassifying other Clean Air Act preemption waivers from orders into rules," Cal.'s Mot., Att. 30, Cal.'s Proposed Order, ECF No. 13-30.[7] The same

[7] Simultaneously, California filed a Request for Judicial Notice, ECF No. 14, which was granted with no opposition from defendants or defendant-intervenors, *see* Minute Order (Aug. 4, 2026).

day, the parties were directed "to meet and confer and to submit by" the next day, "a proposed briefing schedule," Minute Order (June 25, 2026), which proposed briefing schedule was adopted on June 26, 2026, Minute Order (June 26, 2026).

On July 10, 2026, the same day EPA filed its opposition to California's preliminary injunction and simultaneously moved to dismiss the complaint, *see* EPA's Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj. & in Supp. of EPA's Mot. to Dismiss ("EPA's Opp'n"), ECF No. 21, API and AFPM moved to intervene on behalf of EPA, *see* Def.-Intervenors' Mot. to Intervene, ECF No. 22. EPA took "no position of AFPM and API's Motion to Intervene," which California opposed. Joint Schedule Proposal & Notice of Position at 2, ECF No. 23. The parties were again ordered to confer and propose a schedule for the two additional motions to dismiss and to intervene, *see* Minute Order (July 11, 2026), and the parties' proposed schedule was adopted the same day submitted, *see* Minute Order (July 13, 2026). On July 16, 2026, API and AFPM moved to treat their opposition to the preliminary injunction also as a motion to dismiss. *See* Def.-Intervenors' Mot. to Treat Their Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj. as Both a Resp. in Opp'n & a Mot. to Dismiss, ECF No. 25. Over California's opposition, *see* Cal.'s Notice Regarding Def.-Intervenors' Mot. to Treat Their Resp., ECF No. 28, API and AFPM's motions to intervene and to convert were granted, and an expedited briefing schedule was ordered so that defendant-intervenors' motion to dismiss would become ripe on August 10, 2026, *see* Minute Orders (Aug. 4, 2026).

In the interim, on July 23, 2026, California filed a notice indicating that the previous day EPA "announced that it had reclassified as 'rules' and submitted to Congress two additional Clean Air Act waivers": (1) "[a] 2023 waiver authorizing enforcement of amendments to the California Air Resources Board's ('CARB's') Ocean-Going Vessels At-Berth regulation" ("2023 vessel

waiver") and (2) "[a] 2025 waiver authorizing enforcement of amendments to CARB's Commercial Harbor Craft regulation" ("2025 vessel waiver"). Cal.'s Notice of Suppl. Auth. at 1. Meanwhile, since July 18, 2026, more than a dozen resolutions have been introduced in Congress seeking disapproval of EPA's decision to grant the six California waivers, which EPA has recently reclassified as "rules" and submitted to Congress. *See* H.R.J. Res. 202, 119th Cong. (July 18, 2026) (2009 waiver); H.R.J. Res. 205, 119th Cong. (July 23, 2026) (2013 waiver); S.J. Res. 205, 119th Cong. (Aug. 5, 2026) (SORE waiver); S.J. Res. 206, 119th Cong. (Aug. 5, 2026) (2009 waiver); S.J. Res. 207, 119th Cong. (Aug. 5, 2026) (2013 waiver); S.J. Res. 208, 119th Cong. (Aug. 5, 2026) (2022 waiver); H.R.J. Res. 210, 119th Cong. (Aug. 6, 2026) (2023 vessel waiver); H.R.J. Res. 211, 119th Cong. (Aug. 6, 2026) (2009 waiver); H.R.J. Res. 212, 119th Cong. (Aug. 6, 2026) (2022 waiver); S.J. Res. 209, 119th Cong. (Aug. 6, 2026) (2023 vessel waiver); S.J. Res. 210, 119th Cong. (Aug. 6, 2026) (2025 vessel waiver); H.R.J. Res. 213, 119th Cong. (Aug. 10, 2026) (2023 vessel waiver); H.R.J. Res. 214, 119th Cong. (Aug. 10, 2026) (SORE waiver).

On August 11, 2026, California filed "Protective Petition[s] for Review" in the Ninth Circuit and D.C. Circuit challenging EPA's decisions to reclassify the four waivers at issue in this case, explaining that "California has challenged these actions in the U.S. District Court for the District of Columbia, *California v. EPA*, No. 1:26-cv-02185 BAH (D.D.C. June 22, 2026), and maintains that court has jurisdiction," but that "California files this protective petition in order to protect its right to judicial review in the event the district court is found to lack jurisdiction, and this Court is found to be the proper venue pursuant to 42 U.S.C. § 7607(b)(1)." Protective Pet. for Review at 2, *California v. EPA*, No. 26-1218 (D.C. Cir. Aug. 11, 2026); Protective Pet. for Review at 2, *California v. EPA*, No. 26-5143 (9th Cir. Aug. 11, 2026).

A hearing on the pending motions was scheduled, as had been requested by California in its motion for preliminary injunction, *see* Cal.'s Mot. at 2, for August 12, 2026, *see* Minute Order (Aug. 4, 2026), but, at the parties' request, *see* Pl's Unopposed Mot. to Reschedule Hr'g, ECF No. 34, the hearing was rescheduled to August 19, 2026, *see* Minute Order (Aug. 5, 2026). Following the August 19, 2026, hearing, the parties submitted supplemental briefing to clarify several issues not addressed in briefing, including as to "why either 42 U.S.C. § 7604 or 42 U.S.C. § 7607 does not deprive this Court of jurisdiction," "why 42 U.S.C. § 7543(b) controls the process for withdrawal of a Clean Air Act Section 209(b) waiver, as EPA's counsel represented at the hearing, rather than an Administrative Procedure Act procedure," and defendant-intervenors positions on the four at-issue waivers during the administrative process. Minute Order (Aug. 20, 2026). This supplemental briefing was completed on August 21, 2026, *see* Pl. & Defs.' Resp. to the Court's Order Requesting a Joint Explanation Concerning 42 U.S.C. §§ 7604, 7607 ("Pl. & Defs.' Resp."), ECF No. 42; Def.-Intervenors' Resp.; EPA's Resp. to the Court's Aug. 20, 2026 Order ("EPA's Resp."), ECF No. 44, and California's motion for a preliminary injunction and EPA's and intervenor-defendants' motions to dismiss are now ripe for resolution.

## II. LEGAL STANDARD

Set out below are the separate legal standards applicable to California's motion for a preliminary injunction and EPA's and intervenor-defendants' motions to dismiss.

### A. Motion for Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). A plaintiff seeking a preliminary injunction "must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The plaintiff must "establish

that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "The balance of the equities weighs the harm to [plaintiff] if there is no injunction against the harm to [defendants] if there is," and, when the government opposes the preliminary injunction, "the [government]'s harm and the public interest are one and the same, because the government's interest *is* the public interest," so the third and fourth factors merge. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).

Additionally, "[t]he 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)); *see also Pheenix USH LLC v. Dist. Dep't of Transp.*, No. 25-7060, 2025 WL 3013527, *3 (D.C. Cir. Oct. 24, 2025) (per curiam) ("But in making 'a prediction of the likelihood of success on the merits,' a court must assess the likelihood that jurisdiction exists." (quoting *Lackey v. Stinnie*, 604 U.S. 192, 207 (2025)). The party seeking a preliminary injunction "carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed. 1995)).

### B. Motions to Dismiss

To survive a motion to dismiss for "lack of subject-matter jurisdiction," under Federal Rule of Civil Procedure 12(b)(1), "[t]he plaintiff bears the burden of invoking the court's subject matter jurisdiction." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). When considering jurisdictional questions, the court accepts as true all uncontroverted material factual allegations contained in the complaint and "construe[s] the

complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged." *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 281 (D.C. Cir. 2022) (second alteration in original) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)). Additionally, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability" and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556-57). "[T]he Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

## III. DISCUSSION

California asserts two claims that EPA violated the APA and acted *ultra vires*, in excess of the agency's statutory authority, by reclassifying the four at-issue preemption waivers "from adjudicatory orders into 'rules'" and then submitting "those orders as 'rules' to Congress," Compl.

¶ 97 (Count I); *see also id.* ¶¶ 120-21 (Count II), accompanied by serious critiques of how these agency actions of reclassification and submission run afoul of the Congressional Review Act and Clean Air Act. EPA contends, with echoes from defendant-intervenors, that this Court lacks subject matter jurisdiction to consider these claims because the CRA bars judicial review and California has failed to establish Article III standing; that California fails to state a viable APA claim because no final agency action occurred here; and, in any event, that all four factors requisite for preliminary relief weigh against California. EPA's Opp'n at 1-2; Def.-Intervenors' Mot. to Intervene, Att. 5, Def.-Intervenors' Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj. ("Def.-Intervenors' Opp'n") at 1-2, ECF No. 22-5.

As a threshold issue, the parties dispute whether the challenged agency action is two separate actions of reclassification and then of submission to Congress, Compl. ¶¶ 82, 97-99; Cal.'s Mem. at 1, 13, or instead a single action of EPA "sending the reports to Congress," EPA's Resp. at 2. Indeed, EPA denies that any action under the APA occurred at all, instead averring that the only action taken—the determination that the waivers are rules—was embodied in the report submitted to Congress. *See* Hr'g Tr. at 44:18-23 (EPA's Counsel: "[W]hat California calls reclassification decision and the submission to Congress are not two separate things. They are the same thing. The determination that the waivers are rules is embodied in the report sent to Congress. It is a decision about what to send to Congress."). California contends that this position is not plausible, stating: "The notion that EPA took press-release-worthy action concerning waivers that are up to seventeen years old in order to *change nothing* is not credible. It is also wrong." Cal.'s Opp'n to Def.-Intervenors' Mot. to Dismiss ("Cal.'s Opp'n") at 13, ECF No. 36 (emphasis in original).

This fundamental disagreement, with EPA denying doing anything other than submitting a report to Congress and California focusing on the reclassification of waivers from orders to "rules" to meet the prerequisite for invoking the CRA process, is easily resolved by looking at EPA's own statements. Recall that the CRA defines the term "rule" to have the same meaning as that provided by the APA but narrows that definition to exclude "any rule of particular applicability," "any rule relating to agency management or personnel," or "any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties." 5 U.S.C. § 804(3). As the definition of "rule" under the CRA is entirely circumscribed by the definition of "rule" under the APA, axiomatically, any agency action that is not a rule under the APA is also not a rule under the CRA. Each of EPA's four waiver decisions at issue contains the language that "[t]he Congressional Review Act . . . does not apply because this action is not a rule." *See* 74 Fed. Reg. at 32784; 78 Fed. Reg. at 2145; 87 Fed. Reg. at 14379; 90 Fed. Reg. at 642. Yet, in the June 12, 2026, press release, EPA states that "EPA has determined that each of these waivers is a rule under the CRA," EPA June 2026 Press Release at 1, and further states, in the letters sent to Congress and the Comptroller General, that "EPA is submitting the following final rules 'to each House of the Congress and to the Comptroller General,' for their review under 5 U.S.C. 801(a)," EPA's Resp., Ex. A, Letter from EPA to Hon. Mike Johnson, Speaker of the U.S. House of Representatives at 1 (June 12, 2026), ECF No. 44-2. The single-page report attached to the EPA Administrator's transmittal letters for each of the waivers includes the description "This rule is a: Final Rule" and "Proposed Effective Date: N/A." *Id.* at 3. These waivers cannot be "rules" under the CRA, as EPA represented to Congress, unless they have also been classified as "rules" under the APA.

EPA engages in mind-numbing word calisthenics to avoid this straight-forward conclusion. In its supplemental briefing to this Court, EPA avers that "[e]mbodied in those reports are EPA's determinations that the waivers must be reported to Congress because they are rules within the meaning of the Congressional Review Act." EPA's Resp. at 2. EPA continues that "California decided to call EPA's determinations a 'reclassification,' and to call the acts of sending the reports to Congress a 'submission[,]' [b]ut in reality, there is just a report that EPA sent to Congress." *Id.* If this were "just a report that EPA sent to Congress," why bother making the "determination" that, years after the waivers' approval, the waivers suddenly needed to be reclassified as "rules" unless this distinction was important? Why bother citing to the CRA at all if these waivers were merely "just a report that EPA sent to Congress"? Obviously, EPA's decisions to reclassify these waivers as "rules" were critical and meant something. Agency action either results in a rule under the APA or not, and EPA cannot say one thing to Congress while ignoring any consequence from reclassifying these waivers as rules—unless the EPA Administrator was misleading or dissembling to Congress, a conclusion the Court avoids by opting to take EPA at its word to Congress: namely, that EPA made determinations as to each of the at-issue waivers and reclassified these adjudicatory orders to be treated as final rules of general applicability subject to the CRA's narrower definition of "rule."

EPA's action in reclassifying prior waiver orders, one of which was issued over fifteen years ago, to now treat those waivers as "rules" is a slippery slope in the use of the CRA. Fudging what is or is not a "rule" subject to that statute can work both ways, both to expand, as here, the types of agency actions subject to congressional review, or to remove agency actions from congressional review. Such gamesmanship may seem like a clever policy move, but undermines honest compliance with the law, which is what Americans should expect from executive branch

agencies. Taking EPA's statements at face value that the agency made the "determination" to reclassify its prior four waiver orders as "rules" subject to the CRA, EPA's jurisdictional challenges may be quickly dispatched and rejected, before turning to the merits of California's request for preliminary injunctive relief.

### A. Subject-Matter Jurisdiction May Be Exercised As To California's Claims

EPA and defendant-intervenors primarily rely upon two arguments to contend that this Court lacks subject-matter jurisdiction: first that the jurisdiction-stripping provision of the CRA bars this action, and second that California lacks standing. *See* EPA's Opp'n at 9-10; Def.-Intervenors' Resp. in Opp'n to Pl.'s Mot. for Prelim. Inj. ("Def.-Intervenors' Mot.") at 6-9, 12-14, ECF No. 22-5. Both arguments fail.[8]

#### 1. *CRA's § 805 Does Not Preclude Judicial Review of EPA's Reclassifications*

CRA's Section 805 states, in full, that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. This judicial review bar, according to EPA, applies to the agency's reclassification decisions as to the four at-issue waivers by virtue of their submission to Congress, regardless of whether those reclassification decisions

[8] Another subject matter jurisdiction issue implicated by the Clean Air Act's jurisdiction channeling provision, under 42 U.S.C. § 7607(b)(1), was addressed by the parties at the hearing, Hr'g Tr. 9:4-12:1, 42:7-43:4, and in post-hearing briefing, *see* Minute Order (Aug. 20, 2026), in accord with this Court's obligation to ensure that subject matter jurisdiction may be exercised over the legal issues raised, *see Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). The parties agree that the channeling provision "does not deprive this Court of jurisdiction." Pl. & Defs.' Resp. at 2. The Supreme Court recently explained how "action . . . under this chapter" should be interpreted, determining that "[t]he enumerated 'actions' in § 7607(b)(1) make clear that this provision 'treats each activity the Clean Air Act allows the EPA to take as a distinct action.'" *EPA v. Calumet Shreveport Refining, LLC*, 605 U.S. 627, 637-38 (2025) (internal quotation marks omitted) (quoting *Kentucky v. EPA*, 123 F.4th 447, 460 (6th Cir. 2024)). The Court elaborated that "[t]hese 'actions' all refer to particular exercises of EPA authority undertaken pursuant to particular CAA provisions" and that "the enumerated EPA 'action' is defined by reference to the substantive authority under which EPA is acting." *Id.* As recounted *infra* in Part III.C.1, EPA has never so much as hinted at statutory authority under the CAA that would permit the agency to convert an adjudicative order into a rule, and therefore, EPA's reclassification of the waivers was not made pursuant to the Clean Air Act, a conclusion that EPA does not dispute, *see* Pl. & Defs.' Resp. at 7 ("EPA took its alleged actions, however framed, under the CRA."). Thus, the CAA's jurisdiction-channeling provision is not triggered, and poses no bar to this Court's exercise of subject matter jurisdiction.

are correct as a legal matter. EPA's Opp'n at 11 ("Simply put, an agency's determination that an action either is or is not a rule that must be reported to Congress is a determination under the CRA. . . . [W]hen an agency sends a report to Congress stating that it is submitting a rule under the CRA, that is an 'action . . . under' the CRA." (quoting 5 U.S.C. § 805)). Under EPA's logic, the CRA's judicial review bar may extend so far as to preclude an analysis of unlawful agency action under the APA for any agency action submitted to Congress for review under the CRA. In EPA's view, "[a]fter all, *every* CRA plaintiff has some merits theory about how the CRA has been improperly invoked, or misinterpreted, or otherwise violated. The purpose of a jurisdiction-stripping provision is to prohibit judicial review of those very questions." *Id.* at 14-15 (emphasis in original). In response, California cautions that this approach and expansive reading of the CRA's judicial review bar could undermine the rule of law by encouraging disregard of statutory limitations by Congress and the Executive Branch in a joint effort to invalidate regulatory expectations of long-standing reliance. *See* Cal.'s Mem. at 28 ("EPA invites Congress to repeat its 2025 actions and "review"—i.e., disapprove—these four waivers, purportedly under the CRA, as it did with three others.").

The Supreme Court has long instructed that there is "a strong presumption favoring judicial review of administrative action," *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015), and "[o]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review," *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 350 (1984) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967)); *see also id.* at 345, 351 (noting that presumption of judicial review may be overcome by showing there is no "substantial doubt" that Congress intended to bar judicial review, when such intent is "fairly discernible in" a judicial review provision's "express language, . . . structure[,] . . . its objectives, its legislative

history, and the nature of the administrative action involved."); *Ass'n of Civilian Technicians v. FLRA*, 283 F.3d 339, 341-42 (D.C. Cir. 2002) (assessing whether a statutory provision strips federal courts of jurisdiction to review certain agency actions involves examination of the plain language of the statute, the statutory structure, and the legislative history). In accord with this instruction, examination of the scope of the CRA's judicial review bar in Section 805 begins with the text.

Section 805 cabins the judicial review bar to four specified activities "under this chapter." 5 U.S.C. § 805; *see Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1235-36 (10th Cir. 2020) (noting that "'under this chapter' specifies those determinations, findings, actions, or omissions that are covered by § 805" and finding that the Department of Interior's failure to submit a final rule to Congress is unambiguously an omission under the CRA). For example, the CRA imposes various procedural requirements on federal agencies, on Congress itself, and others. *See, e.g.*, 5 U.S.C. § 801(a)(1)(A) (agencies "shall submit" a report); *id.* § 801(a)(1)(C) (the House and Senate "shall provide" copies of the report to committees); *id.* § 801(a)(2)(B) (agencies "shall cooperate" with the Comptroller General); *see also id.* § 801(a)(2)(A) (the Comptroller General "shall provide" a report on each major rule); *id.* § 801(c)(1) (a rule that would otherwise not take effect may take effect if the President "makes a determination"). Any "action" or "omission" to comply with these CRA procedural duties are precluded from judicial review since Section 805 "denies courts the power to void rules on the basis of agency noncompliance with the Act." *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (denying judicial review of claim seeking "to invalidate an unspecified number of previous Forest Service amendments to [an existing regulation]" on the basis that the agency had failed to report those amendments to Congress); *see also Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,

892 F.3d 332, 347 (D.C. Cir. 2018) (relying upon CRA's § 805 and *Montanans for Multiple Use* to reject challenge to a rule that "was published in the Federal Register fewer than 60 days before it took effect, contrary to the Congressional Review Act's mandatory 60-day delay."); *Bernhardt*, 946 F.3d at 563 (holding that "[b]ecause enacting a joint resolution of disapproval is an action under the CRA, we lack jurisdiction to consider" statutory claims arising under the CRA related to the Department of the Interior only submitting a regulation to Congress a month after that regulation had become effective).[9]

Beyond the CRA's procedural requirements, EPA relies on the CRA's bar on judicial review of a "determination" or "finding" made "under this chapter," 5 U.S.C. § 805, to posit that EPA's reclassification of the waiver orders as "rules" is a determination "inextricably intertwined" with the transmittal of the report to Congress such that this determination is also subject to the CRA's judicial review bar. *See* EPA's Opp'n at 15 ("California's APA claims here are at a minimum inextricably intertwined with their allegations regarding EPA's actions taken under the CRA and thus are equally barred by the CRA's preclusion provision. (internal quotations and citation omitted)); EPA's Reply in Supp. of EPA's Mot. to Dismiss ("EPA's Reply") at 6, ECF No. 32 ("California's claims are inextricably intertwined with determinations under the CRA."). This reading of the scope of Section 805 goes too far. Even EPA is vague as to where, along the chain of decision-making by an agency leading up to the submission of a CRA report to Congress, Section 805's judicial review bar would lift to permit such review. *See* Hr'g Tr. at 47:18-48:4 (in response to Court's query, "am I understanding your argument correctly that [] if an agency decides to send a rule under the CRA to Congress, that all the decisions leading up to that are not subject

[9] Notably, in contrast to the four waiver orders at issue here, in each of these cited cases where the CRA's judicial review bar was found to apply, the agency action under scrutiny was indisputably classified as a final rule and designated as such throughout a notice and comment period, or, in the case of *Montanans for Multiple Use*, 568 F.3d at 229, the challenged agency action was assumed to be a rule on judicial review.

to judicial review[?]," EPA's counsel deflected without answering directly, stating only: "Well, Your Honor, I think this case is actually narrow in the sense that all it's about is a report sent to Congress. Again, the underlying determination is embodied in that report, all it is, is a decision about whether to send the report to Congress. It's not a decision about the APA, it's not a decision about licensing, it doesn't say anything about procedural rights for rescission or for licensing—any of those things.").

In EPA's broad reading of Section 805, any agency action—no matter whether an adjudicatory order, license, internal agency management or personnel procedure or practice, or action otherwise excluded from CRA's definition of "rule"—could be transmitted to Congress as a "rule" under the CRA and thereby effectively bar judicial review not only of the submission to Congress but also of any prior agency decision to classify the action as a "rule." Acceptance of EPA's position would certainly leave to Congress alone the assessment of whether the agency's transmitted report properly invoked the CRA or instead ignored limitations embodied by the CRA's definition of "rule" in 5 U.S.C. § 804(3). Up to this point, this Court agrees with EPA that how Congress decides to address an agency's report submitted "under" the CRA is non-justiciable.

At the same time, EPA's expansive reading of Section 805's scope would also cover an agency determination that an agency action qualifies as a "rule," or not, under the APA when that is nowhere contemplated by the text of the CRA and in fact ignores the structure of the CRA. Under the CRA, a federal agency's obligation to submit a report to Congress is limited to a "rule," which is defined to incorporate, with some exclusions, the definition of the same term under the APA. *See* 5 U.S.C. § 804(3). This structure means that EPA has no authority to call whatever action it wants a "rule" for purposes of a CRA report to Congress, regardless of whether the same action would be a "rule" under the APA. As already explained, the same agency action cannot be

a "rule" under the CRA without also being a "rule" under the APA, and an agency determination as to whether an action qualifies as a "rule" is subject to judicial review under the APA and outside Section 805's scope.

This conclusion that the CRA's Section 805 has more limited preclusive scope than EPA would wish is informed by the D.C. Circuit's recent analysis in *Ardelyx*, as the parties have recognized. *See* Cal.'s Reply at 4-5 (discussing *Ardelyx*); EPA's Reply at 7-9 (attempting to distinguish *Ardelyx*). *Ardelyx* addressed the scope of a statutory provision precluding "judicial review of 'the identification of renal dialysis services included in the bundled payment,'" invoked by the Centers for Medicare & Medicaid Services ("CMS") to bar review of an APA challenge by a pharmaceutical manufacturer to a CMS rule limiting inclusion of oral-only drugs in the bundled payment for renal dialysis services. *Ardelyx, Inc. v. Kennedy*, 179 F.4th 947, 953 (D.C. Cir. 2026) (quoting 42 U.S.C. § 1395rr(b)(14)(G)). The initial question was to "determine the scope of [a court's] authority to review the challenged actions," taking into account "the strong presumption that Congress intends judicial review of administrative action," *id.* at 953-54 (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)), which "presumption is 'particularly strong' where, as here, a party claims an agency has acted 'in excess of delegated authority'" because "Congress 'rarely intends to foreclose review of action exceeding agency authority,'" *id.* at 954 (quoting *Amgen, Inc. v. Smith*, 357 F.3d 103, 111-12 (D.C. Cir. 2004)). This "presumption can be overcome by 'specific language' evincing a 'congressional intent to preclude judicial review,'" *id.* (quoting *Ascension Borgess Hosp. v. Becerra*, 61 F.4th 999, 1003 (D.C. Cir. 2023)), but even then "the judicial inquiry does not end there" because "[a] 'jurisdiction-stripping provision does not apply if the agency's action fails to qualify as the kind of action for which review is barred,'" *id.* (quoting *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1238 (D.C. Cir. 2020)).

The D.C. Circuit explained, "in order 'to determine whether the judicial-review bar applies in this case, we must decide whether the challenged agency action[s]' are the sort of actions shielded from review by" the statutory bar itself, *id.* (alteration in original), which inquiry "may 'merge consideration of the legality of the [agency]'s action with consideration of this court's jurisdiction," *id.* at 956 (alteration in original) (quoting *COMSAT Corp. v. FCC*, 114 F.3d 223, 227 (D.C. Cir. 1997)). After determining that the text of the preclusion provision showed a clear congressional intent to preclude judicial review, *id.* at 954, the Court identified that "Congress expressly tied the bar to judicial review . . . to the definition of 'renal dialysis services' [provided elsewhere in the paragraph] by defining that term '[f]or purposes of this paragraph,'" *id.* at 955 (quoting 42 U.S.C. § 1395rr(b)(14)(B)). Upon close examination of the relevant definitions "to determine the scope of" the judicial review bar, *id.* at 956, the Court determined CMS had properly exercised authority to include oral-only drugs in the bundled payment system and "[b]ecause the regulation . . . accords with the statutory definition," the judicial review bar "precludes us from reviewing the regulation any further," *id.* at 962.

The same key question posed in *Ardelyx* is pertinent here: Is the challenged agency action the sort of action shielded from review by the judicial review bar itself? *See id.* at 954; *Am. Hosp. Ass'n*, 964 F. 3d at 1238. To be clear as to the challenged agency action here, California asserts no claim that EPA's transmittal of the waiver orders as a report to Congress was a violation of the CRA, and only challenges EPA's determination that the waiver orders are "rules" as a *violation of the APA* or as *ultra vires*. *See* Compl. ¶¶ 94-127. These two claims fall outside the scope of Section 805's judicial review bar.[10] To be sure the factual allegations underlying these two claims

[10] Even if the transmittal of the reports or the contents therein to Congress were not insulated from judicial review by the CRA's Section 805, binding precedent in *National Resources Defense Counsel v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988), which EPA raises for the first time in reply, *see* EPA's Reply at 1, 2, 7, 9-10, 20 (discussing *Hodel*),

reference California's view of the unlawfulness of EPA's submission to Congress of reports on the waiver orders as if they were "rules," *see, e.g.*, Compl. ¶¶ 11-12, 38-41, 56, 72. Such factual allegations are not the claims, however, nor the measure of the scope of Section 805.

Contrary to the position urged by EPA, Section 805 does not sweep so broadly as to insulate from judicial review an agency's decision to act through rulemaking or adjudication or an agency's decision to treat an action as a rule, an order or a license—even when that decision has consequences for triggering the CRA expedited legislative disapproval process—in order to ascertain Section 805's scope. Tellingly, EPA does not test the boundaries of the CRA in this case by submitting Clean Air Act Section 209(b) waiver orders to Congress, without first taking the action of reclassifying those waivers from adjudicatory orders to "final rules" that are subject to the CRA. *See, e.g.*, EPA June 2026 Press Release at 2 ("EPA has determined that each of these waivers is a rule under the CRA. . . . The four rules have prospective, national effects, giving California and the states that adopted the waivers under Clean Air Act section 177 the force of federal law, supplanting EPA authority."); EPA's Resp., Ex. A, Letter from EPA to Hon. Mike Johnson, Speaker of the U.S. House of Representatives (June 12, 2026) at 1 ("EPA is submitting the following final rules 'to each House of the Congress and to the Comptroller General,' for their review under 5 U.S.C. 801(a)."). Nor does EPA test the boundaries of CRA's definition of a "rule" subject to the CRA, and instead takes pains to skirt around application of the CRA's definitional

would have the same effect. In *Hodel*, the D.C. Circuit reasoned that, when acting pursuant to a congressional reporting requirement, "the designated Executive Branch officer is simply reporting back to the source of its delegated power in accordance with the Article I branch's instructions," the reporting "requirement [] by its nature seems singularly committed to *congressional* discretion in measuring the fidelity of the Executive Branch actor to legislatively mandated requirements." 865 F.2d at 318 (emphasis in original). Reasoning that "the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives," the D.C. Circuit reasoned that "in the absence of a congressional directive for judicial review of claims by non-congressional parties, this issue seems to us quintessentially within the province of the political branches to resolve as part of their ongoing relationships." *Id.* at 319. *Hodel* does not go so far as to decide that courts may not review an agency's decision to reclassify an adjudicatory order and such review does not make courts "the arbiters of congressional oversight," as EPA warns, *see* EPA's Reply at 9.

exceptions—in particular, the exception for "any rule of particular applicability," *id.* § 804(3)(A)—by describing the national impact of the four at-issue waivers, stating that these waivers addressed California emission standards involving "cars, trucks, lawn mowers, and other equipment used daily by Americans," and had "prospective, national effects." EPA June 2026 Press Release at 2. Whether EPA correctly characterized the four waivers at issue, under the APA, as an order or as a rule "of general or particular applicability," 5 U.S.C. § 551(4), is agency action that is independent of any concomitant or subsequent determination by the agency to submit the rule to Congress under the CRA, and thus falls outside the Section 805 judicial review bar, regardless of the interplay between the two decisions or the fact that both decisions may be part of an overall scheme to use the CRA to undo expeditiously regulatory action previously taken by the agency.

Indeed, the D.C. Circuit has repeatedly contemplated the binary distinction between agency adjudication and rulemaking, without such consideration being subject to the judicial review bar in Section 805, even when a finding that the agency must proceed through rulemaking may trigger a concomitant requirement for the agency to submit a report to Congress under the CRA. *See, e.g.*, *Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017) ("An agency may not escape requirements of § 553 [the APA's rulemaking provision] by labeling its rule an adjudication."); *Neustar, Inc. v. FCC*, 857 F.3d 886, 894 (D.C. Cir. 2017) ("The fact that an order rendered in an adjudication 'may affect agency policy and have general prospective application,' does not make it rulemaking subject to APA section 553 notice and comment." (quoting *Conf. Grp., LLC v. FCC*, 720 F.3d 957, 966 (D.C. Cir. 2013))). Beyond the classification distinction between a rule and an order, the determination of whether a rule is of general or particular applicability also carries concomitant obligations under the APA. For example, agencies are required to publish in the

Federal Register "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency," 5 U.S.C. § 552(a)(1)(D), but the APA imposes no analogous obligation for rules of particular applicability, *see Am. Broad. Cos. v. FCC*, 682 F.2d 25, 31 (2d Cir. 1982) ("The APA, however, makes no provision for publication of rules of particular applicability.").

EPA's repeated reliance on the Supreme Court's recent decision in *Mullin v. Doe*, 146 S. Ct. 2121 (2026), does not change this analysis. *See* EPA's Opp'n at 10-11, 13-14; EPA's Reply at 3-5. *Mullin* addressed the issue of whether those who "challenge the termination of Temporary Protected Status (TPS) for aliens from Syria and Haiti[] are entitled to" a stay of those terminations during litigation. 146 S. Ct. at 2127. The government invoked a provision in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, *id.* at 2130, barring "judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection," 8 U.S.C. § 1254a(b)(5)(A). In examining the sweep of that preclusion provision, the Court started with "the key term 'determination,'" which "may be used as a synonym for 'decision'" or "may also be used to describe the chain of events leading up to a decision." *Mullin*, 146 S. Ct. at 2133 (citations omitted). Next, the Court reasoned that "[n]ot only is it common to use the term 'determination' in this broad sense, but other terms in the judicial-review bar—particularly the phrase 'with respect to'—support this broad understanding," and emphasized that this "phrase 'generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject.'" *Id.* at 2133-34 (quoting *Patel v. Garland*, 596 U.S. 328, 339 (2022)). Notwithstanding "that when a statutory provision is reasonably susceptible to divergent interpretation, we adopt the reading that accords with the traditional and basic principle that executive determinations generally

are subject to judicial review," the Court reasoned that "here, the text of the TPS judicial-review bar very clearly overcomes the general presumption in favor of judicial review." *Id.* (internal quotation marks and citation omitted).

EPA relies heavily on the broad definition of "determination" articulated in *Mullin* to argue that the use of this same word in CRA's Section 805 means that all the subsidiary decisions leading up to an agency's decision to transmit to Congress a report under the CRA are also all subject to the same judicial review bar. *See* EPA's Reply at 7 ("The text of the provision in *Mullin* prohibits review of any 'determination' just as § 805 does."). The reasoning employed in *Mullin* is not controlling here, however, for several reasons. First, context is important, and in *Mullin*, the judicial review bar under scrutiny related to the Executive's powers to control the entry and exit of non-citizens under the INA, a context in which the Court pointed out the Executive Branch retains broad discretion, *id.* at 2129; *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("Our cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). Second, the standards for grant or removal of TPS are far less amenable to judicial review than those under the CRA, since, for example, to designate a country for TPS, assessments of various conditions in the foreign country are necessary. *See Mullin*, 146 S. Ct. at 2129 (citing 8 U.S.C. § 1254a(b)(1)). In contrast, the CRA imports definitions from the APA, and involves assessing agency action, an assessment squarely within the bailiwick of federal courts. Bluntly put, no assessment of conditions in foreign nations is required to determine whether an agency action is an order or a rule. Finally, importantly, the Supreme Court found the phrase "with respect to" to "support this broad understanding" of the scope of the TPS judicial review bar, because that "phrase 'generally

has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to the subject.'" *Mullin*, 146 S. Ct. at 2133-34 (quoting *Patel*, 596 U.S. at 339). No similar language appears in CRA's Section 805, which cabins the CRA preclusion bar solely to certain agency actions "under this chapter" and further cabins the chapter to apply only to a subset of "rules," as defined under the APA.

Critically, *Mullin* reaffirmed the "general presumption in favor of judicial review" of executive determinations, 146 S. Ct. at 2134, and highlighted the specific context of the TPS judicial review bar, which implicates the Executive's ability to control entry and exit of persons at the border, concerns the review of assessments made about conditions in other nations, and contains broad language within the provision itself, as the reasons permitting the Court to overcome this general presumption. None of those circumstances are present with respect to judicial review bar in the CRA's Section 805.[11]

---

[11] *Mullin* makes passing observation of "general administrative-law principles," that "[i]n APA cases, an agency's subsidiary decisions merge into the final agency action which is then subject to review." *Id.* at 2136 (citing *U.S. Army Corps .of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597-98 (2016) (finding that "preliminary JDs [jurisdictional determinations]—which are 'advisory in nature'" do not "'mark[] the consummation' of the Corps' decisionmaking process" but "[t]he definitive nature of approved JDs also gives rise to 'direct and appreciable legal consequences,'" and constitutes final agency action subject to review (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997))). This brief reference to "subsidiary decisions" is inapplicable here since nothing about EPA's explicit "determination" about the waivers being reclassified to "rules" was "advisory in nature," or was anything other than "definitive."

*Mullin* goes on, in the same summary paragraph, to observe that in APA cases "[i]f the final agency action is unreviewable, then so too are subsidiary determinations," and explains that "[t]his important principle ensures that challengers cannot avoid a judicial-review bar by creative pleading or clever lawyering." *Id.* (citing *Amgen, Inc.*, 357 F.3d at 113 ("If a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, or procedurally defective, but it must determine whether the challenged agency action is of the sort shielded from review."), and *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 506 (D.C. Cir. 2019) (applying the judicial bar "that '[t]here shall be no administrative or judicial review' of '[a]ny estimate of the Secretary for purposes of determining the factors described'" on the basis that "a challenge to the methodology for estimating uncompensated care is unavoidably a challenge to the estimates themselves" (quoting 42 U.S.C. § 1395ww(r)(3)(A))). *Ardelyx* relied upon both of these cases cited in *Mullin* and provided more careful analysis that "almost any challenge" to an agency determination subject to a judicial review bar "could be recast as a challenge to [the] underlying [regulation]," which recasting would represent "an artful dodge we cannot allow," 179 F.4th at 957 (quoting *DCH Reg'l Med. Ctr.*, 925 F.3d at 506), and thus review of contested agency action potentially subject to a judicial review bar occurs "only 'to the extent necessary to determine whether the challenged agency actions fall within the scope of the preclusion of judicial review,'" *id.* at 956 (quoting *Amgen, Inc.*, 357 F.3d at 113). Here, California is not attempting to circumvent a judicial review bar as to agency reports sent to Congress under the CRA;

In this case, an agency reclassified as a rule of general application the four at-issue waiver orders issued to California under the Clean Air Act's Section 209(b). Although that reclassification may be a prerequisite for another decision to submit the newly-designated "rule" to Congress, only the latter decision is shielded by Section 805's judicial review bar. Otherwise, the entire decision-making process leading up to the issuance of *any* rule or order would be shielded from judicial review as a result of an agency's determination to comply with the CRA obligation to send, or even to omit to send, the rule to Congress, effectively gutting the authority for judicial review of final agency actions under the APA, 5 U.S.C. §§ 702-706. *See* Hr'g Tr. at 27:21-28:2 (California's Counsel: "The CRA process happens at the back end and it refers to the promulgation of a rule. And that promulgation happens under other statutes, typically the APA, but it could be another statute. None of that is under the CRA. All of that is outside the CRA and not subject to the [§] 805 bar. If it were, . . . we'd write the APA . . . out of the U.S. code. . . ."). Congress cannot be presumed to have *sub silentio* eliminated judicial review under the APA, and, had Congress done so, this elimination would not have lain dormant for the thirty years that the CRA has been in effect. CRA's Section 805 cannot be read so capaciously.

Accordingly, Section 805 of the CRA does not preclude judicial review of California's challenge to EPA's reclassification of the Clean Air Act Section 209(b) waiver orders, *see* 5 U.S.C. § 551(6) & (8) (defining "order" to "includ[e] licensing," and "license" to "include[]" a "statutory exemption or other form of permission" ), as "final rules" of general national applicability.

rather, the State is challenging an agency action that directly affects its legal rights, *see infra* III.B, separate and apart from any reports sent to Congress, and thus this challenged agency action is not "the sort shielded from review," *Amgen, Inc.*, 357 F.3d at 113.

### 2. *California Has Established Standing to Assert the Claims In This Case*

EPA and defendant-intervenors contend that California lacks standing to challenge, under the APA or as *ultra vires*, the reclassification of the four at-issue waiver orders as "final rules" of "general national applicability." *See, e.g.*, EPA's Opp'n at 18-24; Def.-Intervenor's Mot. at 13-14. To establish standing, a plaintiff "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The "[f]irst and foremost" element is injury-in-fact, for which a plaintiff must show "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338-39 (2016) (alteration in original) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998), and *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

In assessing California's standing, the Court is guided by the D.C. Circuit's over-arching principle, nowhere mentioned by EPA, that "states have greater leeway in showing standing given the 'special solicitude' they receive for matters involving their 'quasi-sovereign interests.'" *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1230 (D.C. Cir. 2021) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)); *see Marino v. Nat'l Oceanic & Atmospheric Admin.*, 33 F.4th 593, 598 (D.C. Cir. 2022) ("It is of considerable relevance that the party seeking review here is a sovereign State and not . . . a private individual" because "States are not normal litigants for the purposes of invoking federal jurisdiction." (quoting *Massachusetts*, 549 U.S. at 518)); *see also California v. Trump*, 963 F.3d 926, 936 (9th Cir. 2020) ("[A] state may sue to assert its 'quasi-sovereign interests in the health and well-being—both physical and economic—of its residents in general.'" (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982))); *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015) ("'It is of considerable relevance that the party seeking review

here is a sovereign State and not . . . a private individual' because 'States are not normal litigants for the purposes of invoking federal jurisdiction.'" (quoting *Massachusetts*, 549 U.S. at 518)). Indeed, the Supreme Court has emphasized that "[p]aramount among the States' retained sovereign powers is the power to enact and enforce any laws that do not conflict with federal law." *Cameron v. EMW Women's Surgical Ctr, P.S.C.*, 595 U.S. 267, 277 (2022). "Therefore, a State 'clearly has a legitimate interest in the continued enforceability of its own statutes,' and a federal court must 'respect . . . the place of the States in our federal system." *Id.* (quoting *Maine v. Taylor*, 477 U.S. 131, 137 (1986), and *Arizonans for Official English v. Arizona*, 520 U.S. 43, 75 (1997)). As a consequence, "a State's opportunity to defend its laws in federal court should not be lightly cut off." *Id.*

California asserts four injuries in support of Article III standing: "that EPA's actions are injuring the State [1] by threatening its ability to enforce its own laws through facilitating invalidation of these waivers, [2] by depriving California of licensee rights, [3] by causing the State to expend and divert resources, and [4] by hampering state agency work." Cal.'s Opp'n at 7.[12] California's first theory of injury stems from the risk that Congress will act to enact Joint Resolutions of Disapproval as to each of the four waivers at issue, just as Congress did in 2025 with three other California waivers. Given the congressional disapproval action just last year, and the pending congressional joint resolutions for disapproval of the at-issue waiver orders, this theory of injury has support due to the significant risk that Congress may act, as California fears. Nonetheless, EPA contends that "speculation about the possible future actions of an independent

[12] California's last asserted injury is not well developed or supported in the record, since the State has done little more than assert "that communications with manufacturers and other stakeholders will be impaired by the uncertainty about CARB's authority that EPA has (intentionally) created." Cal.'s Reply at 20. While California's declarant attests his expectation that communications from stakeholders will "decrease" "and will impact program implementation and long-term planning," Cal.'s Mot., Att. 2, Decl. of Air Pollution Specialist of the Air Quality Planning & Sci. Div., Cal. Air Res. Bd., Austin Hicks ("Hicks Decl.") ¶ 24, ECF No. 13-2, this speculation, without more, is not sufficient to meet the plausibility standard required to establish standing.

third party not before the Court . . . cannot support standing," EPA's Reply at 12, and the Supreme Court has held as much, *see Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("Yet the Court has said that plaintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013)). At the same time, a substantial risk of harm, even if not inevitable, may be sufficient to support standing. *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) ("[S]ubstantial risk that the harm will occur" is sufficient for Article III injury. (citation omitted)). Here, however, even though California has overcome the most common obstacle confronted by plaintiffs who allege injuries based on potential congressional conduct, that "few things are more hypothetical and speculative than Congress passing a specific act of legislation," *Doubly R Ranch Trust v. Nedd*, 284 F. Supp. 3d 21, 31 (D.D.C. 2018) (CRC), California's first proffered injury lacks redressability as courts may not interfere with the legislative activities of a co-equal branch of government, *see Frison v. United States*, No. 95-5062, 1995 WL 686224, at *1 (D.C. Cir. Oct. 4, 1995) (per curiam) ("The district court appropriately declined to interfere prospectively with the exercise of legislative power by the United States Congress." (citing *McChord v. Cincinnati, New Orleans & Tex. Pac. Ry. Co.*, 183 U.S. 483, 495 (1902) ("[T]he general rule is that legislative action cannot be interfered with by injunction."))).

California next advances the distinct injury-in-fact that EPA has deprived California of procedural protections under the Section 209(b) waiver orders as a licensee. Under the APA, a "statutory exemption or other form of permission" is a "license," 5 U.S.C. § 551(8), and, with certain exceptions, "the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given—

(1) notice by the agency in writing of the facts or conduct which may warrant the action; and (2) opportunity to demonstrate or achieve compliance with all lawful requirements," *id.* § 558(c). California argues that "[i]f these waivers are now rules, California has lost those rights" to notice and an opportunity to correct, which constitutes an "injury to California, particularly given the threat that EPA may soon seek to administratively invalidate one or more of these waivers and would now attempt to do so without affording advance notice and a correction opportunity to California." Cal.'s Mem. at 17-18.

While EPA's reclassification of the waiver orders to rules does deprive California of a correction opportunity, the State somewhat overstates the point that a rule can be withdrawn "without affording advance notice" or a hearing. An agency's withdrawal of a rule may only occur without notice and a hearing, "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).[13] The D.C. Circuit has determined that this "good cause exception is to be narrowly construed and only reluctantly countenanced," *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1339 (D.C. Cir. 2023) (quoting *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012)), such that the exception applies only "in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare," *id.* at 1340 (quoting *Chamber of Com. of U.S.*

[13] EPA suggests that even assuming the at-issue waivers are licenses, California could be deprived of the waivers without notice or an opportunity to correct due to a "broad exception any time the 'public health, interest, or safety requires otherwise.'" EPA's Reply at 16 (quoting 5 U.S.C. § 558(c)). Section 558(c) indeed provides that notice by an agency and an opportunity to correct is required for a license to be withdrawn "[e]xcept in cases of willfulness or those in which public health, interest, or safety requires otherwise." The willfulness condition is more frequently litigated, and the D.C. Circuit has upheld application of the willfulness exception when "supported by substantial evidence." *Coosemans Specialties, Inc. v. Dep't of Agric.*, 482 F.3d 560, 568 (D.C. Cir. 2007). This substantial evidence standard creates a higher burden for the agency to withdraw a license without notice and an opportunity to correct than does the "good cause" requirement to replace a rule without notice and comment.

*v. SEC*, 443 F.3d 890, 908 (D.C. Cir. 2006)). That being said, the reclassification of California's waiver orders to "rules" subjects these orders to a different administrative regime for enforcement and elimination or withdrawal, and only the procedures applicable to orders or licenses appears to provide California with the protection of requiring a pre-withdrawal, pre-hearing opportunity to correct.

Further challenging California's asserted procedural injuries, EPA makes assurances, in post-hearing supplemental briefing, that its "consistent position, both before and after it sent the waivers to Congress under the CRA, is that section 209(b) of the Clean Air Act requires prior notice and an opportunity for public comment and hearing when making waiver decisions, including withdrawal of a waiver" and that "this is EPA's position regardless of whether a waiver is a rule or an order under the CRA." EPA's Resp. at 5. The assertion that EPA's position has been "consistent" is dubious, given the agency's abrupt reclassification of certain waivers to "rules," compounded by the agency's waffling assertion in earlier briefing that California's position that APA's Section 558(c) "would entitle [California] to notice and an opportunity to respond 'before the institution of agency proceedings' to withdraw that 'license' . . . *may or may not be correct* . . . but this Court need not opine on any of those questions now." EPA's Reply at 16 (emphasis supplied). Rather than address the actual or potential procedural disadvantages to California from the agency's reclassification decision, EPA tries to duck the question, urging the Court instead simply to trust that the agency will follow the law. *Id.* ("Even if this Court wishes to indulge in speculation about EPA's future actions, at the very least, the Court should presume that EPA will *follow* the law—not violate it." (emphasis in original)).

As to the merits of EPA's position that CAA's Section 209(b) and not APA's Section 558(c) controls withdrawal of the waiver, the agency advances three arguments. First, EPA argues

that "[v]arious provisions of the Clean Air Act contain procedural requirements that supersede the APA under the principle that specific statutory provisions displace more general requirements." EPA's Resp. at 5. This reasoning is generally unpersuasive as the relationship between CAA's Section 209(b) and APA's Section 558(c) does not amount to one between a specific and general requirement as to the withdrawal of a waiver, since CAA's Section 209(b) is completely silent as to waiver withdrawals. *See* 42 U.S.C. § 7543(b). EPA attempts to fill in this gap by arguing that "[b]ecause section 209's notice and hearing procedures apply to the grant of a waiver, those procedures apply to the withdrawal of a waiver as well," but provides no case law for this proposition, and points only to legislative history. EPA's Resp. at 6 (citing S. Rep. No. 90-403, at 34 (1967)). EPA's first argument is not enough to show why silence in Section 209(b) combined with the CAA's legislative history is capable of overriding the APA's clear statutory command about the "*pre-proceeding* rights" for licensees before withdrawal of a license, Cal.'s Reply at 13 (emphasis in original), that are not applicable to withdrawal of a rule, where the agency must act through notice and comment, *see Humane Soc'y of the U.S. v. U.S. Dep't of Agric.*, 41 F.4th 564, 569 (D.C. Cir. 2022) ("[O]nce an agency makes a rule—that is, once it makes a statement prescribing law with future effect—the APA requires the agency to provide notice and an opportunity for comment before repealing it."); *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 919 (D.C. Cir. 1998), without a pre-proceeding opportunity to correct.

Second, EPA attempts to invoke past practice, highlighting that "[i]n 2019[,] EPA withdrew a California waiver after notice and public hearings," which would seem to support EPA's position that CAA's Section 209(b) may be and has been interpreted to apply notice and hearing procedures to withdrawal of a waiver issued under this section. EPA's Resp. at 7. The agency, however, neglected to mention that this 2019 withdrawal occurred through notice-and-

comment rulemaking, under the APA, rather than the procedures required under CAA's Section 209(b). *See* 84 Fed. Reg. at 51310 ("On August 24, 2018, the Environmental Protection Agency (EPA) and the Department of Transportation's National Highway Traffic Safety Administration (NHTSA) jointly published in the Federal Register a *notice of proposed rulemaking* entitled, 'The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks.'" (emphasis added)); *id.* ("The agencies anticipate issuing a final rule on standards proposed in the NPRM in the near future."). Past practice thus provides no support for EPA's representation that the procedures contained in CAA's Section 209(b) govern the administrative withdrawal of waivers that EPA has now deemed to be rules.

Third, EPA contends that "the procedures of section 209(b) would satisfy or go beyond the notice procedures under section 558(c) of the APA" because the latter procedure "is not onerous, and can be satisfied by an opportunity to submit a letter to the decisionmaker" and "notice and a public hearing would provide *more* process than that." EPA's Resp. at 7 (emphasis in original). EPA does not respond to the position that California seeks "notice and an opportunity to correct *before initiating* any withdrawal proceeding," Cal.'s Reply at 18 (emphasis in original), to the State would be entitled under Section 558(c), *see* 5 U.S.C. § 558(c) ("[T]he withdrawal, suspension, revocation, or annulment of a license is lawful only if, *before the institution of agency proceedings* therefor, the licensee has been given . . . opportunity to demonstrate or achieve compliance with all lawful requirements." (emphasis added)). Moreover, EPA does not address California's concern that EPA may try to use the good cause exception to replace its waivers without any notice and comment at all. *See* 5 U.S.C. § 553(b)(B).

In sum, California has plausibly alleged that the reclassification as "rules" of its waivers has resulted in the loss of procedural protections to which the State would otherwise be entitled.

EPA's assertions to the contrary are, at this stage of the litigation, unavailing, and so California has established injury-in-fact.

Finally, California contends that the expenditure of state funds and the diversion of agency resources "to plan for the possibility that these waivers, upon which some of the State's air pollution reduction plans rest, will be invalidated," raises another basis for injury-in-fact. Cal.'s Reply at 19. These waivers are especially important to California because without them, "in addition to subjecting California residents to unhealthy air," the State is "going to be out of compliance with federal law." Hr'g Tr. at 41:16-21 (California's Counsel). Indeed, California relies upon these Section 209(b) waivers to meet federal National Ambient Air Quality Standards under the Clean Air Act, and the loss of the waivers would require the State to develop new regulations to stay in compliance with federal law. *See* Cal.'s Mot., Att. 2, Decl. of Air Pollution Specialist of the Air Quality Planning & Sci. Div., Cal. Air Res. Bd., Austin Hicks ("Hicks Decl.") ¶ 12, ECF No. 13-2 ("CARB and California have historically received waivers granted by EPA pursuant to Section 209 of the Clean Air Act to enforce certain emission standards applicable to vehicles and engines sold or operated in California. CARB has relied on these waivers, and the regulations they authorize CARB to enforce, as significant components of broader plans to meet federal and state air quality standards, and the State's other air pollution reduction objectives.").

Should California fail to create new standards, the State could face sanctions from EPA, including the loss of federal highway funds. 42 U.S.C. § 7509(b)(1)(A) ("The [EPA] Administrator may impose a prohibition, applicable to a nonattainment area, on the approval by the Secretary of Transportation of any projects or the awarding by the Secretary of any grants . . . ."). Now that EPA has threatened a number of the Section 209(b) waivers, California emphasizes that planning must begin immediately due to the "long time horizons to develop plans

or plan amendments to meet these air pollution targets" and that "[i]t generally takes years to identify measures to reduce emissions, model the impacts of those measures, prepare SIP [CAA State Improvement Plans] and other planning documents, and put the measures in place in time to meet statutory and other deadlines." Hicks Decl. ¶ 13. Consequently, "EPA's escalation of the threat to the four Section 209 waivers at issue in this case immediately requires CARB to devote significant resources toward SIP and other plan revisions." *Id.* California contends that "[t]he actions challenged here thus appear to be part of the never-published actions plan to administratively attack California's waivers." Cal.'s Mem. at 14; *see* Hr'g Tr. at 39:10-12 (California's Counsel: "Your Honor, I think the entire California regulatory program is being targeted because there isn't a common characteristic[]" among the waivers that were reclassified and submitted to Congress.); Cal.'s Reply at 1 ("As EPA intended, its Reclassifications have escalated the federal government's threats to California's authority to enforce its own laws, requiring the State to expend and divert resources and hampering the California Air Resources Board's mission to protect public health and meet state and federal air pollution requirements."). Indeed, since February 2025, three of California's waivers have been disapproved by Congress and six more have been reclassified by EPA into rules. *See* Compl. ¶¶ 7-9, 13; Pl.'s Notice of Suppl. Auth. at 1.

EPA discounts California's concerns, arguing, first, no agency action has or will be taken "that is inconsistent with law" to target California's waivers and, second, that the resources committed to developing new emissions plans constitutes "a self-inflicted injury." EPA's Opp'n at 20-21. Nowhere does EPA acknowledge the significant reliance interests attached to the at-issue Section 209(b) waivers—two for more than a decade—that have been shaken by the challenged agency action. As to EPA's first argument, California points out that EPA has already

engaged in conduct that is inconsistent with law by reclassifying the four waivers as rules of general national applicability when these waivers were originally issued as "not a rule, for purposes of 5 U.S.C. 804(3)," 74 Fed. Reg. at 32784; 78 Fed. Reg. at 2145; 87 Fed. Reg. at 14379; 90 Fed. Reg. at 642, and "[i]n determining jurisdiction, this Court generally will assume the merits as the plaintiff . . . pleads them," Cal.'s Reply at 6 n.5 (quoting *Ctr. for Regul. Reasonableness v. EPA*, 849 F.3d 453, 454 n.1 (D.C. 2017)); *see also Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023) ("For purposes of standing, 'we assume the merits in favor of the plaintiff.'" (quoting *Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017))). California plausibly argues that, absent injunctive relief, EPA will persist in treating California's Section 209(b) waivers as "rules," when the waiver orders were expressly not, and "upend the state's long-standing regulatory programs." Cal.'s Mem. at 29 (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction.")).

As to EPA's second argument, the agency appears to misread the D.C. Circuit's precedent on self-inflicted injuries. In *Arizona v. Environmental Protection Agency*, (D.C. Cir. 2023), the D.C. Circuit summarized a line of cases where the "alleged injury is 'self-inflicted'" and determined that "[i]n each case, we held that the regulated party's failure to pursue a safer available option made the alleged injury 'self-inflicted' and thus destroyed traceability." *Id.* at 1130. Here, California is not left with a safer option: if the State takes no action and EPA continues to reclassify Section 209(b) waiver orders and to effectuate their withdrawal or invalidation, the State would be out of compliance with federal law unless the development of new regulations begins now. The D.C. Circuit has also held that the focus is "on whether [plaintiff] undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged" unlawful actions. *Equal Rts.*

*Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011). Here, California is clearly developing new emissions regulations in response to EPA's threats, so EPA's argument that California's expenditures are self-inflicted is unavailing.

In short, California has plausibly alleged that the diversion of resources required to develop new air regulations in order to ensure compliance with federal law constitutes a second basis for injury-in-fact.

Having demonstrated injury-in-fact, the remaining requirements for standing—traceability and redressability—follow in short order. In broad terms, California traces the harm from EPA's reclassification of the waivers to EPA and seeks an injunction to enjoin EPA "from committing similar violations in the future." Cal.'s Reply at 23. EPA's misguided argument on traceability starts with the faulty premise that the only injury identified stems from submission of the waivers in reports to Congress under the CRA. For example, EPA contends that "California bases its injury on Congress enacting a joint resolution, but that action—if it were to occur—would be attributable to Congress, which has unfettered discretion to pass a statute and is a third party not before the Court." EPA's Opp'n at 22; *id.* ("[T]he relief California seeks would not preclude Congress from enacting a joint resolution."). Separately, EPA argues that California has not adequately alleged that "EPA might administratively rescind the waiver without notice." *Id.* at 23. Both contentions boil down to the position that "there's no point in closing the barn door after the horses have already bolted." This, however, is not a good reason against reviewing the decision to open the barn door in the first place or against enjoining the responsible party from continuing to open more barn doors.

To be sure, EPA's submission of reports on the four at-issue waivers to Congress is *fait accompli*, and California concedes this Court lacks power to compel Congress to return or

disregard the reports or to otherwise preclude the legislature from passing a resolution of disapproval. Hr'g Tr. at 16:24-25 (California's Counsel: "We're not asking you to compel Congress to do anything, Your Honor."); Cal.'s Opp'n at 1 ("But the Complaint does not ask this Court to direct Congress to do (or not do) anything at all."); *see* EPA's Opp'n at 23 ("This Court cannot look behind the curtain of a coordinate branch to second-guess the procedures (much less the motivations) of legislators exercising independent constitutional roles."). Indeed, California clarifies that the State "does not seek an order from this Court that would . . . instruct Congress in any way," and "[t]he relief California seeks would not therefore alter Congress's constitutionally assigned powers." Cal.'s Reply at 21. In other words, there is no disagreement that this Court lacks the power to direct Congress to unsee what has already been seen.[14]

Unlike Congress, however, EPA is indisputably a party to this case such that California may seek injunctive relief against EPA "from committing similar violations in the future." Cal.'s Reply at 23. The reclassifications by EPA are both "fairly" and only traceable to EPA, and the agency's campaign to reclassify California's waivers would be halted if an injunction were in place preventing the agency from taking action to reclassify California's Section 209(b) waiver orders as rules of general applicability. Thus, California's Article III standing has been established.

### B. EPA's Reclassification Decisions Were Final Agency Actions

In addition to seeking dismissal for lack of subject matter jurisdiction, under Federal Rule of Civil Procedure 12(b)(1), EPA and defendant-intervenors contend that California has failed to state a claim, under Rule 12(b)(6), because "EPA's interpretation of the CRA has no present, independent legal effect on California." EPA's Reply at 21; *see id.* at 20 ("[T]he legal regime

---

[14] As no request is being made "to direct Congressional procedures and Congress's deliberative process," this case does not "raise nonjusticiable political questions" as defendant-intervenors' argue. Def.-Intervenors' Mot. at 9; *see also* Def.-Intervenors' Reply in Supp. of Mot. to Dismiss. at 7, ECF No. 38 ("The Court of course cannot repeal or suspend Congress's own procedural rules or actions.").

remains the same regardless of whether EPA considers the waivers rules or orders and whether the Agency transmits the waivers to Congress or fails to do so."). This ground for dismissal is predicated on the flawed premise that EPA's determination to reclassify as "rules" the four Section 209(b) waiver orders was merely part of an integrated decision to submit a report to Congress under the CRA. Properly understood, however, for reasons already explained, *see supra* Part III.A.2, these reclassification decisions are stand-alone actions that may sustain a viable claim under the APA so long as they meet the criteria for a "final agency action." 5 U.S.C. § 704; *see Sec'y of Lab. v. Indus. TurnAround Corp.*, 138 F.4th 1339, 1342 (D.C. Cir. 2025) ("[O]rdinarily 'appellate review of administrative action is restricted to final agency orders.'" (quoting *Meredith v. Fed. Mine Safety & Health Rev. Comm'n*, 177 F.3d 1042, 1047 (D.C. Cir. 1999))).

In assessing whether an agency action is final, courts look to "two conditions" set out in *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997): first, "the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and, second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow,'" *id.* (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948), and *Port of Bos. Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The second condition "is a 'pragmatic' and 'flexible' one." *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (quoting *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005)).

EPA does not contest that the reclassification as "rules" of the four at-issue Section 209(b) waiver orders constitute the consummation of its decision-making process, *see* EPA's Opp'n at 24-27; EPA's Reply at 19-22, nor do defendant-intervenors, *see* Def.-Intervenors' Mot. at 11.

Thus, this dispute boils down to whether the reclassification decisions have "direct and appreciable legal consequences." *U.S. Army Corps .of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016).

Obviously, these reclassifications have appreciable legal consequences, as California summarizes, because "EPA asserts that its Reclassifications—its conversion of these waivers from order to rules—determined its *obligations* to transmit these waivers to Congress." Cal.'s Mem. at 17 (emphasis in original). Indeed, California is correct that "*Bennett*'s second prong is satisfied by legal consequences that affect only the agency itself." *Id.* (quoting *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 149 (D.D.C. 2020) (BAH), *aff'd sub nom. W. Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021)); *see Sierra Club v. Trump*, 929 F.3d 670, 698 n.23 (9th Cir. 2019) ("[T]he question we must ask in determining finality is whether the agency action imposes obligations on the agency, not whether it imposes obligations on Plaintiffs."); *see also Bennett*, 520 U.S. at 178 (finding final agency action because said action "alter[ed] the legal regime to which the action agency [wa]s subject").

Satisfaction of the second *Bennett* prong is further demonstrated for the same reasons that California has asserted an injury-in-fact, namely: the loss of the procedural protection of notice and an opportunity to correct before the initiation of withdrawal proceedings. This only compounds the fact that EPA's reclassification of the four at-issue waiver orders to rules constitutes an action with appreciable legal consequences.

As the reclassifications are actions from which California's "rights or obligations have been determined," *Bennett*, 520 U.S. at 178, both conditions requisite for final agency action have been satisfied, and EPA's and defendant-intervenors' motions to dismiss on this basis are denied.

### C. California Is Likely to Prevail on Its Argument that the Waivers Are Orders

Having determined that the exercise of subject matter jurisdiction as to California's claims is not precluded by CRA's Section 805, that California has established Article III standing and that

EPA's reclassification decision qualifies as a final agency action, thus defeating EPA's and defendant-intervenors' pending motions to dismiss for lack of jurisdiction and failure to state a viable APA claim, examination now turns to the merits of California's motion for preliminary injunctive relief. Each preliminary injunction factor is addressed *seriatim*.

**1. *California Has Established a Likelihood of Success on the Merits***

California launches several arguments to establish a likelihood of success on the merits, and, perhaps because of EPA's strategy of denying the occurrence of any agency action to reclassify the waivers, the agency has little to say in defense. In any event, California has shown a likelihood of success on the merits of its two claims.

First, California contends that the reclassifications were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Compl. ¶ 103 (quoting 5 U.S.C. § 706(2)(A)). An agency action is "arbitrary and capricious" if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The requirement for a "reasoned explanation" means that when an agency is changing its policy, the agency must demonstrate recognition of that change and provide "good reasons for the new policy," and those reasons must be especially strong where the "prior policy has engendered serious reliance interests" or where the "new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). California establishes a likelihood that EPA's action in reclassifying the CAA Section 209(b) waiver orders as "final rules" was arbitrary and capricious because EPA not

only supplies no explanation for this abrupt change in long-standing policy but also denies the fact that a change in the classification of the waivers occurred at all.

Second, California argues that the reclassifications were "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Compl. ¶ 103 (quoting 5 U.S.C. § 706(2)(C)). As the Supreme Court has reminded, "[a]dministrative agencies are creatures of statute[, and] [t]hey accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (per curiam). EPA denies that any action occurred at all and consequently has identified no statute authorizing the reclassification decisions challenged here. No statutory authority for the agency to take this action is apparent or has been presented to the Court so far in this case. Accordingly, California succeeds in establishing a likelihood of success on the claim that EPA has acted in excess of its statutory authority. As a corollary, California also likely succeeds on its third claim that the reclassification decisions were made "without observance of procedure required by law," Compl. ¶ 103 (quoting 5 U.S.C. § 706(2)(D)), as EPA has failed to identify any law under which the agency was acting nor did "EPA and its Administrator observe[] [any] public process at all when they changed position on the nature of already finalized actions," *id.* ¶ 106.

In the alternative, California argues that the reclassification decisions were *ultra vires*. *See id.* ¶¶ 118-27. *Ultra vires* review "is available where (i) there is no express statutory preclusion of all judicial review; (ii) 'there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory[.]'" *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (alteration in original) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). California notes that "[h]ere, if APA review is

unavailable, California has no alternative procedure to seek review of EPA's Reclassifications," and argues that "EPA has plainly acted in excess of its delegated powers, as no statute delegates authority to EPA to engage in post-hoc reclassifications of adjudicatory orders." Cal.'s Reply at 15. Again, EPA's only rebuttal is to contend that no action was taken other than the submission of the waivers to Congress. *See* EPA's Reply at 5. For the reasons already explained, such a position is untenable, and thus, should APA review not be available, California has established a likelihood that EPA's actions were *ultra vires*.

It is worth pausing to consider EPA's persistence in insisting that no reclassification of the waivers occurred rather than making any effort to justify this reclassification as legally viable. Similarly to EPA's response to GAO in 2025, when asked for "any explanation" for EPA's new "determination" that CAA Section 209(b) waiver orders are rules, *see supra* n.4, EPA is just as silent now. The reason for this silence from EPA is because these Section 209(b) waivers are properly considered adjudicatory orders under the APA, and therefore under the CRA, for both procedural and substantive reasons. First, the procedure an agency employs dictates whether an agency action is a rule or an order, since, by definition, a rulemaking cannot lead to an order and an adjudication cannot lead to a rule. *See Safari Club*, 878 F.3d at 331-32 (discussing this distinction); *see also* 5 U.S.C. § 551(6) (defining "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter *other than rule making* but including licensing" (emphasis added)); *id.* § 551(7) (defining "adjudication" as "agency process for the formulation of an order"). Due to this emphasis on the procedure used to reach an agency decision, agencies have not been empowered to transmogrify a rule into an order or an order into a rule without the appropriate form of process underlying the decision. The four at-issue waivers were promulgated by EPA, pursuant to an abbreviated process

as outlined in the Clean Air Act and, as such, did not go through notice-and-comment rulemaking and thus cannot be rules.

Second, the California waivers have all the indicia of an order. To start, "[t]he nature of that proceeding 'reflect[s] a highly fact-specific, case-by-case style' characteristic of adjudication." *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) (second alteration in original) (quoting *Conf. Grp., LLC v. FCC*, 720 F.3d 957, 965 (D.C. Cir. 2013)). Indeed, for each waiver, the EPA Administrator had to review California's determination and find that each determination was not "arbitrary and capricious," that California needed these "standards to meet compelling and extraordinary conditions," and that such "standards and accompanying enforcement procedures are not inconsistent with" CAA Section 7521(a). 42 U.S.C. § 7543(b)(1). Additionally, each "approval, by its own terms, applies only to the [California] program. *Nat'l Biodiesel Bd.*, 843 F.3d at 1018; *see Neustar, Inc. v. FCC*, 857 F.3d 886, 896 (D.C. Cir. 2017) ("[A]djudications by nature are likely to be specific to individuals or entities, while rules tend to be matters of more general application.").

Finally, the waivers have "none of the hallmarks of legislative rulemaking that this court has identified, such as amending a prior legislative rule or explicitly invoking the [agency]'s general legislative authority." *Conf. Grp.*, 720 F.3d at 965. The fact that other States have the option, per CAA Section 177, to adopt regulatory emission standards approved by a Section 209(b) waiver order issued to California does not convert an order into a rule because, as the D.C. Circuit articulated, "[j]ust as a class action can encompass the claims of a large group of plaintiffs without thereby becoming a legislative proceeding, an adjudication can affect a large group of individuals without becoming a rulemaking." *Goodman v. FCC*, 182 F.3d 987, 994 (D.C. Cir. 1999). The minority of States that have followed California's lead on emission standards subject to Section

209(b) waiver orders is just that, a minority, so even under this measure, the waivers have failed to have "national effects." EPA June 2026 Press Release at 1.

In sum, California has demonstrated a likelihood of success on its claims.

### 2. *California Has Demonstrated Irreparable Harm*

The second requisite factor for injunctive relief is the establishment of irreparable harm. To warrant preliminary equitable relief, plaintiffs must demonstrate "a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C.), *aff'd* 548 F.2d 977 (D.C. Cir. 1976)). That injury must be "actual and not theoretical" and must be such that "adequate compensatory or other corrective relief" will likely not be possible "at a later date, in the ordinary course of litigation." *Id.* (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam)). California satisfies this factor as well.

The sources of California's irreparable harm, absent an injunction, follow those bases for finding an injury-in-fact requisite for standing. First, reclassification of the waivers has resulted in the loss of some procedural protections should EPA initiate the process of seeking repeal or withdrawal of the waivers. *See supra* Part III.A.2. The very fact that EPA has reclassified the waivers as rules and also submitted the waivers to Congress for possible legislative disapproval stymies California's ability to enforce, further implement and even conduct future planning that builds on the regulations that are affected. Hicks Decl. ¶ 17 ("EPA's recent purported reclassification of four additional waivers, and EPA's transmittal of those additional waivers to Congress, is causing CARB to have to plan now for the possibility that it will be unable to enforce the underlying state regulations."). This harm is now and is ongoing since EPA's actions are "detract[ing] from CARB's work to make *additional* pollution reduction progress." Cal.'s Mem. at 31 (emphasis in original). California argues that "EPA's actions have significantly elevated the

risk to these waivers," Cal.'s Mem. at 30, and that EPA has taken steps designed to dismantle the State's regulatory structure concerning air pollution, *see* Cal.'s Reply at 17 ("To the extent EPA intends to suggest that California provided no evidence that EPA's actions have significantly increased this threat, EPA is simply wrong. California established that, over a period of sixty years, Congress has only *once* passed resolutions targeting waivers: when EPA reclassified three other waivers last year." (emphasis in original)).

Elevating the likelihood of irreparable harm is that should Congress accept EPA's reports that the four at-issue waivers (or any other of California's waivers that EPA reclassifies in the absence of an injunction) are rules subject to the CRA and consequently enact joint resolutions of disapproval, the CRA prevents the waivers from being "reissued in substantially the same form." 5 U.S.C. § 801(b)(2). Not only would this preclude California from developing, and EPA from approving Section 209(b) preemption waivers for, regulations that are "substantially" the same, but also the next time California develops regulations that bear a passing resemblance to any disapproved waivers, those regulations could be tested in legal challenges and tied up in protracted litigation both administratively and in the courts. The back-sliding on California's emission standards that has already occurred with the disapproval of three waiver orders by Congress in 2025, and the pending disapproval resolution for the additional four at-issue waiver orders presents a significant challenge as to what planning for the future can take place. *See* Hicks Decl. ¶ 19 ("Based on prior plans, it is not yet obvious what regulations would result in sufficient emissions reductions to replace those emissions reductions, or what regulations would replace the anti-backsliding benefits of some of the earlier-adopted regulations covered by the waivers at issue (several of which have been approved into the SIP [CAA State Improvement Plan])."). 

California also claims the diversion of resources and the concomitant monetary expenditure necessary to develop proactively new air quality regulations to abide by federal law as an additional basis for irreparable injury. *Id.* ¶ 14 ("[I]f [California] does not begin to identify and develop sufficient alternative measures that could be included in those SIP revisions, it would run out of time and be at risk of such sanctions."); *id.* ¶ 19 ("[California] cannot wait to begin to identify or develop those additional measures because, as described above, the timeline from beginning to end of the process of adopting additional measures and incorporating them into plans is long."). These resources were "intended to support other priorities, imposing opportunity costs on the State as well." Cal.'s Mem. at 30.

EPA again misses the mark, focusing on the risk of harm from congressional disapproval of the reported waivers, arguing that "bare speculation about the possible future actions of an independent third party not before the Court," *i.e.*, Congress, cannot establish irreparable injury, nor can California establish that the agency "is more likely to take some future action that causes harm to California." EPA's Reply at 12-13. EPA overestimates the nimbleness of an entity responsible for the health and welfare of more than 39 million residents and that must maintain compliance with federal laws, and EPA elides the fact that for years California "has relied on these waivers, and the regulations they authorize [the California Air Resources Board] to enforce, as significant components of broader plans to meet federal and state air quality standards, and the State's other air pollution reduction objectives." Hicks Decl. ¶ 12. Plus, EPA's arguments simply do not address the actions as part of a years-long process that California must now start taking in order to plan new regulations sufficient to meet requirements under the CAA. The State's ability to engage in policymaking on behalf of its residents is hamstrung by the indeterminacy of its rights under federal law. This predicament is especially exacerbated by the dozens of other waiver orders

that EPA could, without extending to California any public process or opportunity to remedy, reclassify and then summarily submit to Congress or administratively repeal, leaving California in a more precarious position. California is left with sacrificing resources that could be used to make plans for its future to instead "begin the time-consuming and costly development of a Plan B now." Cal.'s Mem. at 31. While EPA continues to play word games and refuses to acknowledge legal rights and reliance interests affected, California's ability to regulate for its future is being hampered. As the Supreme Court has acknowledged, "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Consequently, in the absence of a preliminary injunction, California must continue diverting limited resources while the regulatory programs adopted by California, the District of Columbia, and seventeen other States, have been put in jeopardy by EPA reclassifying as "rules" the waiver orders that allow those States' programs to operate. This loss of resources is actual, not theoretical, and will not be compensated in the ordinary course of litigation, and so California has established a likelihood of irreparable harm.

**3. *The Merged Factors Favor California***

The remaining factors, the balance of the equities and the public interest, merge where, as here, the government is the opposing party. *Pursuing Am.'s Greatness*, 831 F.3d at 511. Under this step, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief'" and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987), and *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). These merged factors likewise favor California.

As the D.C. Circuit has observed, a "high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest" because "[t]here is generally no public interest in the perpetuation of unlawful agency action" and "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). For this reason, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (PLF).

California also rightly points out that "the balance of equities favors California because the preliminary injunction will preserve the longstanding status quo for these four waivers." Cal.'s Mem. at 32. The D.C. Circuit has recognized that "[t]he status quo is the last *uncontested* status which preceded the pending controversy" and that "[t]he traditional goal of a preliminary injunction is to preserve *that* status quo." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (emphasis in original) (quoting *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)). The same is true for preserving the status quo for California's other extant CAA waivers.

EPA merely responds that "the United States is always 'irreparably harmed by an improper intrusion by a federal court into the workings of a coordinate branch of the government.'" EPA's Opp'n at 30 (quoting *Kingdom v. Trump*, No. 26-5181, 2026 WL 1905418, at *2 (D.C. Cir. June 17, 2026) (per curiam)). EPA's indisputable status as a component of a coordinate branch of government vested with many statutory powers does not mean the agency has the right to do whatever it wants, let alone take action that is likely unlawful, arbitrary and capricious to reclassify a CAA Section 209(b) waiver order as a final rule.

To the contrary, as with all executive agencies, EPA is obliged to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. To facilitate EPA's adherence to this constitutional obligation, EPA shall be preliminarily enjoined and stayed, pursuant to 5 U.S.C. § 705, from taking any further action to reclassify California's CAA Section 209(b) waiver orders as "rules," as well as directed to take all necessary steps within the agency's control to restore the *status quo*, as it existed before EPA's June 12, 2026 press release, as to the four at-issue waiver orders, including to withdraw or correct EPA's June 12, 2026 press release regarding these same waiver orders.

## IV. CONCLUSION

For the foregoing reasons, California's motion for a preliminary injunction is **GRANTED**, and EPA's and intervenor-defendants' motions to dismiss are **DENIED**. An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: September 2, 2026

**BERYL A. HOWELL**
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CALIFORNIA,<br>Plaintiff,<br>v.<br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br>Defendants. | Civil Action No. 26-cv-2185 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM AND ORDER**
**GRANTING SECOND MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff California filed the instant suit on June 22, 2026, asserting that defendants the United States Environmental Protection Agency (and its Administrator, in his official capacity) (collectively, "EPA") violated the Administrative Procedure Act ("APA"), or, in the alternative, engaged in *ultra vires* conduct in excess of statutory authority, by reclassifying on June 12, 2026, four of California's Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*, Section 209(b) waiver orders as "rules" subject to the Congressional Review Act ("CRA"), 5 U.S.C. § 801 *et seq.* *See* Compl. ¶¶ 94-127, ECF No. 1. Following extensive briefing and a hearing on California's motion, as well as on motions to dismiss filed by EPA and defendant-intervenors American Petroleum Institute ("API") and American Fuel & Petrochemical Manufacturers ("AFPM"), the dismissal motions were denied and California's motion for a preliminary injunction was granted, on September 2, 2026, enjoining EPA "from taking any further action to reclassify California's CAA Section 209(b) waiver orders as 'rules,' as well as directed to take all necessary steps within the agency's control to restore the *status quo*, as it existed before EPA's June 12, 2026 press release, as to the four at-issue waiver orders, including to withdraw or correct EPA's June 12, 2026 press release regarding these same waiver orders." *California v. EPA*, No. 26-cv-2185 (BAH), 2026 U.S. Dist. LEXIS 198939, at *105 (D.D.C. Sept. 2, 2026).

The Memorandum Opinion accompanying the preliminary injunction order explained that "these Section 209(b) waivers are properly considered adjudicatory orders under the APA, and therefore under the CRA, for both procedural and substantive reasons." *Id.* at *94-95. "First, the procedure an agency employs dictates whether an agency action is a rule or an order, since, by definition, a rulemaking cannot lead to an order and an adjudication cannot lead to a rule." *Id.* at *95 (citations omitted). As a consequence of "this emphasis on the procedure used to reach an agency decision, agencies have not been empowered to transmogrify a rule into an order or an order into a rule without the appropriate form of process underlying the decision." *Id.* CAA Section 209(b) waiver orders are "promulgated by EPA, pursuant to an abbreviated process as outlined in the Clean Air Act and, as such, did not go through notice-and-comment rulemaking and thus cannot be rules." *Id.*

"Second, the California waivers have all the indicia of an order." *Id.* "To start, 'the nature of that proceeding reflects a highly fact-specific, case-by-case style characteristic of adjudication,'" *id.* at *95-96 (alterations accepted and internal quotation marks omitted) (quoting *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1018 (D.C. Cir. 2016)), because "for each waiver, the EPA Administrator had to review California's determination and find that each determination was not 'arbitrary and capricious,' that California needed these 'standards to meet compelling and extraordinary conditions,' and that such 'standards and accompanying enforcement procedures are not inconsistent with' CAA Section 7521(a)," *id.* at *96 (quoting 42 U.S.C. § 7543(b)(1)). Finally, "[t]he fact that other States have the option, per CAA Section 177, to adopt regulatory emission standards approved by a Section 209(b) waiver order issued to California does not convert an order into a rule because, as the D.C. Circuit articulated, '[j]ust as a class action can encompass the claims of a large group of plaintiffs without thereby becoming a legislative proceeding, an

adjudication can affect a large group of individuals without becoming a rulemaking.'" *Id.* at *96-97 (quoting *Goodman v. FCC*, 182 F.3d 987, 994 (D.C. Cir. 1999)).

EPA's position that no reclassification of the waiver orders under the APA had occurred because "the only action taken—the determination that the waivers are rules—was embodied in the report submitted to Congress," was rejected. *Id.* at *47. After all, "the CRA defines the term 'rule' to have the same meaning as that provided by the APA but narrows that definition to exclude 'any rule of particular applicability,' 'any rule relating to agency management or personnel,' or 'any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties.'" *Id.* at *48 (quoting 5 U.S.C. § 804(3)). Therefore, "[a]s the definition of 'rule' under the CRA is entirely circumscribed by the definition of 'rule' under the APA, axiomatically, any agency action that is not a rule under the APA is also not a rule under the CRA." *Id.*

While briefing was underway on the dismissal and preliminary injunction motions, the EPA, on July 22, 2026, "reclassified another two California waiver orders as 'rules' and submitted them to Congress." *Id.* at *5. These reclassified waiver orders ("July 2026 Reclassified Orders") are: (1) the "2023 waiver authorizing enforcement of amendments to the California Air Resources Board's ('CARB's') Ocean-Going Vessels At-Berth regulation" ("2023 vessel waiver"), and (2) the "2025 waiver authorizing enforcement of amendments to CARB's Commercial Harbor Craft regulation" ("2025 vessel waiver"). *Id.* at *40-41. On September 4, 2026, two days after issuance of the order granting preliminary injunctive relief, California was granted permission, without objection from EPA or defendant-intervenors, *see* Minute Order (Sept. 4, 2026), to file an amended complaint adding facts and allegations concerning these two July 22 reclassifications, *see* Am. Compl. ¶¶ 9, 76, 81, 83, Counts III, IV, ECF No. 48; *see also* Cal.'s Mot. for Leave to Suppl.

Compl. at 2, ECF No. 47 ("On September 4, 2026, Defendants and Intervenors indicated they do not oppose the filing of the proposed Supplemental Complaint.").

California now has two pending motions before the Court: first, a motion, filed on September 9, 2026, seeking "a second preliminary injunction expressly identifying the July reclassifications and requiring the restoration of the status quo specifically as to those reclassifications," Pl.'s Second Mot. for Prelim. Inj. at 2, ECF No. 49; and a motion, filed on September 11, 2026, for an expedited ruling on this second motion for a preliminary injunction, "by 9 a.m. Eastern on Tuesday, September 15, 2026," Pl.'s Mot. for Expedited Ruling on Its Second Prelim. Inj. Mot. at 1, ECF No. 53. California "initiated the meet-and-confer about this motion to expedite before the Court issued its minute order [] requiring the parties to provide a briefing schedule for Plaintiff's second preliminary injunction motion." *Id.* at 1 (citing Minute Order (Sept. 11, 2026)). EPA states opposition to "California's second motion for a preliminary injunction or stay for the reasons outlined in EPA's briefs in this case. Further, EPA disagrees with this Court's order granting California's first motion for a preliminary injunction, as well as the memorandum opinion. EPA agrees, however, that this Court can decide California's second motion based on the parties' earlier briefing. EPA reserves all other rights," *id.* Cal.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for Expedited Ruling at 2 n.2, ECF No. 53-1. As to the pending motion to expedite consideration of the second preliminary injunction motion, EPA "takes no position," although stating that "EPA disagrees that the House's announcement provides a basis to expedite the motion." *Id.* Defendant-intervenors had not then indicated a position on whether additional briefing is necessary, but did so in response to the Court's order, Minute Order (Sept. 12, 2026), indicating that they opposed the second preliminary injunction request "for the reasons already set forth in Intervenor-Defendants' briefing on Plaintiff's first Preliminary Injunction Motion," and

had no intention "to seek additional briefing." Def.-Intervenors' Resp. to Court's Order at 3, ECF No. 54. As to California's pending motion for expedited consideration of the second preliminary injunction motion, defendant-intervenors stated that "their position is consistent with" EPA's position and, again, they "do not intend to file an opposition." *Id.* at 2.

Having already thoroughly considered, and rejected, the arguments raised by EPA and defendant-intervenors in opposition to California's first request for preliminary injunction relief, and defendants do not intend to raise any additional arguments, California's second motion for preliminary injunctive relief as the July 2026 Reclassified Orders may be promptly granted for the same reasons already articulated in *California*, 2026 U.S. Dist. LEXIS 198939.

Accordingly, upon consideration of plaintiff California's Second Motion for a Preliminary Injunction, ECF No. 49; plaintiff's Motion for Expedited Ruling on Its Second Preliminary Injunction Motion, ECF No. 53; the memoranda submitted in support; the previous Memorandum and Order, *California v. Environmental Protection Agency*, No. 26-cv-2185 (BAH), 2026 U.S. Dist. LEXIS 198939 (D.D.C. Sept. 2, 2026), docketed at ECF Nos. 45, 46; Def.-Intervenors' Resp. to Court's Order, ECF No. 54, and the entire record herein, it is hereby:

**ORDERED** that plaintiff's Motion for Expedited Ruling on Its Second Preliminary Injunction Motion, ECF No. 53, is **GRANTED**; it is further

**ORDERED** that plaintiff's Second Motion for a Preliminary Injunction, ECF No. 49, is **GRANTED**; it is further

**ORDERED** that defendant EPA take all necessary steps within the agency's control to restore the *status quo*, as it existed before EPA's July 22, 2026, press release, as to the two Clean Air Act preemption waiver orders referenced in the press release and titled "Ocean Going Vessels

at Berth," 88 Fed. Reg. 72461 (Oct. 20, 2023), and "Commercial Harbor Craft Amendments," 90 Fed. Reg. 1998 (Jan. 10, 2025); it is further

**ORDERED** that defendant EPA withdraw or correct EPA's reclassifications of these two Clean Air Act Section 209(b) waiver orders, and other such reclassifications, from orders to rules in all public statements, including the July 22, 2026 press release; it is further

**ORDERED** that defendant EPA is **ENJOINED** and **STAYED**, pursuant to 5 U.S.C. § 705, from giving effect to the reclassification of these two Clean Air Act Section 209(b) waiver orders, and other such reclassifications, from orders to rules; it is further

**ORDERED** that defendant EPA submit, by September 30, 2026, a status report summarizing the steps taken to comply with this order; and it is further

**ORDERED** that this Order and this Court's September 2, 2026, Order shall remain in effect until further order of this Court.

**SO ORDERED.**

Date: September 12, 2026

**BERYL A. HOWELL**
United States District Judge

*This is an appealable order.*