NOT YET SCHEDULED FOR ORAL ARGUMENT

Nos. 26-5330, 26-5336 (consol.)

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

STATE OF CALIFORNIA,
*Plaintiff/Appellee*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Defendants/Appellants*,

and

AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, et al.,
*Intervenors-Defendants/Appellants*

---

Appeal from the United States District Court for the District of Columbia
No. 1:26-cv-2185 (Hon. Beryl A. Howell)

---

**BRIEF FOR APPELLANT**
**U.S. ENVIRONMENTAL PROTECTION AGENCY**

---

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT J. LUNDMAN
JEFFREY HUGHES
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3080
jeffrey.hughes@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

Plaintiff-Appellee. Plaintiff in the district court and appellee in this appeal is the State of California.

Defendants-Appellants. Defendants in the district court and appellants in this appeal are the United States Environmental Protection Agency and Lee Zeldin, in his official capacity as Administrator of the United States Environmental Protection Agency.

Intervenors. Intervenor-Defendants in the district court and appellants in this appeal are American Fuel & Petrochemical Manufacturers and American Petroleum Institute.

### B. Rulings Under Review

Appellants appeal from the orders of the United States District Court for the District of Columbia, Judge Beryl A. Howell, dated September 2, 2026, No. 1:26-cv-2185 (D.D.C.), ECF 45, and September 12, 2026, No. 1:26-cv-2185 (D.D.C.), ECF 55. The order of September 2, 2026 is accompanied by a memorandum opinion. The opinion of the district court has not been published in the Federal Supplement but is available at 2026 WL 2593640.

## C. Related Cases

This case has not previously been before this Court or any other court aside from the district court from which this appeal was taken.

Two related cases are pending in this Court: *California v. EPA*, No. 26-1218, a petition for review of the asserted actions at issue in these consolidated cases with respect to four of the Clean Air Act waivers at issue in this case, *see California v. EPA*, No. 26-1218, ECF 2187882; and *California v. EPA*, No. 26-1246, a petition for review of the asserted actions at issue in these consolidated cases with respect to two of the Clean Air Act waivers at issue in this case, *see California v. EPA*, No. 26-1246, ECF 2194325. Both cases are being held in abeyance, with the parties to file motions to govern within 30 days of the disposition of *California v. EPA*, No. 1:26-cv-2185 (D.D.C.). *See California v. EPA*, No. 26-1218, ECF 2190992; *California v. EPA*, No. 26-1246, ECF 2196572.

Two related cases are also pending in the U.S. Court of Appeals for the Ninth Circuit: *California v. EPA*, No. 26-5143, a petition for review of the asserted actions at issue in these consolidated cases with respect to four of the Clean Air Act waivers at issue in this case, *see California v. EPA*, No. 26-5143 (9th Cir.), ECF 1.1; and *California v. EPA*, No. 26-6109, a petition for review of the asserted actions at issue in these consolidated cases with respect to two of the Clean Air Act waivers at issue in this case, *see California v. EPA*, No. 26-6109 (9th Cir.), ECF

1.1. Both cases are being held in abeyance, with status reports due every 90 days and a status report and motion for further relief due within 7 days of the disposition *California v. EPA*, No. 1:26-cv-2185 (D.D.C.). *See California v. EPA*, No. 5143 (9th Cir.), ECF 19.1; *California v. EPA*, No. 26-6109 (9th Cir.), ECF 15.1.

There are two additional protective petitions for review of the asserted actions at issue in *California v. United States*, No. 4:25-cv-4966 (N.D. Cal.), which are not at issue in this case. Those cases are *California v. EPA*, No. 25-5071 (9th Cir.), and *California v. EPA*, No. 25-1174 (D.C. Cir.). Both cases are in abeyance pending the resolution of the proceedings in *California v. United States*, No. 4:25-cv-4966 (N.D. Cal.). *See California v. EPA*, No. 25-5071 (9th Cir.), ECF 32.1; *California v. EPA*, No. 25-1174 (D.C. Cir.), ECF 2145305.

/s/ *Jeffrey Hughes*
JEFFREY HUGHES

Counsel for Appellants

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

TABLE OF AUTHORITIES ..... vi

GLOSSARY ..... xii

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 4

STATEMENT OF THE ISSUES ..... 4

PERTINENT STATUTES AND REGULATIONS ..... 5

STATEMENT OF THE CASE ..... 6

A. Statutory and regulatory background ..... 6

1. The Congressional Review Act ..... 6

2. The Clean Air Act ..... 8

B. Factual background ..... 10

C. Proceedings below ..... 11

SUMMARY OF ARGUMENT ..... 14

STANDARD OF REVIEW ..... 17

ARGUMENT ..... 17

I. California lacks Article III standing. ..... 18

A. Any future procedural injury from a hypothetical administrative withdrawal proceeding is speculative, unripe, and not traceable to the challenged conduct. ..... 19

B. Self-inflicted injury is insufficient to support Article III standing. ....24

II. The jurisdiction-stripping provision in 5 U.S.C. § 805 expressly bars this suit. ....26

A. No presumption of reviewability applies to congressional reporting requirements. ....26

B. California's claims all require judicial review of actions and determinations under the CRA, so § 805 bars them. ....28

1. EPA's submissions of the waivers to Congress under the CRA are actions under the CRA. ....29

2. The district court attempted to redefine the agency action at issue in order to avoid § 805. ....30

3. EPA's determinations that the waivers are rules under the CRA are determinations under the CRA. ....32

C. The district court's reasoning ignores the plain text of § 805 and the precedents interpreting it. ....35

D. Congress passed § 805 so that it could oversee agency compliance with the CRA without judicial interference. ....39

III. California has not identified final agency action. ....41

IV. The remaining preliminary injunction factors weigh against preliminary relief. ....44

CONCLUSION ....45

CERTIFICATE OF COMPLIANCE ....47

ADDENDUM ....48

## TABLE OF AUTHORITIES

### Constitution

U.S. Const. art. I, § 5, cl. 2 .......... 6

### Cases

*Anthropic PBC v. U.S. Dep't of War*,
No. 26-1049, 2026 WL 2881404 (D.C. Cir. Sept. 25, 2026) .......... 24

*Ardelyx, Inc. v. Kennedy*,
179 F.4th 947 (D.C. Cir. 2026) .......... 35, 36

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 43

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 41

*Biden v. Texas*,
597 U.S. 785 (2022) .......... 30, 32

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .......... 44

*Ctr. for Biological Diversity v. Bernhardt*,
946 F.3d 553 (9th Cir. 2019) .......... 28

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir. 2017) .......... 23

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 15, 25

*Cuomo v. NRC*,
772 F.2d 972, 974 (D.C. Cir. 1985 .......... 17

*Davis v. Pension Benefit Guar. Corp.,*
571 F.3d 1288 (D.C. Cir. 2009) .......... 17

*Defs. of Wildlife v. Perciasepe*,
714 F.3d 1317 (D.C. Cir. 2013)....................21

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*,
76 F.3d 1212 (D.C. Cir. 1996)....................42

*Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*,
638 F.3d 794 (D.C. Cir. 2011)....................24

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996)....................20

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....................25

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)....................42

*Friends of the Earth U.S. v. Exp.-Imp. Bank of the United States*,
187 F.4th 616 (D.C. Cir. 2026)....................44

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)....................25

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004)....................30

*Kan. Nat'l Res. Coal. v. U.S. Dep't of Interior*,
971 F.3d 1222 (10th Cir. 2020)....................28, 33

*Kingdom v. Trump*,
No. 26-5181, 2026 WL 1905418 (D.C. Cir. June 17, 2026)....................45

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................18

*Montanans for Multiple Use v. Barbouletos*,
568 F.3d 225 (D.C. Cir. 2009)....................15, 28, 34, 37, 39

*Mullin v. Doe*,
609 U.S. 324 (2026)...................................................... 16, 28, 33, 34, 36, 43

*Munaf v. Geren*,
553 U.S. 674 (2008)..........................................................................17

*Nat'l Ass'n of Home Builders v. EPA*,
667 F.3d 6 (D.C. Cir. 2011)...................................................................20, 22

*Nat'l Ass'n of Mfrs. v. DOD*,
583 U.S. 109 (2018)..........................................................................33

*NRC v. Texas*,
605 U.S. 665 (2025)..........................................................................43, 44

*NRDC v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988).....................................................1, 27, 28, 41

*Serono Labs., Inc. v. Shalala,*
158 F.3d 1313 (D.C. Cir. 1998)..........................................................17

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2011)..........................................................................20

*Trump v. California*,
No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026) ................................21

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)..........................................................................45

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016)..........................................................................42

*Wash. All. of Tech. Workers v. DHS*,
892 F.3d 332 (D.C. Cir. 2018)............................................................28

*Winter v. NRDC*,
555 U.S. 7 (2008)..............................................................................17

## Statutes

5 U.S.C. § 551(4) .......... 7, 32, 34

5 U.S.C. § 551(6) .......... 32, 34

5 U.S.C. § 551(13) .......... 30, 31, 32

5 U.S.C. § 558(c) .......... 19, 22, 24

5 U.S.C. § 702 .......... 30

5 U.S.C. § 704 .......... 41

5 U.S.C. § 705 .......... 41

5 U.S.C. § 801 .......... 7

5 U.S.C. § 801(a)(1)(A) .......... 4, 6, 15, 28, 33

5 U.S.C. § 802 .......... 4, 6, 7

5 U.S.C. § 802(a) .......... 6

5 U.S.C. § 802(g) .......... 6

5 U.S.C. § 804 .......... 7

5 U.S.C. § 805 .......... 1, 3, 4, 8, 15, 26, 28, 29, 33, 36, 38

5 U.S.C. §§ 801-08 .......... 6

28 U.S.C. § 1292(a)(1) .......... 4

28 U.S.C. § 1331 .......... 4

42 U.S.C. § 7543(a) .......... 4, 9

42 U.S.C. § 7543(b) .......... 4, 9

42 U.S.C. § 7543(b)(1) .......... 9, 22, 23

42 U.S.C. § 7543(e) ....................................................................................4, 10

42 U.S.C. § 7607(b) ........................................................................................28

42 U.S.C. § 7607(b)(1)......................................................................................22

Pub. L. No. 89-272, §101, 79 Stat. 992 (1965).......................................................8

Pub. L. No. 119-15, 139 Stat. 65 (2025)...............................................................10

Pub. L. No. 119-16, 139 Stat. 66 (2025)...............................................................10

Pub. L. No. 119-17, 139 Stat. 67 (2025)...............................................................10

**Federal Register Notices**

74 Fed. Reg. 32744 (July 8, 2009).................................................................11, 22

78 Fed. Reg. 2112 (Jan. 9, 2013) .........................................................................11

83 Fed. Reg. 42986 (Aug. 24, 2018)......................................................................10

84 Fed. Reg. 51310 (Sep. 27, 2019) ..................................................................10, 23

87 Fed. Reg. 14332 (Mar. 14, 2022).......................................................................11

88 Fed. Reg. 72461 (Oct. 20, 2023).........................................................................11

90 Fed. Reg. 1998 (Jan. 10, 2025) ..........................................................................11

90 Fed. Reg. 640 (Jan. 6, 2025) ..............................................................................11

91 Fed. Reg. 17125 (Mar. 31, 2026).........................................................................21

**Legislative History**

170 Cong. Rec. S5883...............................................................................................8

H.R.J. Res. 87, 119th Cong. (2025) ............................................................................10

H.R.J. Res. 88, 119th Cong. (2025) ............................................................................10

H.R.J. Res. 89, 119th Cong. (2025) ........................................................................10

## Other Authorities

Black's Law Dictionary 1525 (6th ed. 1990) ...........................................................33

Letter from Executive Office of the President,
Office of Management and Budget,
to Gene Dodaro, Comptroller General, GAO (June 18, 2025),
whitehouse.gov [https://perma.cc/T5L3-USQV] ..........................................10

U.S. Gov't Accountability Off., GAO-B-325553,
*GAO's Role and Responsibilities Under the Congressional Review Act* (2014),
https://www.gao.gov/assets/b-325553.pdf ......................................................7

Wester's Third New Int'l Dictionary 2487
(Philip Babcock Gove ed. 1986)....................................................................33

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CRA | Congressional Review Act |
| EPA | Environmental Protection Agency |

## INTRODUCTION

California's complaint asked the district court to decide which agency actions the U.S. EPA should report to Congress under the Congressional Review Act (CRA). That statute requires agencies to submit their rules to Congress for review, and it contains a set of fast-track legislative procedures for Congress to debate and enact joint resolutions invalidating those agency rules. Because congressional oversight is exclusively for Congress, the CRA contains a comprehensive jurisdiction-stripping provision: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805.

Congress, not the courts, decides what agency actions Congress should review. As then-judge Ginsburg explained nearly 40 years ago, these disputes are "quintessentially within the province of the political branches to resolve as part of their ongoing relationships." *NRDC v. Hodel*, 865 F.2d 288, 318-19 (D.C. Cir. 1988) (R.B. Ginsburg, J.). *Hodel* held that the "presumption of reviewability" "is inapplicable" to "congressional reporting requirements," and that compliance with those requirements is "singularly committed to *congressional* discretion." *Id.*

Rejecting that view, the district court decided to "carry on as an ersatz proxy for Congress itself" (*id.*) and police which agency actions Congress may review. These decisions should be reversed.

The dispute began in February 2025, when EPA sent reports to Congress identifying three Clean Air Act preemption waivers as rules for congressional review under the CRA. California uses those preemption waivers to regulate air emissions from new motor vehicles and engines. After vigorous legislative debate, Congress determined that EPA's preemption waivers are subject to the CRA, and in June 2025 Congress used the CRA's legislative procedures to enact three joint resolutions invalidating the waivers. Those waivers are not at issue in this suit.

This year, in June and July 2026, EPA reported six more preemption waivers to Congress for review under the CRA. In this lawsuit, California complains that EPA incorrectly determined that those preemption waivers are rules under the CRA, and that EPA incorrectly submitted the reports to Congress under the CRA. This is so, California says, notwithstanding that Congress itself reviewed and disapproved preemption waivers under the CRA just last year.

The district court agreed with California. The court preliminarily enjoined EPA, requiring it to "withdraw or correct the EPA's reclassifications of these … waivers … from orders to rules," including press releases announcing the submissions to Congress, and prohibited EPA from taking any further action to determine that other Clean Air Act preemption waivers are rules. JA0637, 0869.

The district court erred at every step. First, California lacks standing. The district court adopted California's theory that EPA's determinations that its

waivers are rules makes it more likely both that EPA (1) will someday revoke the waivers and (2) will do so without enough notice to California. This theory has several problems: There is no causal connection between the acts challenged here and any future withdrawal of the waivers or the procedures EPA might use if it were to someday withdraws the waivers; there is no evidence that EPA intends imminently to rescind the waivers; and, in any event, such action would be separately challengeable on its own terms and cannot be enjoined in advance based on speculative procedural concerns.

Second, the CRA's jurisdiction-stripping provision expressly bars California's challenges because California challenges an "action" "under" the CRA—EPA's reports to Congress. 5 U.S.C. § 805. To hold otherwise, the district court applied a presumption of reviewability to a congressional reporting statute, contrary to *Hodel*. The district court also concluded that EPA's determinations that each waiver is a "rule" under the CRA are separate, reviewable actions, even though these determinations are set forth in EPA's reports to Congress. This fine-grained, theoretical distinction is incorrect, but even if EPA had made determinations outside of the reports, they would likewise be "under" the CRA and § 805 would bar review. Third, determining that waivers are rules under the CRA is not final agency action. Finally, California fails to demonstrate irreparable harm,

and the balance of the equities weighs in favor of EPA. This Court should vacate the injunctions and remand with instructions to dismiss the complaint.

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. § 1331, but EPA contests jurisdiction. The district court granted California's motions for a preliminary injunction or a stay under 5 U.S.C. § 705 on September 2, 2026 and September 12, 2026. JA0636-37; JA0868-69. EPA timely appealed on September 14, 2026. JA0870-71. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

The CRA requires agencies to submit rules of general applicability to Congress for review. 5 U.S.C. § 801(a)(1)(A). Congress may pass a resolution disapproving any submitted rule using certain expedited procedures. *See id.* § 802. However, even without a submission from an agency, Congress can decide for itself that an agency action is a rule and can pass a joint resolution of disapproval following the procedures laid out in the CRA. The CRA also contains a broad jurisdiction-stripping provision providing that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." *Id.* § 805.

Here, EPA determined that six waivers issued to California to enforce otherwise-preempted state emissions regulations, *see* 42 U.S.C. § 7543(a)-(b), (e), qualified as CRA rules and sent those waivers to Congress for review. California

alleged that EPA took two separate unlawful agency actions: the purported reclassification of the waivers from orders under the Administrative Procedure Act (APA) to rules under the CRA and the submission of those waivers to Congress under the CRA. The State subsequently moved for two preliminary injunctions or stays under 5 U.S.C. § 705, which the district court granted.

The issues presented are:

1. Whether California has demonstrated Article III standing to assert its claims with respect to agency acts that depend on hypothetical administrative action to cause injury;

2. Whether the jurisdiction-stripping provision of the CRA applies to EPA's submissions of the preemption waivers to Congress for review under the CRA based on the agency's determinations that each waiver is a "rule" as that term is defined in the CRA;

3. Whether legal consequences flow from EPA's determinations that each waiver is a CRA rule; and

4. Whether the remaining preliminary injunction factors favor EPA.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### A. Statutory and regulatory background

#### 1. The Congressional Review Act

Enacted to enhance congressional oversight of executive rulemaking, the CRA creates a set of procedures for Congress to review agency rules. 5 U.S.C. §§ 801-08. The CRA provides that "[b]efore a rule can take effect, the Federal agency promulgating such rule shall submit" a report "to each House of the Congress." *Id*. § 801(a)(1)(A). Upon receipt of such a report, Congress may enact a joint resolution "disapprov[ing] the rule." *Id*. § 802(a). To do so, the CRA creates a set of expedited legislative procedures for debating disapproval resolutions in Congress. *Id.* § 802. These procedures, along with the definition of a "joint resolution" of disapproval, were enacted in "an exercise of the rulemaking power of the Senate and House of Representatives." *Id.* § 802(g). And because the procedures are "deemed a part of the rules of each House," either House may "change the rules … at any time." *Id.* This is consistent with the constitutional authority of each House of Congress to "determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. If a joint resolution of disapproval passes both Houses of Congress, and is signed into law by the President, the rule "shall have no force or effect." 5 U.S.C. § 802(a).

The CRA applies to agency "rules." *Id.* §§ 801, 802. Under the CRA, "rule" "has the meaning given such term in" the Administrative Procedure Act (APA), with certain CRA-specific exceptions. *Id.* § 804(3). The APA, in turn, broadly defines "rule" as any "agency statement of general … applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).

Congress and individual members sometimes disagree with the Executive Branch's assessment of whether an agency action is a "rule" subject to CRA procedures. *See* JA0111. "To protect its prerogative to review agency rules under the CRA, Congress and the Government Accountability Office (GAO) have developed an ad hoc process in which Members can request that GAO provide a formal legal opinion on whether a particular agency action qualifies as a rule under the CRA." *Id.* GAO has long acknowledged that its opinions are purely advisory because the "statutory scheme ultimately leaves it to Congress to decide whether CRA would apply." U.S. Gov't Accountability Off., GAO-B-325553, *GAO's Role and Responsibilities Under the Congressional Review Act* 9 (2014), *available at* https://www.gao.gov/assets/b-325553.pdf.

In exercising that prerogative, Congress can enact a joint resolution under the CRA even when an agency did not submit the report to Congress, based on Congress's own determination that the agency action was subject to the CRA. JA0137-38. And it has in fact done so. *See id.* The mechanism Congress uses is to

sometimes treat a GAO opinion "classifying an agency action as a rule as the trigger date" for the CRA's fast-track debate procedures under the CRA. JA0135. On the other hand, in response to GAO monitoring of agency compliance, agencies have submitted dozens of actions to Congress "out of an abundance of caution." *See, e.g.*, 170 Cong. Rec. S5883 (daily ed. Sep. 9, 2024) (EC-5696) ("EPA disagrees with GAO's broader reading of the Congressional Review Act" but submits "this action" "out of an abundance of caution"). Whether Congress ultimately chooses to debate or enact a joint resolution disapproving of any agency action is exclusively up to Congress.

To protect that prerogative, Congress included a comprehensive jurisdiction-stripping provision in the CRA. Section 805 states: "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. Accordingly, the determination of whether an agency action is a rule or an order under the CRA—whether that determination is made by an agency, the GAO, or by majority vote in the Senate—is never subject to judicial review. Nor is any "finding," "action," or "omission" under the CRA. In short, evaluating compliance—or not—with the CRA is within Congress's domain.

2. <u>The Clean Air Act</u>

In 1965, Congress amended Title II of the Clean Air Act to authorize federal emission standards for motor vehicles. Pub. L. No. 89-272, § 101, 79 Stat. 992

(1965). Congress subsequently added a broad preemption provision in 1967. 42 U.S.C. § 7543(a).

Section 209(a) of the Clean Air Act provides that "[n]o State … shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a). Congress left only one exception for new motor vehicles to § 209(a)'s broad preemptive reach in what is now § 209(b). *Id.* § 7543(b). Under § 209(b), California may obtain a preemption waiver from EPA under certain circumstances. *Id.* EPA "shall, after notice and opportunity for public hearing," grant a preemption waiver for standards that California determines "will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." *Id.* § 7543(b)(1). "No such waiver shall be granted," however, if EPA concludes that California's determination is arbitrary and capricious, that California "does not need" such standards "to meet compelling and extraordinary conditions," or that the standards are "not consistent with" 42 U.S.C. § 7521(a). *Id.* § 7543(b)(1). Unless EPA issues a waiver, it remains unlawful for California to "adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." *Id.* § 7543(a).

Under § 209(b)(1), EPA can issue preemption waivers only after providing notice and an opportunity for a public hearing. *Id.* § 7543(b)(1). And when EPA has taken administrative action to withdraw a preemption waiver issued under

§ 209, it followed a similar process for notice and comment. *See* 83 Fed. Reg. 42986 (Aug. 24, 2018); 84 Fed. Reg. 51310 (Sep. 27, 2019).[1]

### B. Factual background

In February 2025, EPA submitted three Clean Air Act preemption waivers to Congress. *See* JA0742. The GAO advised Congress that the preemption waivers were orders and not rules under the CRA. *See* JA0171-79. The Executive Branch disagreed, however, and determined that EPA waivers are rules under the CRA, as explained by the Office of Management and Budget. *See* Letter from Executive Office of the President, Office of Management and Budget, to Gene Dodaro, Comptroller General, GAO (June 18, 2025), whitehouse.gov [https://perma.cc/T5L3-USQV%5D].

Congress ultimately determined that the EPA waivers were subject to the CRA. Congress voted on and passed three CRA disapproval resolutions, each one targeting one of the three preemption waivers (the Resolutions). H.R.J. Res. 87, 119th Cong. (2025); H.R.J. Res. 88, 119th Cong. (2025); H.R.J. Res. 89, 119th Cong. (2025). The President signed the Resolutions into law on June 12, 2025. Pub. L. No. 119-15, 139 Stat. 65 (2025); *see also* Pub. L. No. 119-16, 139 Stat. 66 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025).

---

[1] The Clean Air Act also provides a comparable preemption and waiver regime as to California for certain nonroad engines or nonroad vehicles, with differences immaterial here. 42 U.S.C. § 7543(e).

In a June 12, 2026 press release, EPA stated it had transmitted to Congress four additional preemption waivers[2] it had previously issued to California under § 209 of the Clean Air Act. *See* JA0313-15. EPA made determinations pursuant to the requirements of the CRA that each of those prior agency actions granting Clean Air Act preemption waivers was a "rule" as the CRA defines that term. *See id.*

On July 22, 2026, EPA transmitted two additional waivers[3] to Congress. JA0343-44.

### C. Proceedings below

California filed this action on June 22, 2026. The initial complaint sought review of EPA's "determin[ations] that each of [the June 2026 Waivers] … is … a rule" and that each "determination obligates the agency to submit the waivers to Congress for review under the Congressional Review Act," as well as the submission of those waivers to Congress under the CRA, JA0018. California asserted that these actions are either arbitrary and capricious or contrary to law (Count I) or ultra vires (Count II). JA0038-43. On June 25, 2026, California moved for a preliminary injunction. EPA opposed and moved to dismiss.

---

[2] 74 Fed. Reg. 32744 (July 8, 2009); 78 Fed. Reg. 2112 (Jan. 9, 2013); 87 Fed. Reg. 14332 (Mar. 14, 2022); 90 Fed. Reg. 640 (Jan. 6, 2025) (together, the June 2026 Waivers).

[3] 88 Fed. Reg. 72461 (Oct. 20, 2023); 90 Fed. Reg. 1998 (Jan. 10, 2025) (together, the July 2026 Waivers).

American Petroleum Institute and American Fuel & Petrochemical Manufacturers (together, API) moved to intervene on July 10, 2026. The district court granted intervention on August 4, 2026. API similarly opposed California's motion for a preliminary injunction and moved to dismiss.

On September 2, 2026, the district court granted California's motion for a preliminary injunction and denied the motions to dismiss. JA0636-37. The injunction ordered EPA to "take all necessary steps within the agency's control to restore the status quo," "withdraw or correct EPA's reclassification" of the June 2026 Waivers "from orders to rules in all public statements," and enjoined and stayed EPA from "giving effect to the reclassification" of the waivers "and other such reclassifications." *Id.*

The court explained its reasoning in a memorandum opinion. First, the court concluded that EPA took two actions—the "reclassification" of the waivers from "orders" to "rules," and the submissions of those waivers to Congress. JA0668-71 According to the court, because EPA stated that the agency had determined that the waivers were CRA rules, EPA must have taken action separate and apart from the submissions, notwithstanding the fact that EPA's determinations are embodied in the submissions to Congress. JA0669-70.

Second, the court held that the CRA's jurisdiction-stripping provision, 5 U.S.C. § 805, rendered unreviewable EPA's submissions of the waivers to

Congress but did not apply to EPA's determinations that each waiver is a "rule" as that term is defined in the CRA. JA0671-83. Noting that the CRA and APA definitions of "rule" significantly overlap, the court concluded that it must be possible to review EPA's determinations that the waivers are rules under the CRA. JA0675-76. Further, the court reasoned that if determinations that an agency action is a CRA rule were insulated from judicial review, then all the steps an agency took leading up to that determination—including actions taken under other statutes—would be unreviewable, eviscerating the APA. JA0683.

Third, the court held that California had established standing because, the court concluded, EPA would not provide certain procedural protections to California in the event the agency decided to initiate withdrawal proceedings, and this procedural injury, along with California's expenditures in anticipation of such a proceeding, demonstrated injury in fact. JA0684-95.

Fourth, the court held that EPA's determinations were final agency action because EPA's legal conclusion required it to submit the waivers to Congress and deprived California of procedural protections in a hypothetical future administrative withdrawal. JA0697.

Fifth, the court held that California was likely to prevail on the merits because: (a) EPA did not provide an explanation for its determination that the waivers at issue are rules; (b) no statute authorized EPA to reclassify the waivers

from orders to rules; and (c) in the event APA review is not available, the determinations were ultra vires because no statute provided EPA with the power to reclassify the waivers. JA0698-702.

Finally, the district court held that the State had shown irreparable harm largely for the reasons California had demonstrated injury in fact, and that the remaining preliminary injunction factors favored California. JA0702-07.

On September 4, 2026, California moved to supplement its complaint in order to add allegations regarding the July 2026 Waivers. The district court granted the motion the same day. California then moved for a second preliminary injunction to apply to the July 2026 waivers and all parties rested on their briefs. The court granted that second injunction on September 12, 2026. JA0864-69.

EPA timely appealed both orders on September 14, 2026. JA0870-71.

## SUMMARY OF ARGUMENT

1. California cannot demonstrate Article III injury based on the possibility that EPA will take hypothetical future agency actions. While California claims that EPA will deprive the State of certain procedures applicable to licenses in the event EPA decides to withdraw the waivers, any such withdrawal proceedings are entirely hypothetical. Without a proceeding that requires a certain procedure, California cannot suffer a procedural injury or link any proceeding to an imminent injury to the State's concrete interests. Moreover, EPA has for over

fifteen years held the view that § 209 preemption waivers are not licenses under the APA. So, any future procedural injury would not be traceable to EPA's determinations. And because hypothetical agency actions do not suffice for Article III injury, California cannot spend its way into standing based on its fears speculative action coming to pass. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

2. Next, even if California did demonstrate standing, the CRA's jurisdiction-stripping provision still renders this case unreviewable. *See Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (Kavanaugh, J.). Section 805 provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. Here, the submissions were "under" the CRA because EPA sent the reports to Congress for the stated purpose of congressional review under the CRA, which is exactly what the CRA itself requires. *Id.* § 801(a)(1)(A). While the district court concluded that § 805 did not bar review of EPA's determinations that each waiver is a "rule" under the CRA, the agency set forth that interpretation in its submissions to Congress. Because courts may not review abstract decisions apart from a final agency action, those determinations are unreviewable. And even if a court could consider EPA's determinations separate and apart from the agency's submissions to Congress, each determination is a "determination … under" the CRA. *See also*

*Mullin v. Doe*, 609 U.S. 324, 339 (2026). The district court never addressed this straightforward textual argument.

3. Nor has California identified final agency actions for judicial review here. Since the submissions are not reviewable final agency actions, neither are EPA's determinations that culminated in the submissions. Moreover, California's alleged procedural injury does not qualify as a legal consequence flowing from EPA's determinations; rather, that purported injury requires further action by the agency to impact California at all. It is therefore not final. California also cannot sidestep the lack of final agency action by asserting an ultra vires claim because California has not alleged (and cannot allege) that EPA violated any specific statutory prohibition, and the CRA explicitly prohibits review.

4. Finally, California has not demonstrated that the remaining preliminary injunction factors weigh in its favor. Because the State has not demonstrated injury in fact, it has not demonstrated irreparable harm. And because the district court intruded into the operations of a coordinate branch without jurisdiction, the public interest factors favor EPA.

This Court should vacate the preliminary injunctions and remand this case to the district court with instructions to dismiss the complaint.

## STANDARD OF REVIEW

To obtain an injunction or a stay, California was required to show a likelihood of success on the merits, irreparable harm, and that the balance of equities and public interest warrant an injunction. *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985). Although this Court reviews the district court's weighing of the four preliminary injunction factors and its ultimate decision of whether to issue or deny relief for abuse of discretion, it reviews legal questions *de novo*, *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291 (D.C. Cir. 2009), and findings of fact under the "clearly erroneous" standard, *see Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1318 (D.C. Cir. 1998).

An appellate court reviewing a preliminary injunction order may also decide jurisdictional or merits arguments and order dismissal of a complaint. "Review of a preliminary injunction is not confined to the act of granting the injunction, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of the bill, and, if so, to directing a final decree dismissing it." *Munaf v. Geren*, 553 U.S. 674, 691 (2008) (cleaned up).

## ARGUMENT

California is eager to challenge EPA's submissions to Congress under the CRA. But, as even the district court recognized, binding precedent and the CRA

expressly preclude review of any challenge to the submissions. Disregarding these limitations, the district court nonetheless concluded that California could challenge EPA's "reclassifications" of the waivers as rules.

The district court's analysis does not withstand scrutiny. EPA's supposed reclassification of the waivers from orders to rules for purposes of the CRA is undeniably a determination that the waivers are rules under the CRA. California's challenge to EPA's determinations thus fails for the same reasons that the challenge to the submissions do: California lacks standing, § 805 bars review of the State's claims, and California has failed to allege final agency action. Moreover, the remaining preliminary injunction factors weigh against preliminary relief. This Court should reverse with instructions to dismiss.

## I. California lacks Article III standing.

To establish standing, a plaintiff must show (1) it has suffered an injury that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is "fairly traceable to the challenged action" of the defendant and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).

The district court held that the State demonstrated standing in two ways. First, because the APA imposes on agencies certain procedural requirements before they can withdraw a license, *see* 5 U.S.C. § 558(c), California alleges EPA's "reclassification" of the waivers from orders to CRA rules deprives California of those protections and "facilitate[s] and streamline[s]" administrative withdrawal of the waivers. JA0760. Second, California asserts that "the increased threat to these six waivers … is forcing the State to expend resources preparing for the possibility that it will not obtain the emission reduction benefits of those regulations." JA0761. Neither of these claimed harms satisfies California's burden to demonstrate standing.

### A. Any future procedural injury from a hypothetical administrative withdrawal proceeding is speculative, unripe, and not traceable to the challenged conduct.

The State contends that now that EPA has determined that these waivers are CRA rules, the agency is more likely to take some future action that causes harm to California. In particular, California hypothesizes that "EPA will likely attempt to take administrative action to invalidate these waivers … if Congress declines EPA's invitation" to pass disapproval resolutions. JA0759. EPA's determinations, according to California, "facilitate and streamline this alternative, administrative path." JA0760. This theory is meritless.

This argument fails as an initial matter because there has been no procedural deprivation, since EPA has not taken any administrative action to withdraw the waivers. Unless and until EPA withdraws the waivers, it cannot omit a required procedure; procedures are required only in connection with taking a substantive agency action. *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) (plaintiff "must show that *the government act* performed without the procedure in question" will cause Article III injury (emphasis added)).

But even assuming that EPA has somehow deprived California of procedural rights, any such procedural injury is completely untethered to an imminent injury to California's concrete interests. "[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2011). And "[w]ithout an imminent threat of injury traceable to the challenged action, that floor stands as a ceiling." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 15 (D.C. Cir. 2011).

Here, because EPA has not withdrawn the waivers, California cannot base its standing on the alleged deprivation of a procedure in a hypothetical future agency action. Without a "concrete application that threatens imminent harm" to California's interests, the State lacks standing. *Summers*, 555 U.S. at 494; *see also Fla. Audubon Soc'y*, 94 F.3d at 664.

Recently, the Supreme Court held that an executive order directing the U.S. Postal Service to initiate a proposed rulemaking with multiple mandatory provisions, *see* 91 Fed. Reg. 17125, 17126-27 (Mar. 31, 2026), does not inflict an Article III injury on States absent a final rule, *see Trump v. California*, 2026 WL 2473573, at *4 (Aug. 24, 2026). The Court held that the direction to begin the rulemaking process imposed no requirements on the States; rather, only a final rule would impose any legal obligations, and concluding that a final rule *would* harm the States depended on "a string of speculations." *Id.*

Here, California's theory is even more speculative than a challenge to a proposed rule and cannot support standing. Future agency proceedings relating to rescissions of the waivers in question remain entirely hypothetical. EPA has not announced any actual or proposed future action to withdraw these waivers—instead, California merely speculates that EPA will do so, contingent on Congress's inaction. *See* JA0759. But even if California had firmly established the existence of a future action, California lacks standing to challenge government action A (which causes no harm itself) on the theory that it suggests that government action B (which *would* cause Article III injury) is now more likely to follow. *See California*, 2026 WL 2473573, at *4; *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324-25 (D.C. Cir. 2013) ("Article III standing requires more than the possibility of potentially adverse regulation."). And if EPA did take a final

action withdrawing the waivers, California could file a petition for review at that time. *See* 42 U.S.C. § 7607(b)(1).

The district court did not address this argument except to state that it "boil[s] down to the position that 'there's no point in closing the barn door after the horses have already bolted.'" JA0694. This response—unsupported by any authority or legal reasoning—gets things backwards: EPA's argument is not that California has come to court too late, but rather that the State is far too early. The rest of the district court's discussion of this theory analyzed at length what procedures California would be entitled to if and when EPA decided to initiate withdrawal of the waivers. *See* JA0688-91. This extended speculation ignores the critical issue: whether California alleged a substantive, concrete injury at all. And so even if the district court were correct (and it was not, *see infra* at 22-23), California still lacks standing. *See Nat'l Ass' of Homebuilders*, 667 F.3d at 15.

Second, even if California could establish injury-in-fact with speculation about the likelihood of some other future agency action that is not before the Court, California also faces an independent causation and redressability problem. EPA's position—for more than fifteen years—has been that 5 U.S.C. § 558(c) does not apply to § 209 waivers because "what California receives from EPA is a waiver, not a license." 74 Fed. Reg. 32744, 32781 (July 8, 2009). In issuing the waiver authorizing California greenhouse gas emissions regulations for new motor

vehicles, EPA explained that "[a]ny potential action on the waiver request is not subject to the requirements of APA section 558(c)." *Id.* Instead, EPA interprets § 209 to require prior notice and an opportunity for a public hearing when making waiver decisions, including withdrawal of a waiver. *See* 42 U.S.C. § 7543(b)(1) (requiring "notice and [an] opportunity for [a] public hearing" before issuing a waiver); 84 Fed. Reg. 51310, 51311/3 (Sep. 27, 2019) (withdrawing a waiver after notice and public hearings). Therefore, the determinations that the waivers are CRA rules have no effect on EPA's longstanding position that a hypothetical withdrawal of a waiver does not require the procedures of § 558(c). Therefore, California still cannot meet its burden to demonstrate traceability because EPA's views on *those* procedures are unaffected by whether the agency considers the waivers rules or orders.

Finally, California cannot demonstrate traceability and redressability for the independent reason that the State cannot show that the § 558(c) procedures could lead to a different result than § 209's procedures. Even in a case alleging a procedural injury, a plaintiff must still demonstrate that the agency "*could* reach a different conclusion" than the one actually reached.[4] *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 185 (D.C. Cir. 2017) (emphasis in original). Here, according

---

[4] Of course, here, there is no substantive decision affecting California's rights, so attempting to apply the traceability and redressability standards for procedural injuries requires hypotheticals and abstractions.

to California, if EPA decides to withdraw the waivers, the agency must provide the State with notice of the "facts or conduct which may warrant" the withdrawal and an "opportunity to demonstrate or achieve compliance with all lawful requirements" before EPA began the withdrawal process. 5 U.S.C. § 558(c). But there is no reason that, in this hypothetical agency action, EPA could reach a different result if it followed the § 558(c) procedures—which require "notice and an opportunity to be heard … prior to the agency's final determination," *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 638 F.3d 794, 801 (D.C. Cir. 2011) (Kavanaugh, J.)—as opposed to the § 209 procedures—which require prior notice and an opportunity for a hearing. *Cf. Anthropic PBC v. U.S. Dep't of War*, --- F.4th ----, 2026 WL 2881404, at *14 (Sept. 25, 2026) (even if agency provided notice of action and an opportunity to respond later than the statute required, error was harmless because earlier notice and an opportunity to be heard "would not have affected the [agency's] decision"). For this additional reason, any harm to California flowing from these hypothetical, future agency actions would be neither traceable to the alleged procedural injury nor redressable by a court order addressing that procedure.

### B. Self-inflicted injury is insufficient to support Article III standing.

Because California cannot demonstrate standing based on hypothetical, future procedural deprivations, the State cannot manufacture an injury by diverting

resources in anticipation of potentially adverse future statutes or actions. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). That is so even if California's "fear" could fairly be described as "nonparanoid" or "not fanciful, irrational, or clearly unreasonable." *Id.* Such "fear[s]," reasonable or not, do not support a case or controversy under Article III. As the speculative possibility that certain state regulations may become unenforceable as a result of some future federal action is not itself enough to support standing, the fact that California claims to be planning for that speculative possibility gets it no closer. Because the district court concluded—incorrectly, *see supra* Part I(A)—that California alleged a procedural injury, the memorandum opinion does not address this first argument.

In concluding that California had demonstrated standing, the district court relied on a narrow reading  of cases pre-dating *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). *See* JA0693-94. But *Alliance for Hippocratic Medicine* rejected the argument that "standing exists when an organization diverts its resources in response to a defendant's actions." 602 U.S. at 395. Rather, standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) only exists when a defendant's "actions directly affect[] and interfere[] with [the plaintiff's] core … activities." *Alliance for Hippocratic Medicine*, 602 U.S at 395. The district court easily—and correctly—dispatched with *that* theory of standing in a footnote. JA0685.

## II. The jurisdiction-stripping provision in 5 U.S.C. § 805 expressly bars this suit.

The CRA mandates that: "No determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. Through this comprehensive jurisdiction-stripping provision, Congress made clear that oversight of compliance with the CRA is for Congress, not the judiciary. The district court concluded that, though case law and § 805 bar review of EPA's submissions to Congress, EPA's determinations that each rule is an order *are* subject to review, notwithstanding the fact that the agency set forth those determinations in its submissions to Congress. This analysis purports to review an abstract decision untethered to a final agency action and ignores the text of § 805, which prohibits review of determinations under the CRA. Because all that EPA did here was submit the waivers to Congress under the CRA, California's claims are barred under the plain text of § 805.

### A. No presumption of reviewability applies to congressional reporting requirements.

The district court's analysis begins by citing the general presumption favoring judicial review of administrative action. JA0672-73. While the clear text of § 805 overcomes any such presumption, that presumption is inapplicable in the context of congressional reporting requirements, such as those set forth in the CRA.

This Court has held that "the general presumption of reviewability of agency action" "is inapplicable" to "Executive responses to congressional reporting requirements." *NRDC v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988) (R.B. Ginsburg, J.); *see also id.* at 319 (describing "presumption of reviewability of agency action" as "woefully inapposite"). The Court identified several reasons the presumption does not apply in these circumstances, and those reasons apply equally to the CRA. First, this Court found that there is no precedent of courts reviewing agency reporting to Congress, despite such congressional reporting requirements being "legion in federal law" and "ubiquitous." *Id.* at 317.

Second, the nature of congressional reporting is "quite distinct from the prototypical exercise[s] of agency power," because the agency is not exercising authority that "affect[s] … the lives and liberties of the American people." *Id.* at 318. Rather, "the designated Executive Branch officer is simply reporting back to the source of its delegated power." *Id.* So too here. EPA's submissions of the waivers to Congress under the CRA did not have legal consequences for the American people; rather, California fears the consequences that may follow if *Congress* legislatively disapproves the waivers.

Third, this Court recognized that absent "a provision for judicial review," such reporting requirements by their "nature seem[] singularly committed to *congressional* discretion in measuring the fidelity of the Executive Branch actor to

legislatively mandated requirements." *Id.* If Congress believes that EPA's reports are incorrect, inadequate, or unnecessary, "it is most logically for the recipient of the report to make that judgment and take what it deems to be the appropriate action." *Id.* at 319. "[T]his issue seems to us quintessentially within the province of the political branches to resolve as part of their ongoing relationships." *Id.*

Of course, the CRA not only lacks a provision authorizing judicial review; it expressly forecloses judicial review. 5 U.S.C. § 805. But this context is important, and the district court erred in relying on an inapplicable presumption of reviewability when interpreting the plain text of § 805.

### B. California's claims all require judicial review of actions and determinations under the CRA, so § 805 bars them.

All of California's claims seek review of EPA's submissions to Congress under the CRA based on the determinations that each waiver is a "rule" as that term is defined in the CRA, [5] and thus this suit is foreclosed by the plain language of § 805. The jurisdiction-stripping language in § 805 is both broad and clear, and it should be enforced under its plain terms. *See Mullin*, 609 U.S. at 338-39 (interpreting similar jurisdiction-stripping language). This Circuit and other Circuits have consistently recognized that the "language of § 805 is unequivocal

[5] Because EPA made these determinations and submitted the waivers to Congress under the CRA, the Clean Air Act's jurisdictional provision, 42 U.S.C. § 7607(b), does not apply.

and precludes review” of CRA claims. *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (Kavanaugh, J.); *Wash. All. of Tech. Workers v. DHS*, 892 F.3d 332, 346 (D.C. Cir. 2018); *see also, e.g.*, *Kan. Nat'l Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1235-36 (10th Cir. 2020); *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 556 (9th Cir. 2019). Under both its plain language and the precedent, § 805 is fatal to this suit, and the suit should be dismissed.

### 1. EPA's submissions of the waivers to Congress under the CRA are actions under the CRA.

EPA's submissions of the waivers to Congress under the CRA are “action[s] … under” the CRA. They are indisputably actions “under” the CRA because EPA expressly sent the report with the waivers to comply with the CRA's requirement that each agency must send a “report” to “each House of the Congress” containing “a copy of the rule.” 5 U.S.C. § 801(a)(1)(A). Simply put, when an agency sends a report to Congress stating that it is submitting a rule under the CRA, that is an “action … under” the CRA. *Id.* § 805. California's challenge to that action is barred because “[n]o … action” taken under the CRA “shall be subject to judicial review.” *Id.* The district court correctly held that § 805 bars review of EPA's submissions to Congress. *See, e.g.*, JA0675 (“[T]his Court agrees with EPA that how Congress decides to address an agency's report submitted ‘under’ the CRA is non-justiciable.”).

### 2. **The district court attempted to redefine the agency action at issue in order to avoid § 805.**

The district court recognized that both *Hodel* and § 805 barred review of EPA's submissions to Congress. JA0675, 0677-78. Misunderstanding EPA's arguments, the district court concluded that the agency had taken separate action—its determinations that each waiver at issue in this case is a "rule" as that term is defined in the CRA and not an order—reviewable under the APA. JA0671-83. Because EPA made these determinations in the submissions to Congress, and because courts may not review "abstract decision[s]," *Biden v. Texas*, 597 U.S. 785, 809 (2022), there is only one set of actions at issue in this case: the agency's submissions to Congress. Section 805 bars the whole suit.

The APA provides a cause of action to persons injured by "agency action." 5 U.S.C. § 702. "Agency action," in turn, is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). And while that term "undoubtedly has a broad sweep," this Court has "long recognized that the term is not so all-encompassing as to authorize … 'judicial review over everything done by an administrative agency.'" *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (cleaned up).

In its complaint, California asserts that EPA took two actions: first, EPA's determinations that the waivers are CRA rules, and second, EPA's submissions of

those waivers to Congress for review under the CRA. JA0762, 0768. However, EPA's determination that each waiver is a "rule" as that term is defined in the CRA is not action separate and apart from the transmission of each waiver to Congress. As the district court noted, there is no "Federal Register notice" or "any other form documentation about the reclassification decision." JA0789. The documents memorializing EPA's legal determination are those transmitted to Congress. *See, e.g.*, JA0349 ("This rule is a: Final Rule"). In other words, there is no other "agency rule, order, license, sanction, relief, or the equivalent … thereof" that "reclassifies" each "waiver" to a "rule." *See* 5 U.S.C. § 551(13).

The district court's conclusion that EPA took two separate kinds of agency actions—as well as the memorandum opinion's various suggestions that EPA "was misleading or dissembling to Congress"—rests on a misunderstanding of the agency's argument. JA0670. The district court contends that EPA denied that its determinations were "critical" or "meant something," and that the Agency made any determinations at all. *See id.* And so "the Court opt[ed] to take EPA at its word to Congress" and concluded that "EPA made determinations as to each of the at-issue waivers and reclassified these adjudicatory orders to be treated as final rules of general applicability subject to the CRA's narrower definition of 'rule.'" *Id.*

But EPA never suggested otherwise. Rather, the agency argued that the agency made determinations as to each of the at-issue waivers and concluded they

were CRA rules, and therefore § 805 deprived the district court of jurisdiction over California's claims. *See infra* Part II(B)(3). But those determinations were made solely in the documents transmitting the waivers to Congress; there was "just a report . . . to Congress," JA0670 (internal quotation marks omitted), because there was no other possible action whatsoever. The district court quoted EPA's argument making this point, *see id.*, but did not address it. Because courts may not review "abstract decision[s]," *Biden*, 597 U.S. at 809, there is only one potential action at issue in this case—EPA's submissions of the waivers to Congress.

To the extent that California contends that EPA reclassified the waivers in the press release, *see* JA0741, the State is mistaken. The press releases are not rules, orders, sanctions, reliefs, or the equivalent thereof. 5 U.S.C. § 551(13). And in these press releases, EPA announced that it had previously transmitted the waivers to Congress and determined that the waivers are CRA rules. *See* JA0313, 0343. In other words, they are typical press releases publicizing the work of the agency and do not by themselves implement or prescribe any law or policy, nor do they represent a "final disposition" of EPA. 5 U.S.C. § 551(4), (6).

#### 3. **EPA's determinations that the waivers are rules under the CRA are determinations under the CRA.**

To the extent EPA's determinations that each waiver is a "rule" under the CRA are separate from the agency's submissions to Congress—and they are not,

*see* Part II(B)(2)—they are still unreviewable. These claims are barred because "[n]o" such "determination … shall be subject to judicial review." 5 U.S.C. § 805.

Textually, EPA's determinations that the waivers are rules subject to the CRA remain determinations under the CRA, regardless of California's artful pleading or that the CRA's definition of rule turns, in part, on the APA's definition of rule. The word "determination" is a "synonym for 'decision'" and can also "describe the chain of events leading up to a decision." *Mullin*, 609 U.S. at 339. "[T]he word 'under' is a chameleon that must draw its meaning from its context." *Nat'l Ass'n of Mfrs. v. DOD*, 583 U.S. 109, 124 (2018) (quotation marks omitted). In § 805, "under" most naturally means "pursuant to," *Nat'l Ass'n of Mfrs.*, 583 U.S. at 124, "according to," Black's Law Dictionary 1525 (6th ed. 1990), or "subject to the … authority of," Webster's Third New Int'l Dictionary 2487 (Philip Babcock Gove ed., 1986), the CRA.

The phrase "'under this chapter' modifies 'determination,'" and "other parts of the CRA expressly contemplate various determinations." *Kan. Nat. Res. Coal.*, 971 F.3d at 1235. One of those "other parts of the CRA" is the requirement that each agency submit every CRA "rule" to Congress for review. 5 U.S.C. § 801(a)(1)(A). To fulfill that responsibility, agencies must determine whether each final agency action is a rule under the CRA.

Here, EPA determined that the relevant preemption waivers are rules that should be reported under the CRA. That is the only determination EPA made, and the only action EPA took in response was submission of the waivers to Congress. Thus, the determination was "under" or "pursuant" to the CRA. Because California's claims are based on its request for judicial review of that determination, the claims must be dismissed. *See Montanans for Multiple Use*, 568 F.3d at 229.

That EPA determined the waivers were rules subject to the CRA and then articulated that determination in its submission to Congress follows from "general administrative-law principles." *Mullin*, 609 U.S. at 344. Here, EPA's determinations that the waivers are CRA rules that should be submitted to Congress are embodied in and merged with the unreviewable submissions. "In APA cases, an agency's subsidiary decisions merge into the final agency action, which is then subject to review. If the final agency action is unreviewable, then so too are subsidiary determinations." *Id.*

As in *Mullin*, California cannot evade the judicial review bar of § 805 by creative pleading challenging an allegedly separate, implicit "reclassification" that resulted in the submission of the waivers. And that result is even clearer with § 805 because Congress expressly barred review *not only* of actions under the CRA, but also determinations and findings under the CRA.

### C. The district court's reasoning ignores the plain text of § 805 and the precedents interpreting it.

Neither the district court nor California have provided any textual explanation for how EPA's determinations that the waivers are rules under the CRA are not determinations under the CRA, and none exists. Rather, the district court reasoned that, because the CRA's definition of rule depends in part on the APA's definition of rule, it must be possible to review EPA's determinations that the waivers are rules under the CRA. JA0675-83. But § 805's text forecloses that result, and the district court's hypothetical concerns (JA0674) about how far "along the chain of decision-making" the scope of § 805's judicial review bar extends are not presented and fail to recognize the real, textual limits of § 805.

To support its analysis, the district court (JA0676-77) began with this Court's interpretation of a very different jurisdiction-stripping provision in *Ardelyx, Inc. v. Kennedy*, 179 F.4th 947, 954 (D.C. Cir. 2026). As this Court explained in *Ardelyx*, "[a] 'jurisdiction-stripping provision does not apply if the agency's action fails to qualify as the kind of action for which review is barred,'" so the court must determine whether the "'challenged agency action[s]'" fall within the judicial review bar. *Id.* (citation omitted). The jurisdiction-stripping provision in *Ardelyx* foreclosed review "of the [agency's] 'identification of renal dialysis services included in the bundled payment.'" *Id.* at 950-51. Thus, this Court considered "whether the agency's actions qualify as an 'identification of renal

dialysis services,' within the meaning of the bar to judicial review." *Id.* at 955. As a result, the Court reviewed some of the merits of plaintiff's challenge, but "only 'to the extent necessary to determine whether the challenged agency actions fall within the scope of the preclusion of judicial review.'" *Id.* at 956 (citation omitted).

EPA's arguments here are consistent with applying *Ardelyx*'s textual approach to the broader and more capacious language of § 805. California's challenges are barred because they seek judicial review of determinations and actions under the CRA. 5 U.S.C. § 805. Those are the relevant textual touchstones that define the types of agency action that fall within the judicial review bar. And *Mullin* confirms that, even when interpreting jurisdiction-stripping provisions, courts should proceed "on the assumption that those who draft and enact a provision generally intend its terms to mean what they mean in ordinary usage." *Mullin*, 609 U.S. at 342. The CRA's bar on judicial review should be interpreted consistently with its plain terms; it should not be treated as an "unfathomable puzzle." *Id.*

In contrast, both California and the district court appear to have concluded that applying § 805 also requires answering whether EPA correctly determined the preemption waivers were rules subject to the CRA, and thus also necessarily and implicitly concluded they were rules under the APA. Similarly, the district court adopted California's preferred framing as one of "reclassification" of the waivers

from orders to rules governed by the CRA. But nothing in the text of § 805 supports inquiry into these issues: § 805 does not itself mention rules, nor does it cross-reference the APA. It also does not refer to "reclassifications." If anything, these arguments go to the accuracy of the "determinations" EPA made and the legality of the "actions" it took by submitting the waivers to Congress, and the plain text of § 805 forecloses judicial review of those questions.

Here, the district court's ruling deviated from this Court's analysis in *Montanans for Multiple Use*, 568 F.3d at 229. In that case, plaintiffs asked this court to invalidate Forest Service amendments to a forest plan for failing to submit those amendments to Congress under the CRA. *Id.* This Court held that "§ 805 is unequivocal and precludes review of this claim—*even assuming* that the plan amendments qualify as *rules* subject to the Act in the first place." *Id.* (emphases added). In that case, the agency had determined the amendments were not rules and had not submitted them to Congress. Nonetheless, this Court recognized that this alleged omission under the CRA was unreviewable, and it did not matter whether the Forest Service had erred in its determination that they were not rules. Even assuming the agency *had* erred, the judicial review bar applied.

The reason EPA's straightforward textual reading of § 805 does not present the broader concerns raised by the district court is that it only forecloses judicial review of "determination[s], finding[s], action[s], or omission[s] *under*" the CRA.

5 U.S.C. § 805 (emphasis added). Thus, answering the question of whether a particular action or determination occurs under the CRA will depend on the circumstances of how and why EPA takes an action and makes a determination. Here, the only actions EPA took were submissions of the waivers to Congress "under" the CRA, and the only determinations EPA made were determinations that the waivers are rules reportable "under" the CRA. Thus, the actions and determinations were all made under and pursuant to the CRA, for purposes of CRA compliance, and the bar applies.

The district court reasoned that, if it accepted that § 805 barred judicial review of EPA's determination that these waivers are rules under the CRA that should be submitted to Congress, then § 805 would "insulate from judicial review an agency's decision to act through rulemaking or adjudication or an agency's decision to treat an action as a rule." JA0678. Not so.

The district court's slippery slope concerns were unwarranted because, to the extent an agency takes final agency action under other statutes with consequences beyond submitting reports (or not) to Congress, the agency is not acting "under" the CRA and § 805 would not apply. For example, if an agency were to issue an order under the APA, and a court were to find the agency "must proceed through rulemaking" under the APA or another statute, the agency would not be able to argue such a ruling was barred simply because it "may trigger a concomitant

requirement for the agency to submit a report to Congress under the CRA." JA0679. And if in response, the agency then proceeded with rulemaking and issued a rule, the rule would be reviewable under the APA and the relevant statutes, just as the CRA did not bar the other claims plaintiffs brought in *Montanans for Multiple Use*, 568 F.3d at 227-29. But conversely and importantly, if the agency *still* declined to submit the rule to Congress under the CRA, that omission and the determination that it was not a rule under the CRA would still not be judicially reviewable because that omission would occur "under" the CRA. *See id.* at 229.

### D. Congress passed § 805 so that it could oversee agency compliance with the CRA without judicial interference.

The CRA's function is to provide Congressional oversight of Executive agencies, not judicial oversight. It creates a process for Congress to review agency rules and assess whether those rules are consistent with Congress's policy goals. And at its core, it contains a set of legislative procedures for expedited debate to enact joint resolutions disapproving of agency rules through bicameralism and presentment. Because the CRA is ultimately a tool for Congress, Congress appropriately decided that it—not the courts—should resolve disputes about whether an agency action is a rule subject to CRA review.

Recognizing that the CRA is in Congress's wheelhouse is all the more compelling in this case. As discussed above and recognized by the district court, EPA previously sent three different Clean Air Act waivers to Congress in February

2025. JA0650. After vigorous debate in Congress about whether those waivers are properly subject to the CRA, the House and Senate passed—and the President signed—three disapproval resolutions under the CRA, each targeting one of the three preemption waivers. JA0650-52. Thus, Congress determined—through full votes in the House and Senate—that the preemption waivers were properly submitted to Congress and properly subject to CRA review and disapproval. The district court erred in injecting itself into that process.

Regardless of California's and the district court's attempts to circumvent the judicial review provision by focusing on an allegedly separable, implicit reclassification of the waivers to rules under the APA, this entire case is about the CRA submissions and Congress' reactions to them. This is evident from the complaint, which links the submissions and determinations repeatedly because they are, in fact, one and the same action. *See, e.g.*, JA0774 (requesting that the court vacate, enjoin, and provide declaratory relief from EPA's "reclassification[s] and submission[s]" of the waivers to Congress). The complaint even requests that the court "[d]eclare that EPA's submissions of these waivers to Congress and the GAO are not 'report[s]' under 5 U.S.C. § 801(a)(1)(A)." *Id.* Moreover, the district court discusses the CRA and the prior joint resolutions disapproving other waivers at length. JA0650-53. The district court returns to the concerns about potential joint resolutions disapproving waivers and the consequences of such disapprovals

when analyzing irreparable harm. JA0702-04. And one aspect of the injunction is framed broadly in a way that may foreclose submission of other waivers to Congress under the CRA in the future. JA0637 ("**ORDERED** that defendant EPA is **ENJOINED** and **STAYED**, pursuant to 5 U.S.C. § 705, from giving effect to the reclassification of these four Clean Air Act Section 209(b) waiver orders, and *other such reclassifications*, from orders to rules.") (emphasis added); *see also* JA0869.

This Court should enforce the plain text of § 805 and foreclose this suit. Doing otherwise puts the courts in the untenable position of interfering with "on-going relationships between the two political branches in our system of separated powers." *Hodel*, 865 F.2d at 319.

## III. California has not identified final agency action.

Even if California could demonstrate standing, and even if § 805 did not strip the district court of jurisdiction, California has not alleged facts showing that EPA took any final, reviewable agency action here. Judicial review under the APA is limited to "final agency action." 5 U.S.C. § 704. An agency action is 'final' only if it determines legal "rights or obligations" or is one from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation modified). The touchstone of this analysis is whether the action has "direct and

appreciable legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016).

As previously explained, *see supra* Part II(A), California stumbles out of the gate because sending a report to Congress is not a reviewable "agency action." Moreover, because any legal consequences depend on future congressional action, the submissions are not final agency action. *See Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (step by agency not final action when only subsequent presidential action has direct legal consequences).

EPA's determinations also lack legal consequences. The district court disagreed and concluded that the "reclassifications" cause California procedural injury and obligated EPA to submit the waivers to Congress. JA0697.

None of these purported consequences render EPA's determinations final agency action. First, California's alleged future procedural injury does not render the determinations final agency action. An agency's act is unreviewable if it "does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (cleaned up). Here, EPA's alleged reclassifications could only even theoretically impair California's procedural rights in the context of future administrative action to withdraw the waivers. Given this "contingency," any purported loss of procedural rights does not

provide a basis for reviewing the determinations. Second, these determinations culminated in the submissions to Congress. They are therefore subsidiary to—and merge with—the submissions, *see Mullin*, 609 U.S. at 344, which are themselves not reviewable, as the district court concluded, JA0675, 0677-78.

Finally, California cannot evade the statutory limitations for review under the APA by throwing the "Hail Mary pass" of an "ultra vires" claim. *NRC v. Texas*, 605 U.S. 665, 681-82 (2025). Such claims may be brought "only when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Id.* (quotation marks omitted). "Ultra vires review is also unavailable if … a statutory review scheme forecloses all other forms of judicial review." *Id.*

California asserts ultra vires or "nonstatutory" claims in Counts II and V. These claims simply "dress up a typical statutory-authority argument as an ultra vires claim." *NRC*, 605 U.S. at 682. California makes the conclusory assertion that "EPA is expressly prohibited from taking these actions," JA0767, 0773, but fails to identify any "specific prohibition" affirmatively forbidding the determinations. *See NRC*, 605 U.S. at 681. These assertions are insufficient as a matter of law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) ("conclusory" allegations in a complaint are not "assumed true"). And while California purports to identify prohibitions in the APA, it relies on case law outlining background principles of

administrative law rather than specific statutory prohibitions. *See* JA0767, 0773. These allegations do not state an *ultra vires* claim. *See NRC*, 605 U.S. at 681.

Even more problematically for California, the CRA explicitly forecloses judicial review, *see supra* Part II. California cannot use a nonstatutory *ultra vires* claim to circumvent the CRA's jurisdiction-stripping provision. *See NRC*, 605 U.S. at 681.

## IV. The remaining preliminary injunction factors weigh against preliminary relief.

While "a movant's failure to show a likelihood of success on the merits is alone sufficient to defeat their motion for a preliminary injunction," *Friends of the Earth U.S. v. Exp.-Imp. Bank of the United States*, 187 F.4th 616, 625 (D.C. Cir. 2026) (citation omitted), none of the other preliminary injunction factors favors California.

California has not demonstrated irreparable harm. As the district court noted, "[t]he sources of California's irreparable harm … follow those bases for finding an injury-in-fact requisite for standing." JA0702. Because California has not demonstrated injury in fact sufficient for standing, *see supra* Part I, it has not made the more demanding showing of irreparable injury, *see Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("This court has set a high standard for irreparable injury.").

The public interest and the balance of the equities counsel *against* an

injunction, not in favor of one. Here, California is asking the Court to enjoin EPA from complying with a statute meant to facilitate review of administrative actions by the democratically elected Congress. Thus, any judicial order to circumscribe EPA's actions under the CRA run contrary to the public interest. Indeed, as this Court recently reiterated, the United States is always "irreparably harmed by an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Kingdom v. Trump*, No. 26-5181, 2026 WL 1905418, at *2 (D.C. Cir. June 17, 2026) (per curiam) (cleaned up).

It is also in the public interest for the courts to observe jurisdictional limits, including the doctrine of standing and preclusion of review under the CRA. As the Supreme Court has noted, the public interest favors limiting federal courts to the jurisdiction and remedies provided by Congress. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("When a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too."). For these reasons, the balance of the harms and the public interest also weigh against preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should vacate the preliminary injunction orders and remand this case with instructions to dismiss California's complaint.

Respectfully submitted,

/s/ *Jeffrey Hughes*

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT J. LUNDMAN
JEFFREY HUGHES
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3080
jeffrey.hughes@usdoj.gov

October 28, 2026
90-5-2-4-23244

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of this Court's October 19, 2026 Order, ECF 2198970, because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 10,386 words according to the count of Microsoft Word.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Jeffrey Hughes*
JEFFREY HUGHES

Counsel for Appellants

## ADDENDUM

5 U.S.C. § 551 .......................................................................................................1a

5 U.S.C. § 558 .......................................................................................................3a

5 U.S.C. § 801 .......................................................................................................4a

5 U.S.C. § 802 .......................................................................................................7a

5 U.S.C. § 805 .......................................................................................................8a

42 U.S.C. § 7543 ...................................................................................................9a

to any case commenced on or after October 1, 1984, and finally disposed of before the date of the enactment of this Act [Aug. 5, 1985], except that in any such case, the 30-day period referred to in section 504(a)(2) of title 5, United States Code, or section 2412(d)(1)(B) of title 28, United States Code, as the case may be, shall be deemed to commence on the date of the enactment of this Act.

''(c) APPLICABILITY OF AMENDMENTS TO PRIOR BOARD OF CONTRACTS APPEALS CASES.—Section 504(b)(1)(C)(ii) of title 5, United States Code, as added by section 1(c)(2) of this Act, and section 2412(d)(2)(E) of title 28, United States Code, as added by section 2(c)(2) of this Act, shall apply to any adversary adjudication pending on or commenced on or after October 1, 1981, in which applications for fees and other expenses were timely filed and were dismissed for lack of jurisdiction.''

EFFECTIVE DATE

Pub. L. 96–481, title II, § 208, Oct. 21, 1980, 94 Stat. 2330, as amended by Pub. L. 99–80, § 5, Aug. 5, 1985, 99 Stat. 186, provided that: ''This title and the amendments made by this title [see Short Title note below] shall take effect of [on] October 1, 1981, and shall apply to any adversary adjudication, as defined in section 504(b)(1)(C) of title 5, United States Code, and any civil action or adversary adjudication described in section 2412 of title 28, United States Code, which is pending on, or commenced on or after, such date. Awards may be made for fees and other expenses incurred before October 1, 1981, in any such adversary adjudication or civil action.''

Pub. L. 96–481, title II, § 203(c), Oct. 21, 1980, 94 Stat. 2327, which provided that effective Oct. 1, 1984, this section is repealed, except that the provisions of this section shall continue to apply through final disposition of any adversary adjudication initiated before the date of repeal, was itself repealed by Pub. L. 99–80, § 6(b)(1), Aug. 5, 1985, 99 Stat. 186.

SHORT TITLE

Pub. L. 96–481, title II, § 201, Oct. 21, 1980, 94 Stat. 2325, provided that: ''This title [enacting this section, amending section 634 of Title 15, Commerce and Trade, section 2412 of Title 28, Judiciary and Judicial Procedure, Rule 37 of the Federal Rules of Civil Procedure, set out in Title 28 Appendix, and section 1988 of Title 42, The Public Health and Welfare, and enacting provisions set out as notes under this section and section 2412 of Title 28] may be cited as the 'Equal Access to Justice Act'.''

TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions in subsec. (e) of this section relating to annual report to Congress on the amount of fees and other expenses, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and page 153 of House Document No. 103–7.

TERMINATION OF ADMINISTRATIVE CONFERENCE OF UNITED STATES

For termination of Administrative Conference of United States, see provision of title IV of Pub. L. 104–52, set out as a note preceding section 591 of this title.

PROHIBITION ON USE OF ENERGY AND WATER DEVELOPMENT APPROPRIATIONS TO PAY INTERVENING PARTIES IN REGULATORY OR ADJUDICATORY PROCEEDINGS

Pub. L. 102–377, title V, § 502, Oct. 2, 1992, 106 Stat. 1342, provided that: ''None of the funds in this Act or subsequent Energy and Water Development Appropriations Acts shall be used to pay the expenses of, or otherwise compensate, parties intervening in regulatory or adjudicatory proceedings funded in such Acts.''

REVIVAL OF PREVIOUSLY REPEALED PROVISIONS

Pub. L. 99–80, § 6, Aug. 5, 1985, 99 Stat. 186, provided that:

''(a) REVIVAL OF CERTAIN EXPIRED PROVISIONS.—Section 504 of title 5, United States Code, and the item relating to that section in the table of sections of chapter 5 of title 5, United States Code, and subsection (d) of section 2412 of title 28, United States Code, shall be effective on or after the date of the enactment of this Act [Aug. 5, 1985] as if they had not been repealed by sections 203(c) and 204(c) of the Equal Access to Justice Act [Pub. L. 96–481].

''(b) REPEALS.—

''(1) Section 203(c) of the Equal Access to Justice Act [which repealed this section] is hereby repealed.

''(2) Section 204(c) of the Equal Access to Justice Act [which repealed section 2412(d) of title 28] is hereby repealed.''

CONGRESSIONAL FINDINGS AND PURPOSES

Pub. L. 96–481, title II, § 202, Oct. 21, 1980, 94 Stat. 2325, provided that:

''(a) The Congress finds that certain individuals, partnerships, corporations, and labor and other organizations may be deterred from seeking review of, or defending against, unreasonable governmental action because of the expense involved in securing the vindication of their rights in civil actions and in administrative proceedings.

''(b) The Congress further finds that because of the greater resources and expertise of the United States the standard for an award of fees against the United States should be different from the standard governing an award against a private litigant, in certain situations.

''(c) It is the purpose of this title [see Short Title note above]—

''(1) to diminish the deterrent effect of seeking review of, or defending against, governmental action by providing in specified situations an award of attorney fees, expert witness fees, and other costs against the United States; and

''(2) to insure the applicability in actions by or against the United States of the common law and statutory exceptions to the 'American rule' respecting the award of attorney fees.''

LIMITATION ON PAYMENTS

Pub. L. 96–481, title II, § 207, Oct. 21, 1980, 94 Stat. 2330, which provided that the payment of judgments, fees and other expenses in the same manner as the payment of final judgments as provided in this Act [probably should be ''this title'', see Short Title note above] would be effective only to the extent and in such amounts as are provided in advance in appropriation Acts, was repealed by Pub. L. 99–80, § 4, Aug. 5, 1985, 99 Stat. 186.

## SUBCHAPTER II—ADMINISTRATIVE PROCEDURE

**Statutory Notes and Related Subsidiaries**

SHORT TITLE

The provisions of this subchapter and chapter 7 of this title were originally enacted by act June 11, 1946, ch. 324, 60 Stat. 237, popularly known as the ''Administrative Procedure Act''. That Act was repealed as part of the general revision of this title by Pub. L. 89–554 and its provisions incorporated into this subchapter and chapter 7 hereof.

### § 551. Definitions

For the purpose of this subchapter—

(1) ''agency'' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia;

or except as to the requirements of section 552 of this title—

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix;[1]

(2) ''person'' includes an individual, partnership, corporation, association, or public or private organization other than an agency;

(3) ''party'' includes a person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in an agency proceeding, and a person or agency admitted by an agency as a party for limited purposes;

(4) ''rule'' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) ''rule making'' means agency process for formulating, amending, or repealing a rule;

(6) ''order'' means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

(7) ''adjudication'' means agency process for the formulation of an order;

(8) ''license'' includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission;

(9) ''licensing'' includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license;

(10) ''sanction'' includes the whole or a part of an agency—

(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person;

(B) withholding of relief;

(C) imposition of penalty or fine;

(D) destruction, taking, seizure, or withholding of property;

(E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;

(F) requirement, revocation, or suspension of a license; or

(G) taking other compulsory or restrictive action;

(11) ''relief'' includes the whole or a part of an agency—

(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;

(B) recognition of a claim, right, immunity, privilege, exemption, or exception; or

(C) taking of other action on the application or petition of, and beneficial to, a person;

(12) ''agency proceeding'' means an agency process as defined by paragraphs (5), (7), and (9) of this section;

(13) ''agency action'' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

(14) ''ex parte communication'' means an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 381; Pub. L. 94–409, § 4(b), Sept. 13, 1976, 90 Stat. 1247; Pub. L. 103–272, § 5(a), July 5, 1994, 108 Stat. 1373; Pub. L. 111–350, § 5(a)(2), Jan. 4, 2011, 124 Stat. 3841.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| (1) ............ | 5 U.S.C. 1001(a). | June 11, 1946, ch. 324, § 2(a), 60 Stat. 237.<br>Aug. 8, 1946, ch. 870, § 302, 60 Stat. 918.<br>Aug. 10, 1946, ch. 951, § 601, 60 Stat. 993.<br>Mar. 31, 1947, ch. 30, § 6(a), 61 Stat. 37.<br>June 30, 1947, ch. 163, § 210, 61 Stat. 201.<br>Mar. 30, 1948, ch. 161, § 301, 62 Stat. 99. |
| (2)–(13) ....... | 5 U.S.C. 1001 (less (a)). | June 11, 1946, ch. 324, § 2 (less (a)), 60 Stat. 237. |

In paragraph (1), the sentence ''Nothing in this Act shall be construed to repeal delegations of authority as provided by law,'' is omitted as surplusage since there is nothing in the Act which could reasonably be so construed.

In paragraph (1)(G), the words ''or naval'' are omitted as included in ''military''.

In paragraph (1)(H), the words ''functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947'' are omitted as executed. Reference to the ''Selective Training and Service Act of 1940'' is omitted as that Act expired Mar. 31, 1947. Reference to the ''Sugar Control Extension Act of 1947'' is omitted as that Act expired on Mar. 31, 1948. References to the ''Housing and Rent Act of 1947, as amended'' and the ''Veterans' Emergency Housing Act of 1946'' have been consolidated as they are related. The reference to former section 1641(b)(2) of title 50, appendix, is retained notwithstanding its repeal by § 111(a)(1) of the Act of Sept. 21, 1961, Pub. L. 87–256, 75 Stat. 538, since § 111(c) of the Act

[1] See References in Text note below.

ployee presiding at the hearing may, to the extent consistent with the interests of justice and the policy of the underlying statutes, require the party to show cause why his claim or interest in the proceeding should not be dismissed, denied, disregarded, or otherwise adversely affected on account of such violation; and

(E) the prohibitions of this subsection shall apply beginning at such time as the agency may designate, but in no case shall they begin to apply later than the time at which a proceeding is noticed for hearing unless the person responsible for the communication has knowledge that it will be noticed, in which case the prohibitions shall apply beginning at the time of his acquisition of such knowledge.

(2) This subsection does not constitute authority to withhold information from Congress.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 387; Pub. L. 94–409, § 4(a), Sept. 13, 1976, 90 Stat. 1246.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1007. | June 11, 1946, ch. 324, §8, 60 Stat. 242. |

In subsection (b), the word "employee" is substituted for "officer" and "officers" in view of the definition of "employee" in section 2105. The word "either" is added after the word "requires" in the first sentence to eliminate the need for parentheses. The words "the presiding employee or an employee qualified to preside at hearings under section 556 of this title" are substituted for "such officers" in the last sentence. The word "initial" is omitted before "decision", the final word in the first sentence and the sixth word of the fourth sentence, to avoid confusion between the "initial decision" of the presiding employee and the "initial decision" of the agency.

In subsection (c), the word "employees" is substituted for "officers" in view of the definition of "employee" in section 2105.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

**Editorial Notes**

CODIFICATION

Section 557 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2207 of Title 7, Agriculture.

Section 557a of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2208 of Title 7.

AMENDMENTS

1976—Subsec. (d). Pub. L. 94–409 added subsec. (d).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–409 effective 180 days after Sept. 13, 1976, see section 6 of Pub. L. 94–409, set out as an Effective Date note under section 552b of this title.

### § 558. Imposition of sanctions; determination of applications for licenses; suspension, revocation, and expiration of licenses

(a) This section applies, according to the provisions thereof, to the exercise of a power or authority.

(b) A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law.

(c) When application is made for a license required by law, the agency, with due regard for the rights and privileges of all the interested parties or adversely affected persons and within a reasonable time, shall set and complete proceedings required to be conducted in accordance with sections 556 and 557 of this title or other proceedings required by law and shall make its decision. Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given—

(1) notice by the agency in writing of the facts or conduct which may warrant the action; and

(2) opportunity to demonstrate or achieve compliance with all lawful requirements.

When the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 388.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1008. | June 11, 1946, ch. 324, §9, 60 Stat. 242. |

In subsection (b), the prohibition is restated in positive form.

In subsection (c), the words "within a reasonable time" are substituted for "with reasonable dispatch". The last two sentences are restated for conciseness and clarity and to restate the prohibition in positive form.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

**Editorial Notes**

CODIFICATION

Section 558 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2209 of Title 7, Agriculture.

### § 559. Effect on other laws; effect of subsequent statute

This subchapter, chapter 7, and sections 1305, 3105, 3344, 4301(2)(E), 5372, and 7521 of this title, and the provisions of section 5335(a)(B) of this title that relate to administrative law judges, do not limit or repeal additional requirements imposed by statute or otherwise recognized by law. Except as otherwise required by law, requirements or privileges relating to evidence or procedure apply equally to agencies and persons. Each agency is granted the authority necessary to comply with the requirements of this subchapter through the issuance of rules or otherwise. Subsequent statute may not be held to supersede or modify this subchapter, chapter 7, sections 1305, 3105, 3344, 4301(2)(E), 5372, or 7521 of

vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

**Statutory Notes and Related Subsidiaries**

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(D) For any rule submitted under subparagraph (A), if the Federal agency promulgating

the rule, in whole or in part, revokes, suspends, replaces, amends, or otherwise makes the rule ineffective, or the rule is made ineffective for any other reason, the Federal agency shall submit to the Comptroller General a report containing—

(i) the title of the rule;

(ii) the Federal Register citation for the rule, if any;

(iii) the date on which rule was submitted to the Comptroller General; and

(iv) a description of the provisions of the rule that are being revoked, suspended, replaced, amended, or otherwise made ineffective.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a rule that would not take effect by reason of subsection (a)(3) may take effect, if the President makes a determination under paragraph (2) and submits written notice of such determination to the Congress.

(2) Paragraph (1) applies to a determination made by the President by Executive order that the rule should take effect because such rule is—

(A) necessary because of an imminent threat to health or safety or other emergency;

(B) necessary for the enforcement of criminal laws;

(C) necessary for national security; or

(D) issued pursuant to any statute implementing an international trade agreement.

(3) An exercise by the President of the authority under this subsection shall have no effect on the procedures under section 802 or the effect of a joint resolution of disapproval under this section.

(d)(1) In addition to the opportunity for review otherwise provided under this chapter, in the case of any rule for which a report was submitted in accordance with subsection (a)(1)(A) during the period beginning on the date occurring—

(A) in the case of the Senate, 60 session days, or

(B) in the case of the House of Representatives, 60 legislative days,

before the date the Congress adjourns a session of Congress through the date on which the same or succeeding Congress first convenes its next session, section 802 shall apply to such rule in the succeeding session of Congress.

(2)(A) In applying section 802 for purposes of such additional review, a rule described under paragraph (1) shall be treated as though—

(i) such rule were published in the Federal Register (as a rule that shall take effect) on—

(I) in the case of the Senate, the 15th session day, or

(II) in the case of the House of Representatives, the 15th legislative day,

after the succeeding session of Congress first convenes; and

(ii) a report on such rule were submitted to Congress under subsection (a)(1) on such date.

(B) Nothing in this paragraph shall be construed to affect the requirement under subsection (a)(1) that a report shall be submitted to Congress before a rule can take effect.

(3) A rule described under paragraph (1) shall take effect as otherwise provided by law (including other subsections of this section).

(e)(1) For purposes of this subsection, section 802 shall also apply to any major rule promulgated between March 1, 1996, and the date of the enactment of this chapter.

(2) In applying section 802 for purposes of Congressional review, a rule described under paragraph (1) shall be treated as though—

(A) such rule were published in the Federal Register on the date of enactment of this chapter; and

(B) a report on such rule were submitted to Congress under subsection (a)(1) on such date.

(3) The effectiveness of a rule described under paragraph (1) shall be as otherwise provided by law, unless the rule is made of no force or effect under section 802.

(f) Any rule that takes effect and later is made of no force or effect by enactment of a joint resolution under section 802 shall be treated as though such rule had never taken effect.

(g) If the Congress does not enact a joint resolution of disapproval under section 802 respecting a rule, no court or agency may infer any intent of the Congress from any action or inaction of the Congress with regard to such rule, related statute, or joint resolution of disapproval.

(Added Pub. L. 104–121, title II, § 251, Mar. 29, 1996, 110 Stat. 868; amended Pub. L. 118–5, div. B, title III, § 270, June 3, 2023, 137 Stat. 33; Pub. L. 118–97, § 2, Oct. 1, 2024, 138 Stat. 1573.)

AMENDMENT OF SUBSECTION (a)(1)(D)

*Pub. L. 118–97, § 2(b), Oct. 1, 2024, 138 Stat. 1574, provided that, effective 6 years after Oct. 1, 2024, subsection (a)(1) of this section is amended by striking subparagraph (D). See 2024 Amendment note below.*

**Editorial Notes**

REFERENCES IN TEXT

Sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995, referred to in subsec. (a)(1)(B)(iii), are classified to sections 1532, 1533, 1534, and 1535, respectively, of Title 2, The Congress.

The date of the enactment of this chapter, referred to in subsec. (e)(1), (2), is the date of the enactment of Pub. L. 104–121, which was approved Mar. 29, 1996.

AMENDMENTS

2024—Subsec. (a)(1)(D). Pub. L. 118–97, § 2(b), struck out subpar. (D) which required Federal agencies to submit to the Comptroller General a report on rules that are revoked, suspended, replaced, amended, or otherwise made ineffective.

Pub. L. 118–97, § 2(a), added subpar. (D).

2023—Subsec. (a)(2)(A). Pub. L. 118–5, §§ 268, 270, temporarily inserted '', and shall in addition include an assessment of the agency's compliance with such requirements of the Administrative Pay-As-You-Go Act of 2023 as may be applicable'' after ''compliance with procedural steps required by paragraph (1)(B)''. See Termination Date of 2023 Amendment note below.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2024 AMENDMENT

Pub. L. 118–97, § 2(b), Oct. 1, 2024, 138 Stat. 1574, provided that the amendment made by section 2(b) is effective on the date that is 6 years after Oct. 1, 2024.

TERMINATION DATE OF 2023 AMENDMENT

Amendment by Pub. L. 118–5 expires on Dec. 31, 2024, see section 268 of Pub. L. 118–5, set out in a Statutory Administrative Pay-As-You-Go note under section 551 of this title.

EFFECTIVE DATE

Pub. L. 104–121, title II, § 252, Mar. 29, 1996, 110 Stat. 874, provided that: ''The amendment made by section 351 [probably means section 251, enacting this chapter] shall take effect on the date of enactment of this Act [Mar. 29, 1996].''

SHORT TITLE

This chapter is popularly known as the ''Congressional Review Act''.

TRUTH IN REGULATING

Pub. L. 106–312, Oct. 17, 2000, 114 Stat. 1248, as amended by Pub. L. 108–271, § 8(b), July 7, 2004, 118 Stat. 814, provided that:

''SECTION 1. SHORT TITLE.

''This Act may be cited as the 'Truth in Regulating Act of 2000'.

''SEC. 2. PURPOSES.

''The purposes of this Act are to—

''(1) increase the transparency of important regulatory decisions;

''(2) promote effective congressional oversight to ensure that agency rules fulfill statutory requirements in an efficient, effective, and fair manner; and

''(3) increase the accountability of Congress and the agencies to the people they serve.

''SEC. 3. DEFINITIONS.

''In this Act, the term—

''(1) 'agency' has the meaning given such term under section 551(1) of title 5, United States Code;

''(2) 'economically significant rule' means any proposed or final rule, including an interim or direct final rule, that may have an annual effect on the economy of $100,000,000 or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities; and

''(3) 'independent evaluation' means a substantive evaluation of the agency's data, methodology, and assumptions used in developing the economically significant rule, including—

''(A) an explanation of how any strengths or weaknesses in those data, methodology, and assumptions support or detract from conclusions reached by the agency; and

''(B) the implications, if any, of those strengths or weaknesses for the rulemaking.

''SEC. 4. PILOT PROJECT FOR REPORT ON RULES.

''(a) IN GENERAL.—

''(1) REQUEST FOR REVIEW.—When an agency publishes an economically significant rule, a chairman or ranking member of a committee of jurisdiction of either House of Congress may request the Comptroller General of the United States to review the rule.

''(2) REPORT.—The Comptroller General shall submit a report on each economically significant rule selected under paragraph (4) to the committees of jurisdiction in each House of Congress not later than 180 calendar days after a committee request is received. The report shall include an independent evaluation of the economically significant rule by the Comptroller General.

''(3) INDEPENDENT EVALUATION.—The independent evaluation of the economically significant rule by the Comptroller General under paragraph (2) shall include—

''(A) an evaluation of the agency's analysis of the potential benefits of the rule, including any beneficial effects that cannot be quantified in monetary terms and the identification of the persons or entities likely to receive the benefits;

''(B) an evaluation of the agency's analysis of the potential costs of the rule, including any adverse effects that cannot be quantified in monetary terms and the identification of the persons or entities likely to bear the costs;

''(C) an evaluation of the agency's analysis of alternative approaches set forth in the notice of proposed rulemaking and in the rulemaking record, as well as of any regulatory impact analysis, federalism assessment, or other analysis or assessment prepared by the agency or required for the economically significant rule; and

''(D) a summary of the results of the evaluation of the Comptroller General and the implications of those results.

"(4) PROCEDURES FOR PRIORITIES OF REQUESTS.—The Comptroller General shall have discretion to develop procedures for determining the priority and number of requests for review under paragraph (1) for which a report will be submitted under paragraph (2).

"(b) AUTHORITY OF COMPTROLLER GENERAL.—Each agency shall promptly cooperate with the Comptroller General in carrying out this Act. Nothing in this Act is intended to expand or limit the authority of the Government Accountability Office.

"SEC. 5. AUTHORIZATION OF APPROPRIATIONS.

"There are authorized to be appropriated to the Government Accountability Office to carry out this Act $5,200,000 for each of fiscal years 2000 through 2002.

"SEC. 6. EFFECTIVE DATE AND DURATION OF PILOT PROJECT.

"(a) EFFECTIVE DATE.—This Act and the amendments made by this Act shall take effect 90 days after the date of enactment of this Act [Oct. 17, 2000].

"(b) DURATION OF PILOT PROJECT.—The pilot project under this Act shall continue for a period of 3 years, if in each fiscal year, or portion thereof included in that period, a specific annual appropriation not less than $5,200,000 or the pro-rated equivalent thereof shall have been made for the pilot project.

"(c) REPORT.—Before the conclusion of the 3-year period, the Comptroller General shall submit to Congress a report reviewing the effectiveness of the pilot project and recommending whether or not Congress should permanently authorize the pilot project."

### § 802. Congressional disapproval procedure

(a) For purposes of this section, the term "joint resolution" means only a joint resolution introduced in the period beginning on the date on which the report referred to in section 801(a)(1)(A) is received by Congress and ending 60 days thereafter (excluding days either House of Congress is adjourned for more than 3 days during a session of Congress), the matter after the resolving clause of which is as follows: "That Congress disapproves the rule submitted by the ____ relating to ____, and such rule shall have no force or effect." (The blank spaces being appropriately filled in).

(b)(1) A joint resolution described in subsection (a) shall be referred to the committees in each House of Congress with jurisdiction.

(2) For purposes of this section, the term "submission or publication date" means the later of the date on which—

(A) the Congress receives the report submitted under section 801(a)(1); or

(B) the rule is published in the Federal Register, if so published.

(c) In the Senate, if the committee to which is referred a joint resolution described in subsection (a) has not reported such joint resolution (or an identical joint resolution) at the end of 20 calendar days after the submission or publication date defined under subsection (b)(2), such committee may be discharged from further consideration of such joint resolution upon a petition supported in writing by 30 Members of the Senate, and such joint resolution shall be placed on the calendar.

(d)(1) In the Senate, when the committee to which a joint resolution is referred has reported, or when a committee is discharged (under subsection (c)) from further consideration of a joint resolution described in subsection (a), it is at any time thereafter in order (even though a previous motion to the same effect has been disagreed to) for a motion to proceed to the consideration of the joint resolution, and all points of order against the joint resolution (and against consideration of the joint resolution) are waived. The motion is not subject to amendment, or to a motion to postpone, or to a motion to proceed to the consideration of other business. A motion to reconsider the vote by which the motion is agreed to or disagreed to shall not be in order. If a motion to proceed to the consideration of the joint resolution is agreed to, the joint resolution shall remain the unfinished business of the Senate until disposed of.

(2) In the Senate, debate on the joint resolution, and on all debatable motions and appeals in connection therewith, shall be limited to not more than 10 hours, which shall be divided equally between those favoring and those opposing the joint resolution. A motion further to limit debate is in order and not debatable. An amendment to, or a motion to postpone, or a motion to proceed to the consideration of other business, or a motion to recommit the joint resolution is not in order.

(3) In the Senate, immediately following the conclusion of the debate on a joint resolution described in subsection (a), and a single quorum call at the conclusion of the debate if requested in accordance with the rules of the Senate, the vote on final passage of the joint resolution shall occur.

(4) Appeals from the decisions of the Chair relating to the application of the rules of the Senate to the procedure relating to a joint resolution described in subsection (a) shall be decided without debate.

(e) In the Senate the procedure specified in subsection (c) or (d) shall not apply to the consideration of a joint resolution respecting a rule—

(1) after the expiration of the 60 session days beginning with the applicable submission or publication date, or

(2) if the report under section 801(a)(1)(A) was submitted during the period referred to in section 801(d)(1), after the expiration of the 60 session days beginning on the 15th session day after the succeeding session of Congress first convenes.

(f) If, before the passage by one House of a joint resolution of that House described in subsection (a), that House receives from the other House a joint resolution described in subsection (a), then the following procedures shall apply:

(1) The joint resolution of the other House shall not be referred to a committee.

(2) With respect to a joint resolution described in subsection (a) of the House receiving the joint resolution—

(A) the procedure in that House shall be the same as if no joint resolution had been received from the other House; but

(B) the vote on final passage shall be on the joint resolution of the other House.

(g) This section is enacted by Congress—

(1) as an exercise of the rulemaking power of the Senate and House of Representatives, respectively, and as such it is deemed a part of the rules of each House, respectively, but ap-

plicable only with respect to the procedure to be followed in that House in the case of a joint resolution described in subsection (a), and it supersedes other rules only to the extent that it is inconsistent with such rules; and

(2) with full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner, and to the same extent as in the case of any other rule of that House.

(Added Pub. L. 104–121, title II, § 251, Mar. 29, 1996, 110 Stat. 871.)

### § 803. Special rule on statutory, regulatory, and judicial deadlines

(a) In the case of any deadline for, relating to, or involving any rule which does not take effect (or the effectiveness of which is terminated) because of enactment of a joint resolution under section 802, that deadline is extended until the date 1 year after the date of enactment of the joint resolution. Nothing in this subsection shall be construed to affect a deadline merely by reason of the postponement of a rule's effective date under section 801(a).

(b) The term ''deadline'' means any date certain for fulfilling any obligation or exercising any authority established by or under any Federal statute or regulation, or by or under any court order implementing any Federal statute or regulation.

(Added Pub. L. 104–121, title II, § 251, Mar. 29, 1996, 110 Stat. 873.)

### § 804. Definitions

For purposes of this chapter—

(1) The term ''Federal agency'' means any agency as that term is defined in section 551(1).

(2) The term ''major rule'' means any rule that the Administrator of the Office of Information and Regulatory Affairs of the Office of Management and Budget finds has resulted in or is likely to result in—

(A) an annual effect on the economy of $100,000,000 or more;

(B) a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or

(C) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

The term does not include any rule promulgated under the Telecommunications Act of 1996 and the amendments made by that Act.

(3) The term ''rule'' has the meaning given such term in section 551, except that such term does not include—

(A) any rule of particular applicability, including a rule that approves or prescribes for the future rates, wages, prices, services, or allowances therefor, corporate or financial structures, reorganizations, mergers, or acquisitions thereof, or accounting practices or disclosures bearing on any of the foregoing;

(B) any rule relating to agency management or personnel; or

(C) any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties.

(Added Pub. L. 104–121, title II, § 251, Mar. 29, 1996, 110 Stat. 873.)

#### Editorial Notes

References in Text

The Telecommunications Act of 1996, referred to in par. (2), is Pub. L. 104–104, Feb. 8, 1996, 110 Stat. 56. For complete classification of this Act to the Code, see Short Title of 1996 Amendment note set out under section 609 of Title 47, Telecommunications, and Tables.

### § 805. Judicial review

No determination, finding, action, or omission under this chapter shall be subject to judicial review.

(Added Pub. L. 104–121, title II, § 251, Mar. 29, 1996, 110 Stat. 873.)

### § 806. Applicability; severability

(a) This chapter shall apply notwithstanding any other provision of law.

(b) If any provision of this chapter or the application of any provision of this chapter to any person or circumstance, is held invalid, the application of such provision to other persons or circumstances, and the remainder of this chapter, shall not be affected thereby.

(Added Pub. L. 104–121, title II, § 251, Mar. 29, 1996, 110 Stat. 873.)

### § 807. Exemption for monetary policy

Nothing in this chapter shall apply to rules that concern monetary policy proposed or implemented by the Board of Governors of the Federal Reserve System or the Federal Open Market Committee.

(Added Pub. L. 104–121, title II, § 251, Mar. 29, 1996, 110 Stat. 874.)

### § 808. Effective date of certain rules

Notwithstanding section 801—

(1) any rule that establishes, modifies, opens, closes, or conducts a regulatory program for a commercial, recreational, or subsistence activity related to hunting, fishing, or camping, or

(2) any rule which an agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rule issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest,

shall take effect at such time as the Federal agency promulgating the rule determines.

(Added Pub. L. 104–121, title II, § 251, Mar. 29, 1996, 110 Stat. 874.)

## CHAPTER 9—EXECUTIVE REORGANIZATION

Sec.
901. Purpose.

### § 7543. State standards

#### (a) Prohibition

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

#### (b) Waiver

(1) The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiver shall be granted if the Administrator finds that—

(A) the determination of the State is arbitrary and capricious,

(B) such State does not need such State standards to meet compelling and extraordinary conditions, or

(C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

(2) If each State standard is at least as stringent as the comparable applicable Federal standard, such State standard shall be deemed to be at least as protective of health and welfare as such Federal standards for purposes of paragraph (1).

(3) In the case of any new motor vehicle or new motor vehicle engine to which State standards apply pursuant to a waiver granted under paragraph (1), compliance with such State standards shall be treated as compliance with applicable Federal standards for purposes of this subchapter.

#### (c) Certification of vehicle parts or engine parts

Whenever a regulation with respect to any motor vehicle part or motor vehicle engine part is in effect under section 7541(a)(2) of this title, no State or political subdivision thereof shall adopt or attempt to enforce any standard or any requirement of certification, inspection, or approval which relates to motor vehicle emissions and is applicable to the same aspect of such part. The preceding sentence shall not apply in the case of a State with respect to which a waiver is in effect under subsection (b).

#### (d) Control, regulation, or restrictions on registered or licensed motor vehicles

Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles.

#### (e) Nonroad engines or vehicles

##### (1) Prohibition on certain State standards

No State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from either of the following new nonroad engines or nonroad vehicles subject to regulation under this chapter—

(A) New engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower.

(B) New locomotives or new engines used in locomotives.

Subsection (b) shall not apply for purposes of this paragraph.

##### (2) Other nonroad engines or vehicles

(A) In the case of any nonroad vehicles or engines other than those referred to in subparagraph (A) or (B) of paragraph (1), the Administrator shall, after notice and opportunity for public hearing, authorize California to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such authorization shall be granted if the Administrator finds that—

(i) the determination of California is arbitrary and capricious,

(ii) California does not need such California standards to meet compelling and extraordinary conditions, or

(iii) California standards and accompanying enforcement procedures are not consistent with this section.

(B) Any State other than California which has plan provisions approved under part D of subchapter I may adopt and enforce, after notice to the Administrator, for any period, standards relating to control of emissions from nonroad vehicles or engines (other than those referred to in subparagraph (A) or (B) of paragraph (1)) and take such other actions as are referred to in subparagraph (A) of this paragraph respecting such vehicles or engines if—

(i) such standards and implementation and enforcement are identical, for the period concerned, to the California standards authorized by the Administrator under subparagraph (A), and

(ii) California and such State adopt such standards at least 2 years before commencement of the period for which the standards take effect.

The Administrator shall issue regulations to implement this subsection.

(July 14, 1955, ch. 360, title II, § 209, formerly § 208, as added Pub. L. 90–148, § 2, Nov. 21, 1967, 81 Stat. 501; renumbered and amended Pub. L. 91–604, §§ 8(a), 11(a)(2)(A), 15(c)(2), Dec. 31, 1970, 84 Stat. 1694, 1705, 1713; Pub. L. 95–95, title II, §§ 207, 221, Aug. 7, 1977, 91 Stat. 755, 762; Pub. L. 101–549, title II, § 222(b), Nov. 15, 1990, 104 Stat. 2502.)