**ORAL ARGUMENT NOT YET SCHEDULED**

**Nos. 26-5330, 26-5336 (consolidated)**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

STATE OF CALIFORNIA,
*Plaintiff-Appellee,*

v.

ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Defendants-Appellants.*

and

AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, *et al.*,
*Intervenor-Defendants-Appellants.*

On Appeal from the U.S. District Court for the District of Columbia
No. 1:26-cv-2185-BAH (Hon. Beryl A. Howell)

# BRIEF OF AMICI CURIAE STATE OF WEST VIRGINIA AND 23 OTHER STATES IN SUPPORT OF DEFENDANTS-APPELLANTS AND VACATUR

JOHN B. MCCUSKEY
*Attorney General*

OFFICE OF THE WEST
VIRGINIA ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
mwilliams@wvago.gov

MICHAEL R. WILLIAMS
*Solicitor General*
*Counsel of Record*

MADISON T. CASH
*Assistant Solicitor General*

*Counsel for Amicus Curiae State of West Virginia*
[additional counsel listed after signature page]

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), amici curiae States of West Virginia, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming submit this certificate as to parties, rulings, and related cases.

### A. Parties and Amici

The State of California was the Plaintiff in the district court and Appellee here. The Environmental Protection Agency and Lee M. Zeldin, in his official capacity as Administrator of the United States Environmental Protection Agency, were Defendants in the district court and Appellants here. American Fuel & Petrochemical Manufacturers and American Petroleum Institute were Intervenor-Defendants in the district court and Appellants here.

Amici here are the States of West Virginia, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming.

**B. Rulings Under Review**

The primary rulings under review in this appeal are: (1) the opinion and order, entered on September 2, 2026, that grant California's motion for a preliminary injunction and deny EPA's motion to dismiss as to four waivers, *California v. EPA*, No. CV 1:26cv2185 (BAH), ECF Nos. 45, 46 (D.D.C. Sept. 2, 2026)(Howell, J.) and (2) the order, entered on September 12, 2026, granting California's motion for a preliminary injunction *California v. EPA*, No. CV 1:26cv2185 (BAH), ECF No. 55 (D.D.C. Sept. 12, 2026) (Howell, J.). The opinion of the district court has not been published in the Federal Supplement but is available at 2026 WL 2593640. Defendants-Appellants have filed that decision at Document # 2194386.

**C. Related Cases**

Defendants-Appellants have identified *California v. EPA,* No. 26-1218, ECF 2187882 and *California v. EPA*, No. 26-1246, as related cases. *See* Case No. 26-5330, Document #2197871. They have also identified *California v. EPA*, No. 26-5143 (9th Cir.) and *California v. EPA*, No. 26-6109 (9th Cir.) as related cases. All cases are being held in abeyance pending the outcome of the instant case. See *California v. EPA*, No. 26-1218 (D.C. Cir.), ECF 2190992; *California v. EPA*, No. 26-1246 (D.C. Cir.), ECF 2196572; *California v. EPA*,

No. 5143 (9th Cir.), ECF 19.1; *California v. EPA*, No. 26-6109 (9th Cir.), ECF 15.1.

/s/ Michael R. Williams
Michael R. Williams

*Counsel for Amicus Curiae*
*State of West Virginia*

Dated: Nov. 4, 2026

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................... v

GLOSSARY .................... v

INTRODUCTION AnD INTERESTS OF AMICI CURIAE .................... 1

SUMMARY OF THE ARGUMENT .................... 3

ARGUMENT .................... 5

I. The Injunctions Override Congress's Determination That California's Waivers Are Subject To Congressional Review .................... 5

  A. Congress has the constitutional and statutory authority to decide whether and how to review agency action .................... 6

  B. Congress already decided that Clean Air Act waivers are subject to CRA review in 2025 .................... 10

  C. EPA followed Congress's lead in submitting the six waivers on significant, national issues to Congress .................... 13

II. The District Court Erred In Allowing The Case To Proceed .................... 16

  A. California lacks standing to bring this suit .................... 17

  B. This case shows why a court can't second-guess an agency's decision to submit a rule to Congress .................... 19

CONCLUSION .................... 25

ADDITIONAL COUNSEL .................... 26

CERTIFICATE OF COMPLIANCE .................... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Hosp. Ass'n v. Azar*,
964 F.3d 1230 (D.C. Cir. 2020)....................22

*Amgen, Inc. v. Smith*,
357 F.3d 103 (D.C. Cir. 2004)....................22

*Ardelyx, Inc. v. Kennedy*,
179 F.4th 947 (D.C. Cir. 2026)....................22

*Coll. Sports Council v. Gov't Accountability Off.*,
421 F. Supp. 2d 59 (D.D.C. 2006)....................20, 21

*COMSAT Corp. v. FCC*,
114 F.3d 223 (D.C. Cir. 1997)....................22

*Ctr. for Biological Diversity v. Bernhardt*,
946 F.3d 553 (9th Cir. 2019)....................12

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025)....................11, 12, 13

*INS v. Chadha*,
462 U.S. 919 (1983)....................10, 19

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)....................6

*Mistretta v. United States*,
488 U.S. 361 (1989)....................6

*Montanans for Multiple Use v. Barbouletos*,
568 F.3d 225 (D.C. Cir. 2009)....................2, 19, 21

*Mullin v. Doe*,
609 U.S. 324 (2026)....................23

*Murthy v. Missouri*,
603 U.S. 43 (2024)....................19

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
366 F.3d 930 (D.C. Cir. 2004)....................19

*NRC v. Texas*,
605 U.S. 665 (2025) .......... 24

*NRDC v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) .......... 2, 20, 21, 24

*Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
489 F.3d 1267 (D.C. Cir. 2007) .......... 18

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978) .......... 6

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 17

*Trump v. California*,
609 U.S. 1032 (2026) .......... 18

*United States v. Ballin*,
144 U.S. 1 (1892) .......... 10

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
892 F.3d 332 (D.C. Cir. 2018) .......... 15, 20

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 16

**Constitutional Provisions**

U.S. CONST. art. I, § 1 .......... 6

U.S. CONST. art. I, § 5, cl. 2 .......... 10

U.S. CONST. art. I, § 7, cl. 3 .......... 19

**Statutes**

5 U.S.C. § 551 .......... 7

5 U.S.C. § 801 .......... 12

5 U.S.C. § 802 .......... 7, 9, 10

5 U.S.C. § 804 .......... 7

5 U.S.C. § 805 .......... 1, 2, 4, 9, 19, 21, 22, 24

42 U.S.C. § 7543 ....................................................................................11
Act of Apr. 27, 2026, Pub. L. No. 119-85 ..........................................................8, 12
Act of June 12, 2025, Pub. L. No. 119-15, 139 Stat. 65......................................12
Act of June 12, 2025, Pub. L. No. 119-16, 139 Stat. 66......................................12
Act of June 12, 2025, Pub. L. No. 119-17, 139 Stat. 67......................................12
Act of May 21, 2018, Pub. L. No. 115-172, 132 Stat. 1290 ...................................8

**Other Authorities**

170 CONG. REC. S146 (daily ed. Jan. 17, 2024)......................................................9
170 CONG. REC. S5883 (daily ed. Sept. 9, 2024) ....................................................8
171 CONG. REC. S3051 (daily ed. May 21, 2025) ..................................................12
171 CONG. REC. S3088 (daily ed. May 21, 2025) ...........................................14, 16
74 Fed. Reg. 32,744 (July 8, 2009)..........................................................................13
78 Fed. Reg. 2112 (Jan. 9, 2013)..............................................................................13
87 Fed. Reg. 14,332 (Mar. 14, 2022)........................................................................13
88 Fed. Reg. 20,688 (Apr. 6, 2023) ..........................................................................11
88 Fed. Reg. 72,461 (Oct. 20, 2023) ........................................................................13
90 Fed. Reg. 640 (Jan. 6, 2025)...........................................................................11, 13
90 Fed. Reg. 1998 (Jan. 10, 2025)............................................................................13
ALL. FOR AUTO. INNOVATION,
GET CONNECTED EV QUARTERLY REPORT 2026 Q1 (2026),
https://perma.cc/R3P5-X95J ...............................................................................15
Bradford R. Clark,
*Separation of Powers As A Safeguard of Federalism*,
79 TEX. L. REV. 1321 (2001).................................................................................2
CAL. AIR RES. BD.,
MANUFACTURERS ADVISORY CORRESPONDENCE ECCD-2025-
08 (2025), https://perma.cc/ES5W-EK72 .........................................................25

Letter from Mike Stanton,
President and CEO, Nat'l Auto. Dealers Ass'n, to Congress
(Apr. 28, 2025), https://perma.cc/FSB2-P8QH ........................................16

Paul J. Larkin, Jr.,
*Reawakening the Congressional Review Act*,
41 HARV. J.L. & PUB. POL'Y 187 (2018) .......................................................6

*Six States Account for More than 70% of U.S. Fuel Ethanol Production*,
U.S. ENERGY INFO. ADMIN. (Aug. 15, 2025),
https://perma.cc/FB54-9F3Y ........................................................................14

*States That Have Adopted California's Vehicle Regulations*,
CAL. AIR RES. BD.,
https://perma.cc/AG5L-GZFN (last updated Apr. 2025) ............................11

U.S. ENERGY INFO. ADMIN.,
MONTHLY ENERGY REVIEW (Oct. 2026),
https://tinyurl.com/yb4tympa .......................................................................14

U.S. GOV'T ACCOUNTABILITY OFF.,
B-329272, APPLICABILITY OF THE CONGRESSIONAL REVIEW ACT TO BULLETIN ON INDIRECT AUTO LENDING AND COMPLIANCE WITH THE EQUAL CREDIT OPPORTUNITY ACT
(2017) .............................................................................................................7

U.S. GOV'T ACCOUNTABILITY OFF.,
B-325553, GAO'S ROLE AND RESPONSIBILITIES UNDER THE CONGRESSIONAL REVIEW ACT 9 (2014)..........................................................1

*West Virginia State Profile and Energy Estimates*,
U.S. ENERGY INFO. ADMIN., https://tinyurl.com/4e3ynaz5
(last updated Mar. 19, 2026) .........................................................................15

*Wyoming State Profile and Energy Estimates*,
U.S. ENERGY INFO. ADMIN., https://tinyurl.com/5axxukcx
(last updated July 17, 2025) ..........................................................................15

Yeon Baik, et al.,
*Making Electric Vehicles Profitable*,
MCKINSEY & CO. (Mar. 8, 2019), https://perma.cc/ZK49-AK3E ................15

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EPA | Environmental Protection Agency |
| CRA | Congressional Review Act |
| GAO | United States Government Accountability Office |
| OMB | Office of Management and Budget |
| CAA | Clean Air Act |

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

Last year, Congress and the Government Accountability Office disagreed about whether California's Clean Air Act waivers are "rules" that Congress may review under the Congressional Review Act. The GAO said no. Congress said yes—in the one way that counts. It passed three joint resolutions through both Houses and sent them to the President, who signed them into law. That process should have settled the question. After all, under the CRA, it is "le[ft] … to Congress to decide whether CRA would apply" to a given action. U.S. GOV'T ACCOUNTABILITY OFF., B-325553, GAO'S ROLE AND RESPONSIBILITIES UNDER THE CONGRESSIONAL REVIEW ACT 9 (2014). And no "determination, finding, action, or omission under" the statute "shall be subject to judicial review." 5 U.S.C. § 805.

Although Congress appeared to have resolved the dispute, the district court here reopened it anyway. When EPA treated six more California waivers the same way Congress had treated the first three, the court sided with the GAO over Congress. It held that the waivers "cannot be rules." JA0700-01. So it ordered EPA to retract what it had told Congress and say nothing of the kind again. *See* JA0636-37. The court did so by invoking the Take Care Clause against the agency, JA0707—concluding an executive

agency can violate the Constitution by conforming its conduct to Congress's own reading of a statute that Congress wrote for its own use.

The district court also raced to its answers even though it shouldn't have reached the CRA questions in the first place. California's claimed injuries depend on what Congress, the President, and (perhaps someday) EPA might do. That's too speculative. And an order telling EPA to edit a press release doesn't redress the harms. What's more, this Court has already held that Section 805—the provision barring judicial review—is "unequivocal." *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (Kavanaugh, J.). And reporting to Congress is "quintessentially within the province of the political branches." *NRDC v. Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988) (R.B. Ginsburg, J.). Yet the district court gave no meaning to those admonitions, instead assuming these reporting functions as its own.

Amici States have a direct stake in making sure the right branch gets the last word. "[F]ederal action that violates the Constitution's separation of powers may also invade rights which are reserved by the Constitution to the several states." Bradford R. Clark, *Separation of Powers As A Safeguard of Federalism*, 79 TEX. L. REV. 1321, 1324 (2001) (cleaned up). That's just so here, as California's waivers don't stay in California. Seventeen other States

and the District of Columbia have adopted versions of them. *See* JA0639. And because of California's dominant market position, manufacturers often build to California's standards nationwide—raising prices and narrowing choices for drivers, farmers, and small businesses in every State. *See* JA0646-47.

Although Amici's citizens had no vote in Sacramento, they do in Washington. And the CRA exists in part so that the elected representatives of all fifty States can weigh national policy of this kind. The court below wrongly deprived States of their means of weighing in just because one State complained about having to justify itself to the nation. This Court should now vacate the injunctions and remand with instructions to dismiss.

## SUMMARY OF THE ARGUMENT

**I.** The injunctions override Congress's determination that California's waivers are subject to congressional review. In 2025, Congress exercised its Article I powers to decide a question that Congress (through the CRA) had kept for itself: whether California's Clean Air Act waivers are "rules" subject to congressional review. Congress confirmed these waivers were rules. And it then disapproved three waivers by joint resolutions the President signed into law. When EPA submitted six materially indistinguishable waivers in 2026, EPA did not reclassify anything on its own authority. Rather, it honored

Congress's judgment from just last year. The injunctions below, on the other hand, substitute a single district court's classification for Congress's. In doing so, the court disabled the mechanism Congress built so that the elected representatives of every State can review policies that reach far beyond California's borders. And it did so even though CAA waivers have significant, national consequences.

**II.** Threshold defects should have compelled the district court to dismiss this case before it even reached the CRA.

Most obviously, California lacks standing. The relevant waivers are still in force, and EPA hasn't yet proposed to withdraw them. The injuries the court credited—lost procedures in a withdrawal proceeding that does not exist, and money spent preparing for one—rest on a chain of contingencies that may never happen. Contingencies don't create standing. And California sought refuge in those tenuous theories because the injury it actually fears—congressional disapproval—flows from actions the court cannot enjoin, as the court itself acknowledged. Meanwhile, an order directing EPA to correct a press release redresses none of the things that concern California.

Even if one could overlook the standing problem, Section 805 forecloses this suit. EPA did one thing: it determined that the waivers are rules and

reported them to Congress "under" the CRA. That decision is a "determination" and an "action" the statute places beyond judicial review, as this Court has twice held. The district court's "reclassification" theory finds no footing in the text. Instead, it rests on distinguishable cases construing narrow bars tied to specific statutory authority. And it ignores *Hodel*'s teaching that an agency reporting to Congress is not exercising the kind of power courts presume to review. California can't evade those limitations by recasting its disagreement over the CRA's definition of "rule" as an ultra vires claim, either.

## ARGUMENT

### I. The Injunctions Override Congress's Determination That California's Waivers Are Subject To Congressional Review.

The district court closed its opinion by reminding EPA of its obligation to "take Care that the Laws be faithfully executed," JA0707 (quoting U.S. CONST. art. II, § 3)—but it then enjoined the agency from doing exactly that. The "Laws" include the three joint resolutions Congress enacted in 2025, which Congress could pass only after concluding that California's waivers are rules within the CRA's meaning. An executive agency that conforms its reporting practice to Congress's settled construction of the CRA is not defying

the law. It is respecting how the CRA makes Congress the final arbiter of its own coverage.

### A. Congress has the constitutional and statutory authority to decide whether and how to review agency action.

Article I gives Congress the "exclusive province … to formulate legislative policies and mandate programs and projects … [and] to establish their relative priority for the Nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978); U.S. CONST. art. I, § 1. Congress may enlist "the assistance of its coordinate Branches," within limits. *Mistretta v. United States*, 488 U.S. 361, 372 (1989). But an "agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). And when an agency exceeds its power, Congress can step in at any time to correct course, using the procedures it deems best.

So Congress has "significant general legislative authority at its disposal to act," and the CRA is one of the vehicles by which Congress can "prohibit agency actions using its full panoply of powers." GAO'S ROLE AND RESPONSIBILITIES, *supra*, at 9. The law "enables Congress to expeditiously nullify administrative rules that it finds unauthorized, unnecessary, or unwise before they can go into effect." Paul J. Larkin, Jr., *Reawakening the Congressional Review Act*, 41 HARV. J.L. & PUB. POL'Y 187, 197-98 (2018).

Agencies must submit rules—any agency statement of general applicability and future effect designed to implement, interpret, or prescribe law or policy—to Congress to enable its review. 5 U.S.C. §§ 804(3), 551(4).

Although the CRA references the APA's definition of an agency rule, "the class of rules covered by the CRA is broader" than those subject to the APA's notice-and-comment procedures, JA0113, JA0118, like "guidance documents," U.S. GOV'T ACCOUNTABILITY OFF., B-329272, APPLICABILITY OF THE CONGRESSIONAL REVIEW ACT TO BULLETIN ON INDIRECT AUTO LENDING AND COMPLIANCE WITH THE EQUAL CREDIT OPPORTUNITY ACT (2017). Further, "an agency's characterization is not determinative of whether [the agency regulation] is a rule under [the] CRA." *Id.* at 3. Instead, the CRA's statutory scheme "leaves it to Congress to decide whether CRA would apply to" a certain regulation. GAO'S ROLE AND RESPONSIBILITIES, *supra*, at 9. And the CRA explicitly states that Congress can decide not just *when*, but *how*, to use the CRA, based on its "constitutional right … to change the rules … at any time, in the same manner, and to the same extent" as it may change other procedural rules under its rulemaking power. 5 U.S.C. § 802(g)(2). So the district court's contrary premise—that an action not issued through notice and comment 'cannot be' a rule for CRA purposes, JA0700-01—would read

guidance documents and interpretive rules out of a statute Congress wrote to reach them. *See* API Br. 54-55.

Agencies don't get to dictate how Congress reviews their actions and "rules." Because the CRA is an extension of Congress's own legislative and rulemaking power, Congress need not wait for an agency to comply with the CRA's statutory requirements to evaluate whether a particular agency action constitutes a rule. Since enacting the CRA, Congress has reviewed actions agencies never submitted and has issued joint resolutions of disapproval as to those actions years after the actions became final. *See, e.g.*, Act of May 21, 2018, Pub. L. No. 115-172, 132 Stat. 1290 (disapproving a 2013 Consumer Financial Protection Bureau guidance document that had not been submitted to Congress); Act of Apr. 27, 2026, Pub. L. No. 119-85, 140 Stat. 772 (overturning Public Land Opinion 7917, issued in January 2023); JA0135, JA0137-38 (CRS report). Agencies—including EPA—have also submitted at least fifteen of their own actions to Congress under the CRA "out of an abundance of caution," even if they disagreed about whether the action constituted a rule under the CRA. *See, e.g.*, 170 CONG. REC. S5883 (daily ed. Sept. 9, 2024) (EC-5696) ("EPA disagrees with GAO's broader reading of the Congressional Review Act" but submits "this action" "out of an abundance of

caution"); *see also* 170 CONG. REC. S146 (daily ed. Jan. 17, 2024) (EC-3319) (noting that "OMB has concluded that this memorandum is not a 'rule'" under the CRA, but submitted it for review "out of an abundance of caution"). But in no case does the agency itself have authority over disapproval.

Throughout its opinion, the district court made plain that it was uncomfortable with this arrangement. It described EPA's submissions as efforts "to bypass normal administrative and legislative processes" through "the CRA's expedited congressional procedure." JA0640-41. It credited California's warning that honoring Section 805 would let "Congress and the Executive Branch" disregard "statutory limitations" in "a joint effort to invalidate regulatory expectations of long-standing reliance." JA0672. And it reserved the power to review any "scheme to use the CRA to undo expeditiously" prior agency action. JA0679. At argument, the court contrasted ordinary legislation—"hearings," "filibusters," "floor time"—with a CRA process that is "expedited," "fast," and "quick," so that Congress "can just bypass it." JA0834.

But speed was an intentional congressional choice—one that the court wasn't free to question. Congress wrote the fast-track procedures "as an exercise of the rulemaking power of the Senate and House," 5 U.S.C. § 802(g),

a power the Constitution commits to each House alone, U.S. CONST. art. I, § 5, cl. 2. When both Houses pass a joint resolution and present it to the President, that process satisfies every requirement Article I imposes on lawmaking. *See INS v. Chadha*, 462 U.S. 919, 951 (1983). Hearings, filibusters, and floor time are not among those requirements. Congress can even "disregard" a limitation on the CRA's reach because the only limitation would be one Congress wrote and may "change ... at any time." 5 U.S.C. § 802(g). A court that finds the CRA's pace unsettling has a quarrel with Congress's rules of proceeding—and "it is no impeachment of the rule to say that some other way would be better, more accurate, or even more just." *United States v. Ballin*, 144 U.S. 1, 5 (1892).

### B. Congress already decided that Clean Air Act waivers are subject to CRA review in 2025.

It was particularly wrong for the district court to assert control over the CRA process here, where Congress had specifically engaged with these same actions before. That story starts in 2025, when Congress used the CRA to disapprove three similar waivers that gave California too much power under the Clean Air Act.

Start with the CAA basics. The CAA preempts most state regulations governing emissions, but California enjoys preemption waivers that allow it to

enact stricter emissions standards for new motor vehicles. 42 U.S.C. § 7543(b)(1). Other States can adopt California's stringent emissions standards. *Id.* § 7507. The CAA directs EPA to only grant these waivers to California to address "compelling and extraordinary conditions" caused by its specialized regional and local air pollution issues. *Id.* § 7543(b)(1)(B).

In 2023, and again in 2025, EPA granted California waivers that allowed it and 11 other States to impose sweeping emissions standards and force electrification of its new vehicle fleet to "address global climate change" caused by greenhouse gas emissions. 88 Fed. Reg. 20,688 (Apr. 6, 2023); 90 Fed. Reg. at 640, 643 (Jan. 6, 2025); *States That Have Adopted California's Vehicle Regulations*, CAL. AIR RES. BD., https://perma.cc/AG5L-GZFN (last updated Apr. 2025); *see Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 107 (2025) (noting that California has attempted to enact similar regulations since 2005, with varying success). EPA initially approved these waivers without submitting them to Congress despite the serious consequences they posed for other States' economies and consumers. In February 2025, under new leadership, EPA sent all three waivers to Congress for review. *See* JA0181, JA0742.

Given the national impact of the waivers, the Senate decided that it could consider the three waivers as rules under the CRA. *See* 171 CONG. REC. S3051 (daily ed. May 21, 2025) (Senate vote treating the waivers as rules subject to the CRA's expedited procedures); JA0652. Congress then passed joint resolutions of disapproval of those waivers, which the President signed into law. *See* Act of June 12, 2025, Pub. L. No. 119-15, 139 Stat. 65; Act of June 12, 2025, Pub. L. No. 119-16, 139 Stat. 66; Act of June 12, 2025, Pub. L. No. 119-17, 139 Stat. 67.

Once signed into law, those resolutions stripped EPA's three waivers of legal effect, and EPA may not reissue a rule "substantially the same" as any of them. *See* 5 U.S.C. § 801(b)(1)–(2). The resolutions are "legislation," *Diamond Alt. Energy*, 606 U.S. at 107 n.1, "enforceable as a change to substantive law," *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 562 (9th Cir. 2019). And they rest on a premise Congress adopted after full debate in both Houses: that Section 209 waivers are rules subject to the CRA. Nothing in the CRA permits an agency to disregard that judgment the next time a materially identical waiver comes into view. Just the opposite: the CRA anticipates agencies will consider past disapprovals when regulating anew.

### C. EPA followed Congress's lead in submitting the six waivers on significant, national issues to Congress.

EPA's 2026 submissions did no more than treat like waivers alike. This year, EPA submitted six more greenhouse-gas-related waivers—each granted by a prior administration, and each indistinguishable in kind from the three Congress disapproved in 2025.

Just like those disapproved by Congress in 2025, each of the six waivers at issue imposes unworkable emissions standards with national reach that push manufacturers toward electric vehicles and disadvantage other States. They set sweeping greenhouse gas standards for motor vehicles and ocean-going vessels, cleaner-engine requirements for commercial harbor craft, and zero-emission mandates for small engines (including yard equipment), passenger cars, and light trucks. *See, e.g.*, 74 Fed. Reg. 32,744 (July 8, 2009); 78 Fed. Reg. 2112 (Jan. 9, 2013); 87 Fed. Reg. 14,332 (Mar. 14, 2022); 88 Fed. Reg. 72,461 (Oct. 20, 2023); 90 Fed. Reg. 1998 (Jan. 10, 2025); 90 Fed. Reg. 640 (Jan. 6, 2025). And their burden doesn't stop at California's border. "[T]he whole point" of California's regulations is to reduce purchases of liquid fuels and "force ... electrification" of new vehicle fleets. *Diamond Alt. Energy,* 606 U.S. at 114. Because seventeen additional States and the District of Columbia have opted to follow many of these California regulations, JA0639, these

regulations impose painful effects nationally. Vehicle, boat, and small engine equipment manufacturers are all pressured to electrify their fleets and reduce reliance on traditional fossil fuels to avoid greenhouse gas emissions.

Amici States, many of which are the Nation's primary producers of crude oil and ethanol, are hit the hardest. Today, fossil fuels account for more than 83% of American energy production and keep Amici States' economies afloat. *See* U.S. ENERGY INFO. ADMIN., MONTHLY ENERGY REVIEW (Oct. 2026), https://tinyurl.com/yb4tympa; *see also, e.g.*, *Six States Account for More than 70% of U.S. Fuel Ethanol Production*, U.S. ENERGY INFO. ADMIN. (Aug. 15, 2025), https://perma.cc/FB54-9F3Y. Decreased reliance on gasoline production would cause fuel workers in Amici States to lose jobs on a massive scale. Manufacturing companies would no doubt relocate their operations to unregulated foreign locations, while vehicles, lawn equipment, and boats that rely on petroleum-based fuels would be phased out of the market. *See* JA0499-0500, JA0512-14; *see also* 171 CONG. REC. S3088 (daily ed. May 21, 2025) (statement of Sen. Capito). Similarly, increased electrification of vehicles reduces demand for all traditional fuels in exchange for renewable energy, hurting Amici States, like West Virginia and Wyoming, that rely on coal and natural gas as the basis of their economies. *West Virginia State Profile and*

*Energy Estimates*, U.S. ENERGY INFO. ADMIN., https://tinyurl.com/4e3ynaz5 (last updated Mar. 19, 2026); *Wyoming State Profile and Energy Estimates*, U.S. ENERGY INFO. ADMIN., https://tinyurl.com/5axxukcx (last updated July 17, 2025).

Beyond their effects on the targeted industries, the six waivers at issue here also saddle Amici States' consumers with higher costs and fewer choices when they buy the vehicles their livelihoods depend on. Right now, electric vehicles make up only 6.3% of all new light-duty vehicle sales (and a mere 1.3% of sales in States like West Virginia). *See* ALL. FOR AUTO. INNOVATION, GET CONNECTED EV QUARTERLY REPORT 2026 Q1, at 1, 10 (2026), https://perma.cc/R3P5-X95J. The reasons aren't mysterious. Many consumers cannot conveniently charge them, given the financial and geographic hurdles of building charging infrastructure and generation capacity. And because electric vehicles cost thousands more to produce than comparable gas-powered vehicles, manufacturers struggle to recoup those costs and use cross-subsidies that raise prices on conventional vehicles. Yeon Baik, et al., *Making Electric Vehicles Profitable*, MCKINSEY & CO. (Mar. 8, 2019), https://perma.cc/ZK49-AK3E. California's electrification mandates force automakers either to sell more electric vehicles, regardless of consumer

demand, or to ration conventional vehicles in every State. Letter from Mike Stanton, President and CEO, Nat'l Auto. Dealers Ass'n, to Congress 2 (Apr. 28, 2025), https://perma.cc/FSB2-P8QH. That means every vehicle buyer, even those who do not want electric vehicles, absorbs a markup.

In sum, the six waivers at issue here would harm the economies, workers, and consumers of Amici States, who "had no say in California and EPA's decision to impose [these] mandate[s] nationwide." 171 CONG. REC. S3088 (daily ed. May 21, 2025) (statement of Sen. Capito). But in submitting them, EPA ensured that Congress could decide whether those costs are worth bearing. "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)). The CRA exists to keep decisions of that magnitude with Congress. The injunctions take the decision away from Congress and hand it to another unelected actor—a single district court.

## II. The District Court Erred In Allowing The Case To Proceed.

The district court lacked authority to issue an injunction at all. Congress and the President, not EPA, hold the power to invalidate the waivers under

the CRA, so California lacks standing to sue EPA. And the CRA itself bars judicial review of agency compliance with its requirements. This case shows the dangers of ignoring those jurisdictional limits.

**A. California lacks standing to bring this suit.**

The district court held that EPA deprived California of procedural protections, constituting an "actual or imminent" injury sufficient for Article III standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); JA0690-91. It also found that California spent resources "in response to EPA's [alleged] threats" to the waivers. JA0693-94.

But the court assumed, without basis, that EPA's CRA reports amounted to an administrative withdrawal of the waivers (or a "threat" of one). *See* JA0686. That assumption misapprehends the CRA's function. A CRA report changes nothing about a waiver's legal force while Congress reviews it. And whatever procedures would govern a future withdrawal—and EPA has long maintained that Section 209(b)'s notice-and-hearing process, not the APA's license provisions, applies, *see* EPA Br. 22-23—none is implicated now, because EPA hasn't proposed any withdrawal.

Absent any concrete step towards administrative withdrawal, the procedural injury found below rests on conjecture. Similarly, concluding that

EPA *will* withdraw the waivers in a way that harms California requires a court to speculate about when and how EPA would act and whether it would deny California the chance to cure any defects in the waivers. That speculation remains "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. California*, 609 U.S. 1032, 1039 (2026) (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020)). For the same reasons, California cannot claim it "preemptively concretize[d] [its] injury" by spending money to develop new air regulations in response to EPA's hypothetical future action. "[C]osts cannot establish standing when the final rule remains a 'hypothetical future harm that is not certainly impending.'" *Id.* at 1039-40 (cleaned up).

More importantly, the court never explained how its order redresses anything. The waivers' "status quo is held in place by other forces." *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007). The court conceded as much: EPA's reports are a "fait accompli," and the court "lacks power to compel Congress to return or disregard" them. JA0694-95. So it enjoined what it could reach—EPA's press releases and future "reclassifications." JA0636-37. But an order to "correct" a press release guarantees California no procedure in a withdrawal proceeding

that has not been proposed, and it returns none of the money California says it has spent. *See* API Br. 39-40. And enjoining reclassifications only purports to stop what might've never happened at all.

California retreated to these standing theories only because the injury it actually fears—disapproval—flows from a branch the court cannot enjoin. Whether Congress acts is Congress's choice, and any resolution must still clear bicameralism and presentment. U.S. CONST. art. I, § 7, cl. 3; *Chadha*, 462 U.S. at 956-58. A theory that depends on "how independent decisionmakers will exercise their judgment" cannot carry California's burden. *Murthy v. Missouri*, 603 U.S. 43, 57-58 (2024) (cleaned up); *see also Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 939-40 (D.C. Cir. 2004).

### B. This case shows why a court can't second-guess an agency's decision to submit a rule to Congress.

Standing aside, California's action also runs headlong into a jurisdiction-stripping provision. The CRA bars judicial review of any "determination, finding, action, or omission" under its provisions. 5 U.S.C. § 805. This Court has called that bar "unequivocal" in its preclusion of review over claims based on "agency noncompliance" with the CRA. *Montanans for Multiple Use*, 568 F.3d at 229 (declining to review claims that an agency failed to submit actions

as rules under the CRA); *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 346 (D.C. Cir. 2018) (declining to consider whether an agency published a rule before allowing full time for CRA review).

This judicial review bar makes sense considering the principles that animate the separation of powers. A congressional reporting statute like the CRA is a "management tool employed by Congress for its own purposes." *Hodel*, 865 F.2d at 319. So Congress, not the courts, decides whether an agency fulfilled its reporting duties absent a judicial review provision. *Id.* Applying these principles, courts in this circuit have stressed that "it is exclusively Congress' prerogative to determine whether [a] challenged report satisfied the requirements of" the statute, at least "[w]here a report is 'not explicitly or implicitly intended as anything more than a vehicle to inform Congress.'" *Coll. Sports Council v. Gov't Accountability Off.*, 421 F. Supp. 2d 59, 68 (D.D.C. 2006) (cleaned up). And for that reason, the presumption of judicial review that usually applies when an agency exercises legislative or adjudicatory power does *not* apply when an agency is "simply reporting back to the source of its delegated power in accordance with the Article I branch's instructions." *Hodel*, 865 F.2d at 318.

The district court nonetheless held that whether EPA "*correctly* characterized" the waivers as rules "falls outside the Section 805 judicial review bar." JA0679 (emphasis added). That holding contradicts this Court's precedent on this exact issue.

In *Montanans*, this Court refused outright to review an agency's failure to submit actions for congressional review and expressly declined to consider whether "the [actions] qualif[ied] as rules subject to the Act in the first place." 568 F.3d at 229. Hence, the CRA's judicial review bar applies to preclude review of an agency's threshold determination about whether to report an action to Congress. In the context of a similar reporting statute, this Court also declined to review whether an agency's report to Congress contained contradictory or incorrect information. *Hodel*, 865 F.2d at 318 (declining to review allegations of incomplete reports to Congress); *Coll. Sports Council*, 421 F. Supp. 2d at 67 (refusing to review allegations of "material misstatements" in a report to Congress). Congress, not the courts, decides whether it has the information it needs, and as the "most representative branch," it is "not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives." *Hodel*, 865 F.2d at 319.

The district court did not reckon with this precedent. It relied instead on cases that merge "consideration of the legality" of agency action with the scope of a review bar. JA0675, 0677 (cleaned up). Those cases confirm, rather than undermine, the result here. Their method is textual: read the bar and ask whether the challenged action is the kind the bar describes. *See Ardelyx, Inc. v. Kennedy*, 179 F.4th 947, 954 (D.C. Cir. 2026). And the bars in those cases were narrow—they reached only "[i]ncreases or decreases in fees made by amendments pursuant to this paragraph," *COMSAT Corp. v. FCC*, 114 F.3d 223, 227 (D.C. Cir. 1997) (cleaned up), or the "identification of renal dialysis services included in the bundled payment," *Ardelyx*, 179 F.4th at 950-51 (cleaned up). So in those cases, the court had to decide whether the agency had done the specified thing before it could know whether the bar applied. *See also Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1233 (D.C. Cir. 2020); *Amgen, Inc. v. Smith*, 357 F.3d 103, 105 (D.C. Cir. 2004).

Section 805 is not narrow. It reaches every "determination, finding, action, or omission under this chapter." Applying the same method here, the only question is whether EPA's determination and action were "under this chapter," not whether they were correct. By asking whether EPA *correctly*

deemed the waivers rules, the district court answered a merits question the statute removes from the courts.

The district court also worried that if it could not review EPA's CRA compliance, an agency could shield "the entire decision-making process leading up to the issuance of any rule or order" from judicial review. JA0683. But once again, that concern misapprehends the CRA. The CRA governs how agencies report their actions to Congress; the APA holds agencies accountable for arbitrary and capricious final actions. An agency's CRA compliance has no legal impact on its own obligations or on anyone else's rights, so it has no effect on whether a final action is reviewable under the APA. The CRA merely clears the way for Congress to exercise its legislative role while leaving the *agency*'s responsibilities untouched.

The facts of this case bear that out. EPA made one set of determinations—that these waivers are rules reportable under the CRA—and took one set of actions: it reported them. *See* EPA Br. 30-32. The determinations appear nowhere except in the transmittals to Congress, so they "merge into" the submissions and share their unreviewability. *Mullin v. Doe*, 609 U.S. 324, 344 (2026). And even indulging the district court's two-action framing, a determination that a waiver is a rule "under this chapter" is

a "determination ... under this chapter" by the statute's plain terms. 5 U.S.C. § 805. The waivers remain enforceable unless and until Congress disapproves them and the President signs. Because any legal consequence depends on later action by Congress and the President, EPA's submissions are not final agency action, *see* EPA Br. 41-43—and the APA remains fully available if EPA ever acts against California through a separate proceeding.

*Ultra vires* review is no escape from all this. California's theory is a "typical statutory-authority argument" dressed as an ultra vires claim. *NRC v. Texas*, 605 U.S. 665, 682 (2025). It identifies no "specific prohibition" EPA transgressed, *id.* at 681 (cleaned up)—only a disagreement about how the CRA's definition of "rule" applies. And because Section 805 "forecloses all other forms of judicial review," ultra vires review is unavailable. *Id.*

What's more, this case shows why Congress drew the line where it did. A CRA report is interbranch correspondence. Whether it tells Congress what Congress needs to know involves "inherently elusive" judgments that the recipient knows best how to make. *Hodel*, 865 F.2d at 319. Letting a district court make them instead has already had consequences. California's air regulator has announced that it reserves the "right to enforce" the waivers Congress disapproved last year "in the event a court of law holds" Congress's

"resolutions invalid." CAL. AIR RES. BD., MANUFACTURERS ADVISORY CORRESPONDENCE ECCD-2025-08, at 3 (2025), https://perma.cc/ES5W-EK72. If one court's say-so can block an agency from honoring Congress's determination of what counts as a rule, States will be tempted to keep enforcing regulations Congress has repealed.

## CONCLUSION

The Court should vacate the preliminary injunctions and remand with instructions to dismiss the complaint.

Respectfully submitted,

JOHN B. MCCUSKEY
ATTORNEY GENERAL

/s/ Michael R. Williams
Michael R. Williams
*Solicitor General*
*Counsel of Record*

Madison T. Cash
*Assistant Solicitor General*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021

Dated: Nov. 4, 2026

*Counsel for Amicus Curiae*
*State of West Virginia*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

CORI MILLS
Acting Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

RAÚL LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
State of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

JONATHAN SKRMETTI
Attorney General and Reporter
State of Tennessee

DREW WRIGLEY
Attorney General
State of North Dakota

KEN PAXTON
Attorney General
State of Texas

GENTNER DRUMMOND
Attorney General
State of Oklahoma

DEREK BROWN
Attorney General
State of Utah

ALAN WILSON
Attorney General
State of South Carolina

KEITH KAUTZ
Attorney General
State of Wyoming

MARTY JACKLEY
Attorney General
State of South Dakota

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, this brief contains 5,136 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6), as required by Rules 29(a)(5) and 32(a)(7) and D.C. Cir. R. 32(e), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Michael R. Williams
Michael R. Williams

*Counsel for Amicus Curiae State of West Virginia*

Dated: Nov. 4, 2026