**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**Nos. 26-5330, 26-5336**

# In the United States Court of Appeals for the District of Columbia Circuit

STATE OF CALIFORNIA,
PLAINTIFF-APPELLEE,
*v.*
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *ET AL.*,
DEFENDANTS-APPELLANTS,

AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS AND AMERICAN PETROLEUM INSTITUTE, INTERVENORS-APPELLANTS

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA (CIV. NO. 26-2185) (THE HONORABLE BERYL A. HOWELL, J.)*

**BRIEF OF *AMICUS CURIAE* THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF APPELLANTS AND REVERSAL**

ANDREW R. VARCOE
JORDAN L. VON BOKERN
U.S. CHAMBER LITIGATION CENTER
*1615 H Street, NW*
*Washington, DC 20062*
*(202) 463-5337*

WILLIAM M. JAY
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7338*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)

Pursuant to D.C. Circuit Rule 28(a)(1), *amicus curiae* makes the following certification:

**(A) Parties, Intervenors, and Amici.** The parties appearing before the district court and on appeal are the State of California, the United States Environmental Protection Agency, Administrator Lee M. Zeldin, the American Petroleum Institute, and American Fuel & Petrochemical Manufacturers. The State of West Virginia is an amicus for Appellants.

**(B) Rulings Under Review.** The rulings at issue in this appeal are the September 2, 2026, and September 12, 2026, Memorandum Opinions and Orders issued by the Honorable Beryl A. Howell of the United States District Court for the District of Columbia granting preliminary injunctions in favor of California. The memorandum opinions and orders have not been published, but the September 2, 2026, memorandum opinion is available on Westlaw at *California* v. *EPA*, No. 26-cv-2185, 2026 WL 2593640 (Sept. 2, 2026). The memorandum opinions and orders are reproduced in the Joint Appendix at J.A. 636, 638, and 864.

**(C) Related Cases.** Protective petitions for review of the challenged agency actions, all styled *California* v. *EPA*, are pending (and in abeyance)

under the following docket numbers: No. 26-1218 and No. 26-1246 (D.C. Cir.); No. 26-5143 and No. 26-6109 (9th Cir.).

/s/ *William M. Jay*
WILLIAM M. JAY

## DISCLOSURE STATEMENT PURSUANT TO CIRCUIT RULE 26.1

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 29(b), undersigned counsel certifies:

Amicus the Chamber of Commerce of the United States of America ("Chamber") is a nonprofit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has a 10% or greater ownership interest in the Chamber.

/s/ *William M. Jay*
WILLIAM M. JAY

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

All parties have consented to the filing of this amicus brief.

Pursuant to Circuit Rule 29(d), *amicus* certifies that to the extent other amicus briefs may be filed in this appeal, a separate brief by the Chamber is necessary to provide the unique perspective of the broader business community on the issues presented, including the issues related to the Congressional Review Act. Joinder in a single brief with other amici would be impracticable; unlike other potential amici, the Chamber represents the business community rather than a single sector of the economy, and the Chamber has unique, extensive experience with matters relating to the Congressional Review Act.

/s/ *William M. Jay*
WILLIAM M. JAY

## TABLE OF CONTENTS


Page

Identity and interest of *amicus curiae* ........ 1

Introduction and summary of argument ........ 5

Argument ........ 9

I. California's claims are not justiciable ........ 9

A. California lacks Article III standing ........ 9

1. California's asserted procedural injury is merely procedure *in vacuo* ........ 10

2. California's diversion-of-resources theory is entirely speculative and not redressable ........ 14

B. California's lawsuit is barred by § 805 of the Congressional Review Act ........ 18

II. The Senate correctly concluded that the agency actions at issue in this case are rules under the Congressional Review Act ........ 22

Conclusion ........ 29

## TABLE OF AUTHORITIES

Page

## CASES

*American Hospital Ass'n* v. *Azar*, 964 F.3d 1230 (D.C. Cir. 2020) .................20

*Ardelyx, Inc.* v. *Kennedy*, 179 F.4th 947 (D.C. Cir. 2026) ..........................20, 21

*Batterton* v. *Marshall*, 648 F.2d 694 (D.C. Cir. 1980) ......................................23

*Bridgeport Hospital* v. *Becerra*, 108 F.4th 882 (D.C. Cir. 2024)......................20

*Central Valley Chrysler-Jeep, Inc.* v. *Goldstene*,
529 F. Supp. 2d 1151 (E.D. Cal. 2007) ..........................................................27

*Chamber of Commerce of U.S.* v. *EPA*,
642 F.3d 192 (D.C. Cir. 2011)..........................................................................4

*Clapper* v. *Amnesty International USA*, 568 U.S. 398 (2013) .........................15

*Diamond Alternative Energy, LLC* v. *EPA*, 606 U.S. 100 (2025) ...................23

*Environmental Defense Fund* v. *FERC*, 2 F.4th 953 (D.C. Cir. 2021)...........11

*FDA* v. *Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ....................15

*Florida Audubon Society* v. *Bentsen*, 94 F.3d 658 (D.C. Cir. 1996)................12

*Frison* v. *United States*, No. 95-5062,
1995 WL 686224 (D.C. Cir. Oct. 4, 1995).......................................................17

*Green Mountain Chrysler Plymouth Dodge Jeep* v. *Crombie*,
508 F. Supp. 2d 295 (D. Vt. 2007) .................................................................27

*Kansas Natural Resources Coalition* v. *U.S. Department of the Interior*, 971 F.3d 1222 (10th Cir. 2020) .............................................18

*Montanans for Multiple Use* v. *Barbouletos*,
568 F.3d 225 (D.C. Cir. 2009)..........................................................................18

Page

Cases—continued:

*Motor & Equipment Manufacturers Ass'n* v. *EPA*,
627 F.2d 1095 (D.C. Cir. 1979)....................26

*Mullin* v. *Doe*, 609 U.S. 324 (2026) ....................19, 20

*National Association of Home Builders* v. *EPA*,
667 F.3d 6 (D.C. Cir. 2011) ....................11

*National Biodiesel Board* v. *EPA*, 843 F.3d 1010 (D.C. Cir. 2016)....................26

* *Natural Resources Defense Council, Inc.* v. *Hodel*,
865 F.2d 288 (D.C. Cir. 1988)....................5, 21, 22

*Perez* v. *Mortgage Bankers Ass'n*, 575 U.S. 92 (2015)....................23

*Spokeo, Inc.* v. *Robins*, 578 U.S. 330 (2016) ....................11

*Sugar Cane Growers Co-op. of Florida* v. *Veneman*,
289 F.3d 89 (D.C. Cir. 2002)....................10

* *Summers* v. *Earth Island Institute*, 555 U.S. 488 (2009) ....................10

*TransUnion LLC* v. *Ramirez*, 594 U.S. 413 (2021) ....................9

*Trump* v. *California*, 609 U.S. 1032 (2026)....................15

*Trump* v. *New York*, 592 U.S. 125 (2020)....................15

*WildEarth Guardians* v. *Salazar*, 859 F. Supp. 2d 83 (D.D.C. 2012),
*aff'd*, 738 F.3d 298 (D.C. Cir. 2013)....................12, 13

* *Yesler Terrace Community Council* v. *Cisneros*,
37 F.3d 442 (9th Cir. 1994)....................23, 24

**STATUTES**

Clean Air Act:

42 U.S.C. § 7507 ....................23, 25

Page

Statutes—continued:

42 U.S.C. §§ 7543(a)–(b) ............................................................ 6

42 U.S.C. § 7543(e)(2) ............................................................ 23

Congressional Review Act:

5 U.S.C. §§ 801-808 ............................................................ 5-9, 13-15, 17-22, 28

5 U.S.C. § 801(a)(1)(A) ............................................................ 5, 18

5 U.S.C. § 801(b)(1) ............................................................ 5, 13

5 U.S.C. § 801(f) ............................................................ 13

5 U.S.C. § 802 ............................................................ 22

5 U.S.C. § 804(3) ............................................................ 22

* 5 U.S.C. § 805 ............................................................ 5, 8, 9, 18, 21

5 U.S.C. § 551(4) ............................................................ 22

5 U.S.C. § 558(c) ............................................................ 7, 10, 11

Act of May 21, 2018, Pub. L. No. 115-172, 132 Stat. 1290 ............................................................ 17

**MISCELLANEOUS**

113 Cong. Rec. 32478 (1967) ............................................................ 26

171 Cong. Rec. S3051 (daily ed. May 21, 2025) ............................................................ 22

Attorney General's Manual on the Administrative Procedure Act 13 (1947) ............................................................ 25

Valerie C. Brannon & Maeve P. Carey, Cong. Rsch. Serv., R45248, The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress (2024) ............................................................ 17, 22

Page

Miscellaneous—continued:

Government Accountability Office, *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One; One National Program; FRL-10000-45* (Sept. 27, 2019) ........ 26, 27

Brief for Amici Curiae Chamber of Commerce of the United States of America et al. in Support of Petitioners, *Western States Trucking Ass'n, Inc.* v. *EPA*, No. 23-1143 (D.C. Cir. Nov. 13, 2023), 2023 WL 7548089 ........ 4

Letter from Am. Fuel & Petrochemical Mfrs. et al. to Hon. Mike Johnson, Speaker, U.S. House of Representatives, et al. (Sept. 3, 2026) ........ 2

Letter from Neil L. Bradley, U.S. Chamber of Commerce, to Members of the U.S. Senate (May 13, 2025) ........ 2, 24

Letter from Marty Durbin, U.S. Chamber of Commerce, to Members of the U.S. House of Representatives (Jan. 21, 2026) ........ 3

Letter from Marty Durbin, U.S. Chamber of Commerce, to U.S. Environmental Protection Agency (Sept. 16, 2024) ........ 2

Letter from Russell T. Vought, Director, Office of Management and Budget, to Gene Dodaro, Comptroller General, U.S. Government Accountability Office (June 18, 2025) ........ 20

Thomas J. Donohue, U.S. Chamber of Commerce, Little-Known Law Makes a Big Difference (May 22, 2017) ........ 3

Chad Whiteman, U.S. Chamber of Commerce, *Chamber Is Keeping the Focus on Re-Balancing Regulations Through CRAs* (Apr. 25, 2025) ........ 3

* Authorities upon which we chiefly rely are marked with asterisks.

## GLOSSARY OF ABBREVIATIONS

APA .......... Administrative Procedure Act

CAA .......... Clean Air Act

CRA .......... Congressional Review Act

EPA .......... Environmental Protection Agency

GAO .......... Government Accountability Office

J.A. .......... Joint Appendix

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America is the world's largest business organization. As the nation's leading advocate for business, the Chamber represents companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber is interested in protecting Congress's authority to act under the Congressional Review Act ("CRA") to disapprove of agency actions such as the six decisions of the Environmental Protection Agency ("EPA") that are at issue in this litigation. The EPA decisions, known as "waivers" because they waive the ordinary operation of preemption under the Clean Air Act, concern regulations adopted by California and by other states that would restrict the use of internal combustion engines in various settings. These

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* states that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

measures have far-reaching consequences for a wide range of the Chamber's members.

The Chamber has publicly opposed these and other EPA preemption waivers and supported the corresponding CRA disapproval resolutions. *See, e.g.*, Letter from Am. Fuel & Petrochemical Mfrs. et al. to Hon. Mike Johnson, Speaker, U.S. House of Representatives, et al. (Sept. 3, 2026)[2] (coalition letter, joined by the Chamber, that endorses CRA resolutions concerning the six EPA waivers at issue in this case); Letter from Neil L. Bradley, U.S. Chamber of Commerce, to Members of the U.S. Senate (May 13, 2025)[3] ("Disapproval of the rules [under the CRA] is essential to ensuring a unified national vehicle marketplace that promotes continued progress on fuel economy while safeguarding economic growth and consumer interests."); Letter from Marty Durbin, U.S. Chamber of Commerce, to U.S. Environmental Protection Agency (Sept. 16, 2024).[4] More generally, the Chamber is no stranger to the

---

[2] https://www.uschamber.com/assets/images/09.03.2026-Multi-Industry-Letter-of-Support-CA-Waivers-CRA.pdf.

[3] https://www.uschamber.com/environment/hill-letter-supporting-cra-resolutions-of-disapproval-to-overturn-u-s-epas-federal-preemption-waivers-advanced-clean-cars-ii-acc-ii-s-j-res-45-the-omnibus-low-nox-s-j-res-47-and-advanced-clean-trucks-s-j-res-46.

[4] https://www.uschamber.com/assets/documents/CA-ACF-Waiver-FINAL_-Sep-2024.pdf.

CRA. It urged Congress to disapprove a range of administrative actions using CRA joint resolutions. *See, e.g.*, Chad Whiteman, U.S. Chamber of Commerce, *Chamber Is Keeping the Focus on Re-Balancing Regulations Through CRAs* (Apr. 25, 2025)[5] (calling for disapproval of EPA actions similar to those at issue in this litigation, as well as actions by the Consumer Financial Protection Bureau, the Department of Energy, and the Federal Trade Commission); Letter from Marty Durbin, U.S. Chamber of Commerce, to Members of the U.S. House of Representatives (Jan. 21, 2026)[6] (calling for disapproval of a mineral withdrawal decision in the Superior National Forest); Thomas J. Donohue, U.S. Chamber of Commerce, Little-Known Law Makes a Big Difference (May 22, 2017)[7] (summarizing CRA disapproval resolutions enacted by Congress in 2017 with the Chamber's support). The Chamber has also participated as a party or amicus in judicial challenges to EPA waiver

---

5 https://www.uschamber.com/regulations/chamber-is-keeping-the-focus-on-re-balancing-regulations-through-cras.

6 http://uschamber.com/assets/documents/260116_Hill_H.J.-Res.-140_House_Final.pdf.

7 https://www.uschamber.com/regulations/little-known-law-makes-big-difference.

decisions[8]—and might well need to participate in more such challenges if Congress were hindered in disapproving waiver decisions under the CRA.

---

[8] *See, e.g.*, Brief for Amici Curiae Chamber of Commerce of the United States of America et al. in Support of Petitioners, *Western States Trucking Ass'n, Inc.* v. *EPA*, No. 23-1143 (D.C. Cir. Nov. 13, 2023), 2023 WL 7548089; *Chamber of Commerce of U.S.* v. *EPA*, 642 F.3d 192 (D.C. Cir. 2011) (decision in case where the Chamber was petitioner).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Administrative agencies have no authority to act except what Congress grants them. And Congress is responsible for overseeing agencies' exercise of that delegated authority, including by making sure that the Executive Branch acts within the boundaries of national policy set in the first instance by the Legislative Branch. The Congressional Review Act ("CRA") is one important way by which Congress carries out oversight and exercises its legislative powers.

Under the CRA, agencies must "submit to each House of the Congress" their rules to facilitate congressional review. 5 U.S.C. § 801(a)(1)(A). Congress then reviews each of these rules and decides whether to pass a "resolution of disapproval" to rescind the rule and prevent its reissuance. 5 U.S.C. § 801(b)(1). This review procedure, among other things, helps guarantee that agencies appropriately exercise the powers delegated to them by Congress. Disputes about the CRA's review process are "quintessentially within the province of the political branches to resolve as part of their ongoing relationships." *Natural Resources Defense Council, Inc.* v. *Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988). Accordingly, Congress has shielded the process from judicial review. 5 U.S.C. § 805.

Yet California invites the federal judiciary to venture into this inherently political process by preventing the Executive Branch from submitting its work to Congress for review. Under the Clean Air Act, California is expressly preempted from setting various emissions standards; Congress has delegated EPA limited authority to waive the preemption that would otherwise apply. 42 U.S.C. § 7543(a)–(b). At various times, EPA adopted the six waivers at issue here. EPA later submitted those waivers to Congress under the CRA. California recognizes in this case that it cannot sue Congress to prevent it from legislating to rescind EPA's waivers. So California has instead sued EPA, claiming that it is challenging only EPA's alleged "reclassification" of the waivers from orders to rules. The district court agreed, and entered two preliminary injunctions in favor of California. This Court should reverse.

First, California lacks standing. The district court correctly rejected the State's primary theory of standing, acknowledging that the injury California feared—legislative rescission of the waivers—would be traceable to an act of Congress, not to EPA. But the court erroneously credited California's procedural and "diversion of resources" theories of standing. As to the procedural theory, California alleges a procedural injury *in vacuo*. The State alleges that, because of the so-called reclassification, it might lose procedural

protections afforded to licensees under 5 U.S.C. § 558(c). Yet EPA has not deprived California of any such right, for the agency has not initiated withdrawal proceedings on California's waivers. If Congress does not enact resolutions of disapproval with respect to those waivers, then the waivers will remain in effect, and how the agency classified them for purposes of the CRA will have no impact on California. As a result, California cannot demonstrate that EPA's reclassification of its waivers had any impact on its concrete legal interests. Article III demands more than a mere allegation that EPA might someday propose to deprive California of the specific procedure it desires.

As for the "diversion of resources" theory, California cannot spend its way into court. The State alleges that it has to spend its resources to develop new regulations, but that is premised not on how the waivers are classified but on their ultimate "withdrawal or invalidation." J.A. 693. But California's claimed diversion of resources is completely speculative. If California's theory holds, then plaintiffs around the country would be permitted to spend their way into court long before any concrete action materializes, just by preparing for the possibility that such action might materialize someday. Article III does not countenance such speculation.

Aside from the lack of standing, California's claims are nonjusticiable for another reason—the CRA bars judicial review. The statute bars adjudication of any "determination, finding, action, or omission under" the CRA. 5 U.S.C. § 805. The text is clear—Congress intended for the CRA to cabin the rule-review process to the political branches. This includes the agency "determination" about whether the submitted rules are governed "under" the CRA. *Id.* The district court should not have accepted California's invitation to intrude on the cooperation of two coordinate branches of government.

Even if California's claims were justiciable, they are not likely to succeed on the merits. The waivers at issue are "rules" covered by the CRA. The district court concluded that the waivers lacked general applicability, but that is incorrect. As the district court recognized, the waivers have far-reaching implications beyond the borders of California. They make crucial, prospective public policy choices that are particularly suited for congressional review. And given that Congress is entrusted with making policy choices that govern its constituents, it is only fitting that these rules should be subject to review by the Legislative Branch.

The district court should have dismissed this case as nonjusticiable. Instead, it improperly intruded into the relationship between the political

branches, and rendered an incorrect decision on the merits. This Court should reverse.

## ARGUMENT

### I. California's Claims Are Not Justiciable.

This suit is not justiciable. California has not established that it has standing to bring this lawsuit. Though alleging four separate theories for standing, California fails to establish that it has suffered a redressable injury that is traceable to EPA. And even if California has standing, its suit is precluded by the judicial review bar in 5 U.S.C. § 805.

#### A. California Lacks Article III Standing.

None of California's theories of standing carries the burden of showing "(i) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC* v. *Ramirez*, 594 U.S. 413, 423 (2021). At bottom, California fears that Congress, not the defendants here, will take action to negate the waivers. But as the district court recognized, California has not sued (and cannot sue) the Legislative Branch to prevent it from legislating. The district court erred in permitting California to sue the Executive Branch as a substitute. The agency

defendants have caused California no injury, and California cannot base standing on fear that they may someday.

### 1. California's Asserted Procedural Injury Is Merely Procedure *In Vacuo*.

The district court concluded that EPA's "reclassification" of the waivers from "orders" to "rules" inflicted a procedural injury that suffices for standing because the State risks losing certain procedural rights under 5 U.S.C. § 558(c) *if* EPA decides to withdraw the waivers itself—*i.e.*, if they are not disapproved by Congress first. *See* D. Ct. Dkt. 13-1, at 17-18 ("If the waivers are now rules, California has lost those rights."); D. Ct. Dkt. 26, at 12-13. But the agency defendants have denied California no process and caused it no injury. The most California can offer is speculation.

For a procedural injury to suffice to establish Article III standing, the procedure must protect some "concrete interest that is affected by the deprivation." *Summers* v. *Earth Island Institute*, 555 U.S. 488, 496 (2009). Absent a "concrete interest," the procedural deprivation is of a "procedural right *in vacuo*," which is "insufficient to create Article III standing." *Id.* When a plaintiff alleges a procedural deprivation, it must show that "the procedural step was connected to the substantive result." *Sugar Cane Growers Co-op. of Florida* v. *Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002).

This Court has consistently held that a plaintiff "cannot satisfy the demands of Article III standing by alleging a bare procedural violation." *Environmental Defense Fund* v. *FERC*, 2 F.4th 953, 970 (D.C. Cir. 2021) (quoting *Spokeo, Inc.* v. *Robins*, 578 U.S. 330, 342 (2016)). For example, in *National Association of Home Builders* v. *EPA*, the plaintiffs claimed they had suffered a procedural injury from the agency's "failure to provide notice and an opportunity to submit comments pursuant to the APA." 667 F.3d 6, 15 (D.C. Cir. 2011). The court determined that the plaintiffs had failed to prove standing because, despite the procedural violation, "no imminent injury in fact ha[d] been alleged." *Id.* And "[w]ithout an imminent threat of injury traceable to the challenged action," there was no standing. *Id.*

Here there has not even been a procedural violation like the one in *Home Builders*. Rather, California asserts that the reclassification *threatens to* deprive it of procedural protections, such as notice and comment, that licensees enjoy under 5 U.S.C. § 558(c). *See* D. Ct. Dkt. 13-1, at 17-18. But there has not yet been any agency decision to notice, and California as yet has nothing to comment on. The waivers remain in effect, and California is still able to enforce its own emissions standards. And EPA has not initiated any administrative proceedings to revoke California's waivers—much less a

proceeding that denies notice and comment. On the contrary, the agency defendants have represented that *if* EPA initiated such a proceeding, it *would* allow for notice and comment. J.A. 688.

This is a quintessential claim of procedural injury *in vacuo*. There is no "substantive result" of EPA's alleged reclassification. There has not even been a procedural injury—an actual deprivation of process—that could qualify as an injury in fact. California asserts that it has standing based on nothing more than a speculative fear that EPA "may soon" deny it a procedural right that the APA protects[9] and "may" then proceed to make a substantive decision that would injure California. J.A. 688 (quoting D. Ct. Dkt. 13-1, at 17-18). That speculation is not evidence of imminent injury-in-fact traceable to the defendants.

To establish a procedural injury, California must "show that the defendant omitted the required procedure" in question. *WildEarth Guardians* v. *Salazar*, 859 F. Supp. 2d 83, 91 (D.D.C. 2012), *aff'd*, 738 F.3d 298 (D.C. Cir. 2013); *see Florida Audubon Society* v. *Bentsen*, 94 F.3d 658, 664-665 (D.C. Cir. 1996) ("To demonstrate standing, then, a procedural-rights

[9] The defendants raise substantial arguments that the relevant APA provision is not applicable here, a point beyond the scope of this brief.

plaintiff must show . . . that the defendant's acts omitted some procedural requirement . . . ."). Procedural rights are "prophylactic" in nature—they "*precede* the agency's final action," so that they may "guide and inform the agency's decision-making." *WildEarth Guardians*, 859 F. Supp. 2d at 92. But plaintiffs cannot "put the cart before the horse." *Id.* Where there has been no denial of the agency action the plaintiffs want, the plaintiffs cannot argue that the agency "omitted a procedural requirement *before* denying" the plaintiffs that action. *Id.* California's case founders on that requirement: it can only allege that, because of the reclassification, it might not receive procedural protections in the future, and that such a potential future denial might lead to a flawed agency decision.

California's theory would fail even if it were attacking some internal agency classification rather than one under the Congressional Review Act. Here California's standing theory is even weaker, because of the possibility of congressional action under the CRA—the real reason California brought this suit. If Congress enacts disapproval resolutions, then the agency will *never* initiate proceedings to withdraw the relevant waivers—the waivers will be "treated as though [they] had never taken effect." 5 U.S.C. § 801(f); *see* 5 U.S.C. § 801(b)(1). California is trying to prevent the use of the CRA to

disapprove its waivers. It is telling that its claim of standing based on procedural injury depends on the premise that the CRA *will not be used*.

California has alleged a procedural injury *in vacuo*. It has, at best, demonstrated only a speculative, potential deprivation of procedure, unsupported by any violation of its concrete interests. If Congress acts, the sought-after procedure would be beside the point. The agency may not even propose the substantive action California fears and may well provide all the process California wants. Article III demands more than a mere allegation that California might not receive its preferred type of withdrawal proceeding at some point in the future.

### 2. California's Diversion-Of-Resources Theory Is Entirely Speculative And Not Redressable.

The district court also incorrectly concluded that California had standing because of the "diversion of resources required to develop new air regulations in order to ensure compliance with federal law." J.A. 694; *see* D. Ct. Dkt. 13-1, at 30-31; J.A. 54-57, ¶¶ 13-14, 19-22 (Hicks Decl.). But California cannot base standing on its voluntary expenditure of resources to plan for the possibility that its waivers might be rescinded or disapproved. California "has not suffered a concrete injury caused by a defendant's action" and cannot subsequently "spend its way into standing simply by expending money . . . ."

*FDA* v. *Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024). If California could "manufacture its own standing in that way," then "all the organizations in America would have standing to challenge almost every federal policy that they dislike." *Id.* at 394-395. And California's claim of injury is even more remote than in *Hippocratic Medicine*, because it claims to be spending money to prepare for the possibility that the political branches *might* impose the policy California dislikes, and *might* do so using some expedited procedure that requires California to begin preparing its regulatory response now.

States cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper* v. *Amnesty International USA*, 568 U.S. 398, 416 (2013). In the absence of an actual compliance *obligation*, there is no actual compliance *cost*. *See Trump* v. *California*, 609 U.S. 1032, 1035 (2026) (per curiam) (executive order that "imposes no obligations" on States causes them "'no concrete harm'" (quoting *Trump* v. *New York*, 592 U.S. 125, 134 (2020) (per curiam))).

And once again, the fact that this case is really about the Congressional Review Act confirms that California's theory of "diversion of resources"

standing is inapposite. California itself acknowledges that it is spending to prepare for the possibility that *either Congress or EPA* will rescind the waivers. *See* D. Ct. Dkt. 13-1, at 31 (asserting that California "cannot afford to wait and see whether or when Congress or EPA will act to invalidate these waivers" and "must begin the time-consuming and costly development of a Plan B now"). The district court elided the point by referring broadly to the potential "loss" of the waivers—without acknowledging that the waivers might well be lost *through legislation*. J.A. 691. If California would have to spend exactly the same money based on the mere possibility of legislative action, then that spending is not traceable to the actions of the agency defendants. The district court's brief and circular discussion of traceability likewise missed the point; it stated that EPA's reclassification of the waivers was traceable to the agency defendants, J.A. 695, without explaining how California's injury was traceable to the reclassification.

Nor does anything in the district court's preliminary-injunction orders foreclose the possibility that Congress may still disapprove one or more of the waivers. The district court tried to redress California's harm by ordering EPA to "take all necessary steps within the agency's control to restore the *status quo*." J.A. 707. But the waivers have been submitted to Congress. D. Ct. Dkt.

21, at 1. The district court acknowledged that it could not block Congress from acting on them. J.A. 686 (citing *Frison* v. *United States*, No. 95-5062, 1995 WL 686224, at *1 (D.C. Cir. Oct. 4, 1995) (per curiam)), 694-695. And even if EPA had not submitted the report, Congress would still have the power to rescind the waivers. D. Ct. Dkt. 21, at 23. Because the CRA is an exercise of Congress's own rulemaking power, Congress itself can make its own determination about when its procedures are triggered. Thus, for example, when the Consumer Financial Protection Bureau refused to send a "guidance" bulletin to Congress under the CRA, Congress determined that it was a "rule" and passed a joint resolution disapproving it. *See* Act of May 21, 2018, Pub. L. No. 115-172, 132 Stat. 1290 (concluding "that the Bulletin is a rule under the Congressional Review Act"). *See generally* Valerie C. Brannon & Maeve P. Carey, Cong. Rsch. Serv., R45248, The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress 25-26 & nn.233-238 (2024).

Thus, the "diversion of resources" theory likewise fails to circumvent the basic problem with California's theory: the agency has not taken any action that has caused California any harm, and if California does ultimately lose its

waivers, the reason is just as likely to be legislative action. Congress is the elephant in the room—but not a defendant in the caption.

### B. California's Lawsuit Is Barred By § 805 Of The Congressional Review Act.

The Congressional Review Act provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. In drafting this jurisdictional bar, Congress made a clear determination: the promulgation, reporting, and review of agency rules is done pursuant to authority conferred, limited, governed, and overseen by the political branches. The judiciary has no role in this back-and-forth. California's request that the courts weigh in anyway should be rejected.

The text of the CRA prevents the Court from evaluating EPA's determination to send the § 209(b) waivers to Congress. Section 805 limits judicial review of any "determination[s]" and "action[s]" taken "under" the CRA ("this chapter," *i.e.*, chapter 8 of title 5). 5 U.S.C. § 805; *see Kansas Natural Resources Coalition* v. *U.S. Department of the Interior*, 971 F.3d 1222, 1235-1236 (10th Cir. 2020). One such "action" taken under the CRA is the requirement that agencies submit reports to Congress. 5 U.S.C. § 801(a)(1)(A). Courts lack the "power to void rules on the basis of agency noncompliance with the Act." *Montanans for Multiple Use* v. *Barbouletos*,

568 F.3d 225, 229 (D.C. Cir. 2009). As the district court noted, this bars courts from reviewing "[a]ny 'action' or 'omission' to comply with these CRA procedural duties." J.A. 673.

EPA's decision to submit the § 209(b) waivers to Congress was a "determination" "under" the CRA. The Supreme Court recently clarified that the word "determination" is "a synonym for 'decision,'" or "describe[s] the chain of events leading up to a decision." *Mullin* v. *Doe*, 609 U.S. 324, 339 (2026). EPA's actions here indisputably fit that definition. Though California and the district court categorize EPA's submission of the report as an independent, freestanding action—a "reclassification"—EPA's decision to treat the waivers as rules was part of the "chain of events" leading to their submission "under" the CRA. California only points to two items to argue that EPA reclassified the waivers—the Press Release and *the submission of the report to Congress*. *See* D. Ct. Dkt. 26, at 22 ("EPA has already implemented its Reclassifications by issuing its press release and carrying out the Submissions."). Though California wants to label this as a *re*classification, these steps were part of the "chain of events" leading to the "determination" to submit the waivers to Congress. And because the CRA provides that agencies "shall submit" reports to Congress, EPA's determination to submit

each waiver to Congress was clearly made "under" this chapter. *See Bridgeport Hospital* v. *Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024) ("[T]he word 'shall' generally signals a mandatory duty.").

The district court disclaims this straightforward reading of the CRA. Though admitting that California likely could not challenge "EPA's transmittal of the waiver orders as a report to Congress," it nonetheless claims that the judiciary can review "an agency's decision to treat an action as a rule" for CRA purposes. J.A. 677-678. The district court pointed to *Ardelyx, Inc.* v. *Kennedy*, which it asserts stands for the proposition that "'to determine whether the judicial-review bar applies in this case, [the court] must decide whether the challenged agency action[s]' are the sort of actions shielded from review." J.A. 677 (quoting *Ardelyx, Inc.* v. *Kennedy*, 179 F.4th 947, 954 (D.C. Cir. 2026) (quoting *American Hospital Ass'n* v. *Azar*, 964 F.3d 1230, 1238 (D.C. Cir. 2020))). Notably, the statute at issue in *Ardelyx* was completely different in kind and context from the CRA.[10] And the statute at issue in

[10] In ruling against EPA, the district court makes this same argument against the applicability of *Mullin* v. *Doe*, which arose in the context of a statute barring judicial review of the Attorney General's determinations with respect to the designation of a foreign state. *See* 609 U.S. at 328. Though different from the CRA, the statute in *Mullin* v. *Doe* did use the key term "determination." *Id.* The statute in *Ardelyx* did not—a crucial distinction.

*Ardelyx* did not include language similar to the CRA's. *See* D. Ct. Dkt. 32, at 7-9 (explaining that the *Ardelyx* bar covered only an "'identification of renal dialysis services'" (quoting *Ardelyx*, 179 F.4th at 954)).

More crucially, the district court's reading of the statute shows a lack of deference to Congress's supervisory authority. The jurisdictional bar in section 805 makes clear that Congress, rather than the federal courts, is responsible for determining whether an agency's submission of a report was proper under the CRA. When any agency reports to Congress, "the designated Executive Branch officer is simply reporting back to the source of its delegated power in accordance with the Article I branch's instructions," the type of action this Court has long declined to review. *Hodel*, 865 F.2d at 318. And the CRA, by barring adjudication of any "determination, finding, action, or omission under this chapter" in the federal courts, 5 U.S.C. § 805, "singularly commit[s] to *congressional* discretion" the task of "measuring the fidelity of the Executive Branch actor to legislatively mandated requirements." *Hodel*, 865 F.2d at 318. Congress itself has the power to determine that a disapproval resolution meets the requirements of the CRA for streamlined consideration—or to determine that an agency action that was not submitted to Congress but should have been, should be disapproved. *See*,

*e.g.*, Brannon & Carey, *supra*, at 23-27; 171 Cong. Rec. S3051 (daily ed. May 21, 2025) (Senate ruling allowing for expedited consideration of "joint resolutions that meet all the requirements of section 802 of the Congressional Review Act"). In short, whether the agency properly determined that the reported actions were "rules" covered by the CRA is "quintessentially within the province of the political branches to resolve as part of their ongoing relationships." *Hodel*, 865 F.2d at 319.

## II. The Senate Correctly Concluded That The Agency Actions At Issue In This Case Are Rules Under The Congressional Review Act.

All of California's substantive claims hinge on whether the waivers at issue in this case are "rules" under the CRA. For the reasons already stated, those arguments are not justiciable. But if the Court reaches the merits, it should hold that California is not likely to succeed. These agency actions are the type of nationally significant decision that Congress chose to designate for review under the CRA.

The CRA largely adopts the APA definition of a rule. *See* 5 U.S.C. §§ 551(4), 804(3). Under the CRA and APA, a "rule" is "an agency statement of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4) (APA definition); *see* 5 U.S.C. § 804(3) (excluding, from the definition of "rule" under the CRA, rules of

"particular applicability"; rules relating to "agency management or personnel"; and "rule[s] of agency organization, procedure, or practice that do[] not substantially affect the rights or obligations of non-agency parties"). The APA's definition of an agency "rule" is "broad[]." *Perez* v. *Mortgage Bankers Ass'n*, 575 U.S. 92, 95 (2015). The definition includes "nearly every statement an agency may make." *Batterton* v. *Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980). Rules are "prospective[] and ha[ve] a definitive effect on individuals only after the rule subsequently is applied." *Yesler Terrace Community Council* v. *Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994). "The form of the proceeding is not dispositive; what counts is its effect." *Id.* at 449.

Here, EPA's waivers allowed California, and any other states that chose to adopt California's standards pursuant to 42 U.S.C. §§ 7507, 7543(e)(2), to adopt more stringent emissions policies than promulgated by EPA—with corresponding effects on the purchase of fuel for internal-combustion engines, the manufacture of such engines and their components, and a host of other downstream economic relationships. *See Diamond Alternative Energy, LLC* v. *EPA*, 606 U.S. 100, 114 (2025) (discussing the effects of California regulations beyond the parties directly regulated). But those state regulations would have no force without EPA's action—they would be displaced by federal

law. Thus, by operation of law, the waivers functionally transformed California law into federal regulation—a compliance pathway that satisfies federal law in lieu of the federal standards that would otherwise apply. *Cf.* Letter from Russell T. Vought, Director, Office of Management and Budget, to Gene Dodaro, Comptroller General, U.S. Government Accountability Office (June 18, 2025), at 5 (explaining why preemption waivers "directly govern[] the conduct of motor-vehicle manufacturers nationwide" by creating a "unique alternative nationwide compliance pathway").[11] In sum, EPA's waivers had direct, prospective impacts on the interests of a broad category of regulated entities, not just in California, but across the nation. "These are the effects of a rule . . . ." *Yesler Terrace*, 37 F.3d at 449 (finding that a federal agency's decision allowing Washington state's eviction procedures to be used, as an alternative to the federal grievance procedure that would otherwise be required, was a "rule" under the APA because of its prospective effect on "a broad category of people" and the consequent "legal consequences" for those people). These impacts are likewise effects of general, not particular, applicability: they fall not just on particular "named persons," but on every

---

[11] https://www.whitehouse.gov/wp-content/uploads/2025/03/CA-Waiver-Letter-to-GAO.pdf.

manufacturer nationwide subject to the relevant CAA rules. *See* Attorney General's Manual on the Administrative Procedure Act 13 (1947).

Even if the waivers affected only California, the prospective regulation of the nation's largest market remains one of "general" applicability. California may be one State, but its economy is larger than almost every nation in the world. In the overlapping, interstate market for automobiles and other products subject to the waivers in the United States, deviation by a state as large as California leads to nationwide impacts on manufacturers' compliance obligations (and their costs of compliance), necessarily affecting their core business decisions about which products to manufacture and sell for the U.S. market. And it is not just California whose direct coercive power is at stake: a waiver for California allows other states to adopt regulations "identical" to California's under 42 U.S.C. § 7507, further augmenting the waivers' impact and significance.

The district court recognized the sweeping significance of California's waivers. The court surmised that "California [is] seen as an innovator in pollution control, having begun statewide efforts to control air pollution a decade earlier than such efforts at the federal level." J.A. 638. The court likewise described the CAA's waiver provision as allowing "the United States

as a whole [to] benefit by allowing California to continue setting its own more advanced standards." J.A. 639 (quoting 113 Cong. Rec. 32478 (1967) (remarks of Sen. George Murphy of California)). The district court further recognized that California's waivers profoundly influence federal emissions policy. *See* J.A. 644-645 (quoting *Motor & Equipment Manufacturers Ass'n* v. *EPA*, 627 F.2d 1095, 1109, 1110 & n.34 (D.C. Cir. 1979)).

Despite repeatedly concluding that the waivers carry sweeping, national importance, the district court found that California was likely to prove that the policies "applie[d] only to the [California] program." J.A. 701 (quoting *National Biodiesel Board* v. *EPA*, 843 F.3d 1010, 1018 (D.C. Cir. 2016)). This conclusion is difficult to square with the district court's determination of the national importance of the California program, which supports the conclusion that the waivers are of general, not specific, applicability.

The Government Accountability Office (GAO) itself has previously concluded that a revocation of a preemption waiver was a rule. Government Accountability Office, *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One; One National Program; FRL-10000-45* (Sept. 27, 2019) (describing EPA's decision to withdraw a California waiver as a "Final Rule"

under CAA).[12] Likewise, other courts have found EPA waivers to constitute federal regulations. One such court determined that there was "no legal basis for the proposition that an EPA-promulgated regulation or standard functions any differently than a California-promulgated and EPA-approved standard or regulation." *Central Valley Chrysler-Jeep, Inc.* v. *Goldstene*, 529 F. Supp. 2d 1151, 1173 (E.D. Cal. 2007), *as corrected* (Mar. 26, 2008). Similarly, another court determined that it was "beyond serious dispute . . . that once EPA issues a waiver for a California emissions standard, it becomes a motor vehicle standard of the government, with the same stature as a federal regulation" as "Congress . . . could not have intended that an EPA-approved emissions reduction regulation did not have the force of a federal regulation." *Green Mountain Chrysler Plymouth Dodge Jeep* v. *Crombie*, 508 F. Supp. 2d 295, 347 (D. Vt. 2007).

In sum, the waivers would allow the law of an entire state (plus other states that follow it) to escape preemption and to simultaneously disrupt and augment what would otherwise be a nationally uniform legal and regulatory framework. This is exactly the type of "general applicability" and "prospective effect" that fit the broad definition of a rule. Indeed, such waivers have outsize

[12] https://www.gao.gov/fedrules/196015.

nationwide impacts because of their effects on the national markets for vehicles, technology, and energy. As the Chamber has explained regarding other waivers disapproved by Congress under the CRA:

> [The waivers] would severely restrict consumer choice and impose substantial costs on businesses, not only in California but also in other states that have adopted California's regulatory programs. By mandating adoption of technologies not yet commercially viable at scale, and on a recklessly accelerated timeline, these rules risk significant increases to transportation costs and could hinder the movement of people and goods nationwide. Additionally, factors such as insufficient vehicle charging infrastructure, which are beyond the control of manufacturers, further deter market adoption of electric vehicles and exacerbate compliance challenges. Allowing California to set de facto national standards creates a fragmented regulatory landscape, complicating supply chains and compliance for businesses operating across state lines.

Letter from Neil L. Bradley to Members of the U.S. Senate, *supra*.

The crucial public policy choice made by each of the waivers—whether to create an exception to federal preemption for key components of the U.S. economy, and to allow California and other states to reshape key aspects of the nationwide economy—is exactly the type of decision, with sweeping impacts, that Congress reasonably concluded should be subject to review by the People's representatives. As explained above, EPA's decision to submit the waivers in compliance with the CRA is not justiciable in this Court; to hold otherwise would be to trigger serious separation-of-powers concerns. But if

that question were justiciable, the answer is that the waivers do indeed qualify as "rules" under that statute.

## CONCLUSION

The preliminary injunctions should be reversed, and the case should be ordered dismissed for lack of jurisdiction.

Respectfully submitted,

*/s/ William M. Jay*

ANDREW R. VARCOE
JORDAN L. VON BOKERN
U.S. CHAMBER LITIGATION CENTER
*1615 H Street, NW*
*Washington, DC 20062*
*(202) 463-5337*

WILLIAM M. JAY
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7338*

NOVEMBER 4, 2026

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

1. This document complies with the Court's Order dated October 19, 2026, because—excluding the parts of the document exempted by Fed. R. App. P. 32(f) and this Court's Circuit Rule 32(e)(1)—this document contains 5,809 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT.

/s/ *William M. Jay*
WILLIAM M. JAY

NOVEMBER 4, 2026